DAN RAYFIELD
Attorney General
SCOTT KENNEDY #260337
BRIAN SIMMONDS MARSHALL #196129
TY BAIR #251894
Senior Assistant Attorneys General
BRAD MULLEN #245461
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Email: Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Ty.Bair@doj.oregon.gov
Brad.Mullen@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>MEHMET OZ, in his official capacity as Administrator for the Centers for Medicare & Medicaid Services; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>Defendants. | Case No. 6:26-cv-2435<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## I. INTRODUCTION

1. This case concerns a new Medicaid work requirement created in 2025 by H.R. 1—sometimes referred to as the “One Big Beautiful Bill Act.” That legislation conditions the Plaintiff States’ Medicaid funding on their implementation of what is, in effect, a transformative new eligibility system that will leverage healthcare coverage to incentivize work.

2. Congress created the Medicaid program in 1965 as a federal-state partnership. The program’s promise was straightforward: participating States would contribute administrative and financial resources, and the federal government would share the financial burden, all to deliver healthcare to the neediest among us. The ACA expansion then dramatically broadened Medicaid eligibility for those States that accepted it, but it did not fundamentally alter the program’s original objective of providing access to healthcare based on need.

3. The Plaintiff States agreed to participate in Medicaid after its inception, and they subsequently accepted the ACA’s expansion of Medicaid. In so doing, they accepted the terms of both programs—including their shared objective and the basic eligibility criteria that defined them—and made dramatic administrative and financial investments to implement them. The Plaintiff States, and many of their residents, have since come to rely on these programs. All of this, together with the programs’ structure and shared objectives, shaped the Plaintiff States’ expectations about how they would evolve over time.

4. H.R. 1’s new eligibility system now threatens to fundamentally transform the Medicaid program—including the ACA expansion—in ways participating States could not have anticipated. Congress could have, but did not, repeal the ACA’s Medicaid expansion in H.R. 1. Instead, it overlaid a novel eligibility system that imposes a work requirement on expansion enrollees. By creating this new eligibility system, H.R. 1 dramatically reshaped and redefined a program designed to provide medical assistance into a vehicle to encourage *work*, yet did so under the guise of merely amending it.

5. The work requirement will eventually leave millions of former and prospective Medicaid beneficiaries with no place to turn for basic healthcare. In practical terms, this means



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

reduced access to prenatal care for those who are pregnant; interruptions in critical treatment for those with chronic conditions; and suspension of medical screening, diagnostics, and preventative care, all of which can avert serious illness and death. And in a cruel irony, H.R. 1 will also render these individuals *less* able to work—and expose them to financial catastrophe through increasing medical debt—by depriving them of basic healthcare.

6. The Plaintiff States now have no realistic option but to implement H.R. 1's new eligibility system. Under 42 U.S.C. § 1396c, noncompliance with federal Medicaid requirements, including the H.R. 1's work requirement, can result in a State losing all of its federal Medicaid funding. The Supreme Court has previously characterized that threat as one no State could realistically resist—in effect, "a gun to the head." *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 581 (2012) (*NFIB*).

7. Nor can the Plaintiff States realistically avoid H.R. 1's work requirement by opting out of the ACA expansion. The States that accepted that expansion made dramatic administrative and financial investments when implementing it, and those States have since come to rely heavily on the program. Oregon, for example, implemented the ACA expansion in 2014. Roughly 564,177 individuals—about 16 percent of Oregon's adult population—are enrolled in the expansion group, for which approximately $5.1 billion, or 54 percent, of Oregon's federal Medicaid funding in the current fiscal year is attributable.

8. For all these reasons, this case presents the same fundamental issues of federalism that animated *NFIB*. There, the Supreme Court held that Congress could not compel States to join the ACA expansion by threatening their existing Medicaid funding because the expansion was effectively a new program, not a mere alteration of Medicaid.

9. *NFIB's* rationale, if taken seriously, demands the same result here. H.R. 1's work requirement will "transform" Medicaid by "surprising" States with a radical "shift in kind, not merely degree" around Medicaid eligibility. *Id.* at 584, 583. That makes H.R. 1's eligibility system "a new program," which Congress cannot compel the States to accept by threatening their existing Medicaid funds. *Id.* at 582.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

10. In short, because H.R. 1's work requirement effectively conditions continued participation in Medicaid on acceptance of a fundamentally different program, backed by the threat of crushing financial penalties, it exceeds Congress's authority under the Spending Clause.

11. The States therefore seek declaratory and injunctive relief to prevent the federal government from withholding Medicaid funding from a State that declines to implement H.R. 1's work requirement—and to avert the irreparable sovereign, fiscal, and public-health harms that would flow from its implementation.

## II. JURISDICTION AND VENUE

12. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States and officers sued in their respective official capacities. The State of Oregon is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Oregon.

## III. PARTIES

### A. Plaintiffs

14. Plaintiff the State of Oregon is a sovereign State of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

15. Plaintiff the State of Minnesota is a sovereign State of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

16. Plaintiff the State of New Mexico is a sovereign State of the United States. New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

17. Plaintiff the State of Washington, represented by and through its Attorney



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

General, is a sovereign State of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030(1) to pursue this action.

**B. Defendants**

1. Defendant Mehmet Oz is the Administrator for the Centers for Medicare & Medicaid Services. He is sued in his official capacity.

2. Defendant Robert F. Kennedy, Jr., is the Secretary of the U.S. Department of Health and Human Services. He is sued in his official capacity.

3. Defendant Centers for Medicare & Medicaid Services is a federal agency within the U.S. Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer the Medicaid program.

4. Defendant U.S. Department of Health and Human Services is a federal cabinet department within the executive branch of the United States government with authority over the Centers for Medicare & Medicaid Services.

## IV. BACKGROUND

### A. The Medicaid Program and Its Longstanding Purpose

#### i. The Medicaid Program

5. The Medicaid program was established in 1965 as Title XIX of the Social Security Act. Pub. L. No. 89-97, 79 Stat. 343 (1965).

6. Medicaid is a statutory grant program, the funding for which was intended to allow States to provide "(1) medical assistance on behalf of families with dependent children and of aged, blind, or permanently and totally disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1, Pub. L. No. 89-97, § 1901.

7. Medicaid was designed to require participating States to provide health care coverage to individuals who were receiving federal cash assistance under then-existing



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

cooperative federalism programs, including Aid to Families with Dependent Children (AFDC), Old Age Assistance, Aid to the Blind, and Aid to the Permanently and Totally Disabled. Those who were receiving cash benefits under those programs were deemed to be "categorically needy" and deserving of health care coverage.

8. Congress also allowed a State to opt to provide Medicaid benefits to an individual who fell within one of those categories, but whose income was too high to qualify under the standards. Those individuals were described as "medically needy."

9. Congress structured Medicaid according to a framework of cooperative federalism. The federal government provides financial assistance to participating States, and States furnish health care to qualifying individuals.

10. Since its inception, the federal government has provided at least 50% of the costs of (1) services delivered to recipients and (2) administration of the program. *See* 42 U.S.C. § 1396b.

11. The federal medical assistance percentage (FMAP) reflects the rate of federal funding, and the percentage is based on a formula that accounts for a State's per capita income. *Id*. § 1396d.

12. Federal financial participation (FFP) is the "Federal Government's share of a State's expenditures under the Medicaid program." 42 C.F.R. § 400.203. FFP payments are calculated and made to the States on a quarterly basis. 42 U.S.C. § 1396b(d).

13. A State covers the remaining costs of its Medicaid program and administers it pursuant to its individualized state Medicaid plan. *Id*. § 1396a(a).

14. State plans identify who is eligible for Medicaid, and they set standards and procedures to ensure that the healthcare and services provided under the program "will be provided[] in a manner consistent with simplicity of administration and the best interests of the recipients." *Id*. § 1396a(a)(19); *see also* 42 C.F.R. § 430.10.

15. State plans are reviewed, approved, and overseen by Centers for Medicare & Medicaid Services (CMS). 42 U.S.C. § 1396a(a)(6); 42 C.F.R. §§ 430.14–.15, .32.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

16. State plans must—subject to certain waivers—comply with federal requirements set forth in 42 U.S.C. § 1396a. 42 U.S.C. § 1396c.

17. If CMS determines that a state plan does not meet those requirements—or that a State is out of compliance with its plan—it may withhold that State's FFP payments as a way to bring that State into compliance. *See* 42 C.F.R. § 430.35.

**ii. Congressional Changes to the Medicaid Program Before 2010**

18. After creating Medicaid, Congress expanded the population of individuals who were eligible for healthcare coverage—as well as the services to which they were entitled—under the program. But before H.R. 1, Congress had never included a work requirement to the Medicaid program as a condition of eligibility.

19. In 1972, Congress created the Supplemental Security Income for the Aged, Blind, and Disabled (SSI) cash assistance program for low-income elderly people and persons with disabilities. Pub. L. No. 92-603, § 301 (1972). SSI replaced existing cooperative federalism grant programs for the aged, blind, and disabled; and the federal government took control of setting standards of need and funding the payments. When creating SSI, Congress also sought to ensure that States would not withdraw from Medicaid rather than cover those made eligible under the new SSI standards. It did so by requiring States to either (1) extend Medicaid eligibility to all individuals eligible for SSI or (2) allow those with incomes above the prior programs' eligibility levels to deduct their medical expenses from their income in order to qualify. 42 U.S.C. § 1396a(f).

20. Throughout the 1980s, Congress significantly grew the population of Medicaid-eligible individuals by incrementally expanding eligibility. And by 1982, every State had opted into Medicaid.

21. In 1981, for example, Congress reformed Medicaid coverage of long-term care services to reflect the growing national preference away from institutional care and towards in-home and community-based care. *See* Pub. L. No. 97-35, § 2176 (1981). Those reforms promoted state flexibility by allowing States to progress—as possible—toward community-based



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

care in exchange for increased federal funding.

22. In 1984, Congress required States to cover children under age five and first-time pregnant women who had previously been excluded from AFDC—and thus Medicaid—because of the presence of two parents in the household. Pub. L. No. 98-369, § 2361 (1984).

23. In 1986, Congress further expanded Medicaid coverage to all pregnant women who met the financial eligibility threshold for AFDC. Pub. L. No. 99-272, § 9501 (1986).

24. That same year, States were given the option to offer Medicaid coverage for low-income pregnant women and young children whose family incomes exceeded the AFDC threshold. Pub. L. No. 99-509, § 9401 (1986).

25. And in 1988, that option became a requirement as Congress decoupled Medicaid eligibility from AFDC standards and instead phased-in federal poverty level eligibility standards. *See* Pub. L. No. 100-360, § 302 (1988). Through that process, Medicaid coverage eventually reached (1) all children up to age five and pregnant women with family incomes under 133% of the federal poverty level, and (2) children from five to 18 with family incomes under 100% of the federal poverty level. *Id.*; *see also* Pub. L. No. 101-239, § 6401 (1989); Pub. L. No. 101-508, § 4601(a)(1) (1990).

26. As Congress reformed Medicaid eligibility for children and pregnant women, it also began lowering the eligibility floor for lower-income elderly people and persons with disabilities. *See* Pub. L. No. 99-509, § 9403; Pub. L. No. 100-360, § 301 (requiring States to implement a new Medicaid option for States to receive federal payments toward coverage of Medicare premiums and cost-sharing for persons with incomes below the poverty line).

27. In 1990, Congress required States to phase in a cost-sharing approach for people with family incomes up to 120% of the federal poverty line. Pub. L. No. 101-508, § 4501.

28. And throughout the 1990s, Congress created additional innovations to Medicaid, including providing improved services to individuals in nursing homes, *see* Pub. L. No. 100-203, §§ 4211–13 (1987), and allowing States greater flexibility in administration through the creation of managed care delivery systems, such as HMOs. *See* Pub. L. No. 105-33, § 4701(a) (1997).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

29. The 1990s also saw Congress adopt wholesale changes to public assistance programs generally.

30. In 1996 Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA). Pub. L. No. 104-193, 110 Stat. 2105 (1996).

31. PRWORA made wholesale changes to particular immigrants' eligibility for government assistance programs, including Medicaid. But it did not alter the fundamental objective of Medicaid, nor did it significantly rework Medicaid's eligibility criteria. Instead, PRWORA reflected a Congressional policy around immigration—which was based on Congress's broad immigration and naturalization power—that applied across federal benefit programs, including federal-state partnerships like Medicaid.

**iii. Congress Enacted a Wholesale Change to Medicaid in 2010 with the ACA**

32. Congress enacted the Patient Protection and Affordable Care Act (ACA) in 2010. Pub. L. No. 111-148, 124 Stat. 119 (2010).

33. The ACA was formulated to increase the number of Americans covered by health insurance and decrease the cost of health care. In that way, the ACA continued the trend of expanding Medicaid eligibility described above, and it reinforced the original objective of Medicaid to promote healthcare coverage for those in need.

34. The ACA's goal was accomplished—in part—by expanding the population of Medicaid-eligible individuals. It made new federal funds available to States that agreed to extend coverage to all individuals under age 65 who have incomes below 133% of the federal poverty line. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).

35. The Supreme Court's decision in *NFIB* effectively allowed States to choose whether to opt in to the ACA expansion and cover the ACA expansion population. Under *NFIB*, States that declined to do so lost none of their pre-existing Medicaid funding.

36. Currently, 40 States and the District of Columbia have chosen to participate in Medicaid Expansion under the ACA. Approximately 66 million people are enrolled in Medicaid, 19.2 million of whom are eligible under the ACA's Medicaid Expansion. Ctrs. for Medicare &



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Medicaid Servs., *June 2026: Medicaid and CHIP Eligibility Operations and Enrollment Snapshot* (Sept. 25, 2026), https://perma.cc/VZL7-2R2J; Peter Nelson et. al, Off. of the Assistant Sec'y for Plan. & Evaluation, *ACA Exchange Enrollment in 2026* (June 26, 2026), https://perma.cc/6QFN-F768.

**iv. CMS's Role in Section 1115 Waivers and Past Work Requirement Efforts**

37. As part of its review of state plans, CMS evaluates Section 1115 Waivers submitted by States. *See* 42 U.S.C. § 1315(d). Under Section 1115 of the Social Security Act, a State may request authorization to adopt experimental or demonstration projects with the goal of encouraging States to develop innovative programs that promote the objectives of Medicaid. An approved demonstration project results in the waiver of certain general federal requirements for Medicaid state plans that are set out in 42 U.S.C. § 1396a.

38. Historically, States were barred from imposing a work requirement as part of a Section 1115 Waiver.

39. For example, Arizona requested to implement a work requirement or similar activity-based restriction in 2016. *See* Letter from Andrew Slavitt, Acting Admin., CMS, to Thomas Betlach, Dir. Ariz. Health Care Cost Containment Sys. (Sep. 30, 2016), https://perma.cc/RJ6X-M5Q6. But CMS denied that request, explaining that a work requirement "could undermine access to care and do[es] not support the objectives of the program." *Id.*

40. Similarly, New Hampshire requested to amend its Medicaid demonstration project to impose a work requirement. *See* Letter from Vikki Wachnio, Dir., CMS, to Jeffrey Meyers, Comm'r N.H. Dep't of Health & Hum. Servs. (Nov. 1, 2016), https://perma.cc/CE4S-GBTS. CMS denied the requests, writing that the request "could undermine access, efficiency, and quality of care provided to Medicaid beneficiaries and do[es] not support the objectives of the Medicaid program." *Id.*

41. CMS subsequently departed from that understanding and allowed state-based experimentation with a work requirement. For example, CMS allowed Arkansas to implement a work requirement. Letter from Seema Verma, Admin., CMS, to Cindy Gillespie, Dir., Ark. Dep't



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

of Human Servs. (Mar. 5, 2018). But after Arkansas implemented a work and community engagement requirement, the uninsured rate among working age, low-income individuals increased. Benjamin Sommers et al., *Medicaid Work Requirements—Results from the First Year in Arkansas*, 381 NEJM 1073 (2019), https://perma.cc/EZ98-AY29.

42. When CMS approved a work requirement for state plans in Kentucky, Arkansas, and New Hampshire, those waivers were also challenged in court. *See Rose v. Becerra*, No. 19-2848 (JEB), 2024 WL 3202342, at *1 (D.D.C. June 27, 2024) (citing and collecting cases). The waivers were invalidated, with courts "finding them inconsistent with the Medicaid Act." *Id.*

43. CMS recognized the failures of the work requirement experiments and revoked the waivers, noting its concerns that such policies would "create a risk of substantial loss of health care coverage and harm to beneficiaries." Letter from Elizabeth Richter, Acting Admin., CMS, to Dawn Stehle, Deputy Dir., Ark. Dep't of Hum. Servs. (Mar. 17, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ar-works-ca2.pdf [https://perma.cc/K6QL-AXP9].

**v. H.R. 1's New Requirements for Medicaid Expansion Enrollees**

44. Medicaid's longstanding policy of promoting healthcare access for those who most need it was radically altered when Congress enacted H.R. 1 in 2025. Pub. L. No. 119-21, 139 Stat. 172 (2025).

45. H.R. 1 requires States to impose a work or "community engagement" activity requirement for "applicable individuals" within the ACA expansion population. *See* 42 U.S.C. § 1396a(xx).

46. "Applicable individuals" are those who—"other than a specified excluded individual"—are (1) eligible for or enrolled in a state Medicaid plan's coverage, or under a waiver of a state plan, for the ACA expansion population; and (2) between the ages of 19 and 64, not pregnant, not entitled to or enrolled in Medicare Part A or B, and not eligible to enroll in mandatory coverage under a Medicaid state plan. *Id.* § 1396a(xx)(9)(A)(i).

47. H.R. 1 excludes certain individuals from the work requirement. *Id.*



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

§ 1396a(xx)(9)(A)(ii). For example, H.R. 1 excludes individuals who are "medically frail," a term which includes individuals who are blind, disabled, have a substance use disorder, or a serious or complex medical condition. *Id*. § 1396a(xx)(9)(A)(ii)(V). Veterans with disabilities "rated as total," *id*. § 1396a(xx)(9)(A)(ii)(IV), and individuals who are the "parent, guardian, caretaker, relative, or family caregiver . . . of a dependent child 13 years of age and under or a disabled individual" are also excluded from the work requirement, *id*. § 1396a(xx)(9)(A)(ii)(III).

48. H.R. 1 also changes the frequency of eligibility redeterminations for expansion population enrollees, requiring redeterminations every six months rather than annually. *Id.* § 1396a(e)(14)(L). States may also elect to verify compliance with the work requirement even more frequently than just at redetermination. *Id*. § 1396a(xx)(4).

49. The statute specifies ways in which an "applicable individual" can—each month—satisfy the newly-created requirement. *Id*. § 1396a(xx)(2). They include (1) working at least 80 hours, (2) completing 80 hours of community service, (3) participating in a work program for at least 80 hours, (4) being "enrolled in an educational program at least half-time," (5) engaging in a combination of those activities for at least 80 hours, (6) having a monthly income that is greater than the federal minimum wage multiplied by 80 hours, or (7) meeting a similar monthly income level as a seasonal worker. *Id.* State plans may provide exceptions from the work requirement for specific short-term hardship events. *Id*. § 1396a(xx)(3)(B).

50. The work requirement may not be waived as part of a Section 1115 Waiver. *Id.* § 1396a(xx)(10). There is a limited-term exemption based on a State's good faith effort to comply with the newly-imposed work requirement. *Id*. § 1396a(xx)(11). But any exemption granted expires by December 31, 2028, and it may not be renewed beyond that date. *Id.* § 1396a(xx)(11)(c)(i).

## V. HARMS TO PLAINTIFF STATES

51. H.R. 1's work requirement injures the Plaintiff States in multiple respects.

52. *First*, it threatens the Plaintiff States' sovereign interests because it "commandeers a State's legislative or administrative apparatus for federal purposes" by "using



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

financial inducements to exert a power akin to undue influence." *NFIB*, 567 U.S. at 577 (citation modified). In that way, this "legislation runs contrary to our system of federalism." *Id.* at 577–78; *see also Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022) (recognizing that a coercive Spending Clause violation gives rise to a cognizable injury to state sovereignty).

53. *Second*, H.R. 1's work requirement is also imposing—and will continue to impose—direct administrative compliance costs on state Medicaid agencies.

54. The purpose of the ACA was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. States were therefore incentivized to create streamlined, automated technology systems with the goal of making real-time eligibility determinations for Medicaid applicants whenever possible using available and reliable data sources.

55. However, in an about-face, H.R. 1's work requirement effectively mandates that the Plaintiff States build—at significant expense—a new and dramatically more complex eligibility system to gather data from applicable individuals and verify compliance. The high cost of implementing such an administrative system is undeniable and has been acknowledged by both Congress (in passing H.R. 1) and CMS (in implementing it). While Congress appropriated *some* funds to offset these costs, those funds covered only a portion of what States must invest.

56. *Third*, H.R. 1's work requirement will predictably create substantial additional costs for the Plaintiff States when those States' residents lose Medicaid coverage then obtain uncompensated care from state-funded institutions.

57. H.R. 1's work requirement is expected to result in large-scale disenrollment of Medicaid beneficiaries. This will happen either because those beneficiaries failed to work sufficient hours or, in many cases, because they simply failed to navigate the process of documenting their work or demonstrating an exemption. One study estimated that Oregon, for example, will be forced to disenroll approximately 20% of its Medicaid enrollees due to the work requirement. Large-scale disenrollment due to H.R. 1's work requirement will begin early in 2027. And cruelly, those who are disenrolled for failing to show compliance with the work



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

requirement will *also* lose their ability to purchase subsidized coverage through an ACA exchange, *see* 42 U.S.C. § 1396a(xx)(7)(B), meaning they will likely be unable to obtain an alternative source of coverage.

58. Those newly uninsured residents will inevitably experience increased rates and severity of medical emergencies due to the absence of non-emergency preventive care services that would otherwise have been provided through Medicaid. And the Plaintiff States' public hospitals—which are required to treat patients regardless of ability to pay, *see id*. §1395dd—will be forced to absorb those costs.

59. This, in turn, will place a burden on state-supported hospitals, and on the State's uncompensated care funds. These costs are particularly stark given that emergency care is more expensive than the preventative care those patients would otherwise have obtained through Medicaid.

60. Other associated harms flowing from disenrollment will include public health impacts, because rates and severity of untreated or undertreated disease increase. Disenrollment will also cause economic harms because those who lose coverage are more likely to incur medical debt, face bankruptcy, and struggle to find or maintain jobs. State agencies will be left to manage these consequences and absorb the associated costs.

## VI. CAUSES OF ACTION

### COUNT I
### Violation of the Constitution
### Spending Clause
### (Against All Defendants)

61. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

62. The Spending Clause permits Congress to "lay and collect Taxes[] . . . and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl.1. Under that power, Congress generally may "attach conditions on the receipt of federal



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

funds" as a means of promoting the general welfare. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

63. However, this fundamental power exists subject to equally fundamental constraints. Among them is the rule that "Congress cannot use its spending power as a bludgeon." *Chippewa Cree Tribe v. U.S. Dep't of Interior*, 900 F.3d 1152, 1160 (9th Cir. 2018). Specifically, when Congress imposes funding conditions that "take the form of threats to terminate other significant independent grants," then "the conditions are properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580. Such "financial inducement" is permissible when it amounts to "relatively mild encouragement." *Id.* at 581. But it crosses the line when it "leaves the States with no real option but to acquiesce." *Id.* at 582.

64. "Accordingly, Congress may offer conditional funding only if the State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (citation modified).

65. The anti-coercion principle outlined by the Supreme Court in *NFIB* relied on—and expanded—several other core principles of the Court's Spending Clause jurisprudence.

66. *First*, *NFIB* reiterated that the spending power "does not include surprising participating States with post-acceptance or retroactive conditions" on funding. *Id.* at 584. This is because "Spending Clause legislation as much in the nature of a *contract*." *Id.* at 577.

67. *Second*, Spending Clause cases often scrutinize whether conditions on funding are "directly related to one of the main purposes for which" the threatened "funds are expended." *Id.* at 580 (citing *Dole*, 483 U.S. at 208). This is because "conditions on federal grants might be illegitimate if they are unrelated to the federal interest" in, or the "goal of," the funding program at issue. *Dole*, 483 U.S. at 208–09.

68. *Third*, *NFIB* emphasized that the anti-coercion doctrine is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577.

69. Each of these principles informed the Spending Clause analysis in *NFIB*. The



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Court reasoned that the ACA expansion effectively represented a new program because it caused a dramatic shift in Medicaid's purpose and scope—one that States "could hardly anticipate" when they joined the program. *Id.* at 584. Importantly, the Court construed the ACA expansion as a new program *even though* it purported only to modify eligibility for the existing Medicaid program, and *even though* Congress did not threaten funding from any other program. Because the expansion represented a new program, the federal government could not compel States to adopt it by threatening their existing Medicaid funds, because doing so would undermine the States' sovereign prerogative to decline participation in a federal policy. *See id.* at 583–85.

70. Those principles lead to the same conclusion here. H.R. 1's new eligibility system will "transform" Medicaid by "surprising" States with a radical "shift in kind, not merely degree" around Medicaid eligibility. *NFIB*, 567 U.S. at 584, 583. This is true even though "Congress may have styled" the work requirement as "a mere alteration of existing Medicaid." *Id.* at 584. Therefore, Congress cannot compel States to implement this new system by threatening to withhold their existing Medicaid funds. Any other result would "threaten the political accountability key to our federal system," because States lack "a legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 578.

71. The purpose and history of Medicaid show why H.R. 1's new eligibility system fundamentally redefines the program in ways that States could not reasonably have anticipated. Medicaid was initially created to provide healthcare for a limited population of aged, blind, and disabled individuals, as well as low-income, single-parent families. As noted above, the ACA subsequently expanded its scope to include a larger portion of the population, but it did not alter the program's fundamental purpose. Instead, the program has always been understood to be one about promoting *healthcare coverage*.

72. Congress has never before included a work requirement as a condition of Medicaid eligibility. Indeed, courts construed the Medicaid statute to effectively *forbid* such requirements even when the Executive Branch and a State agreed to impose them. *See Rose*, 2024 WL 3202342, at *1 (collecting cases). If Congress can impose such requirements now, then



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

"Medicaid is no longer a program to care for the neediest among us," nor even one "to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level." *NFIB*, 567 U.S. at 583. Instead, "Medicaid [will be] transformed into a program" to promote *work*. *Id.* It does so by forcing States to implement a vast, burdensome, and unexpected eligibility system that scrutinizes residents' *activity*—and leverages their healthcare to incentivize work—rather than conditioning eligibility on need.

73. Moreover, the penalty for a State's failure to adopt this shift in the program would be intolerably severe. H.R. 1 does not include a stand-alone penalty for States that fail to implement the work requirement. Instead, as with the ACA expansion in *NFIB*, non-complying States are subject 42 U.S.C. § 1396c, which "provides that if a State's Medicaid plan does not comply with the Act's requirements, [CMS] may declare that further payments will not be made to the State." *NFIB*, 567 U.S. at 581. A State that "opts out of" H.R. 1's work requirement "thus stands to lose not merely a relatively small percentage of its existing Medicaid funding, but *all* of it." *Id.*

74. Nor could the Plaintiff States realistically seek to evade the work requirement by opting out of the ACA expansion. In Oregon, for example, the ACA expansion accounts for more than *half* of the State's total federal Medicaid funding. Having already built up the expectations of residents who came to rely on coverage from the expansion—and having also invested substantial administrative resources into implementing that policy—it is simply too late for States to back out now *even if* they were willing to abandon the ACA's promise of increasing health coverage. Doing so would trigger loss of healthcare coverage on an unprecedented scale with catastrophic consequences for public health.

75. Thus, regardless of whether a State's failure to implement H.R. 1's work requirement is understood to trigger a threat of total Medicaid funding loss, or just a loss of ACA expansion funding, it amounts to "economic dragooning that leaves the States with no real option but to acquiesce" in a fundamental policy shift they could not have anticipated. *NFIB*, 567 U.S. at 582. This exceeds Congress's spending power.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a. Declare it unconstitutional for Defendants to withdraw or suspend any existing federal Medicaid funds under 42 U.S.C § 1396c due to a Plaintiff State's failure to comply with the requirements in 42 U.S.C. § 1396a(xx);

b. Preliminarily and permanently enjoin Defendants from withdrawing or suspending any existing federal Medicaid funds under 42 U.S.C § 1396c due to a Plaintiff State's failure to comply with the requirements in 42 U.S.C. § 1396a(xx);

c. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

d. Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

e. Award such additional relief as this Court may deem just and proper.

DATED November 5, 2026.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Scott Kennedy*
SCOTT KENNEDY #260337
BRIAN SIMMONDS MARSHALL #196129
TY BAIR #251894
Senior Assistant Attorneys General
BRAD MULLEN #245461
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Ty.Bair@doj.oregon.gov
Brad.Mullen@doj.oregon.gov

*Counsel for the State of Oregon*

**KEITH ELLISON**
Attorney General
State of Minnesota

By: *s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7403 (Voice)
(651) 282-5832 (Fax)
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: *s/ Mark Noferi*
MARK NOFERI
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov

*Counsel for the State of New Mexico*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ William McGinty*
WILLIAM MCGINTY
Deputy Solicitor General
CRISTINA SEPE
Managing Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
william.mcginty@atg.wa.gov
cristina.sepe@atg.wa.gov

*Counsel for the State of Washington*