DAN RAYFIELD
Attorney General
SCOTT KENNEDY #260337
BRIAN SIMMONDS MARSHALL #196129
TY BAIR #251894
Senior Assistant Attorneys General
BRAD MULLEN #245461
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Email: Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Ty.Bair@doj.oregon.gov
Brad.Mullen@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MEHMET OZ, in his official capacity as Administrator for the Centers for Medicare & Medicaid Services, et al.,<br><br>Defendants. | Case No. 6:26-cv-02435-AA<br><br>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>EXPEDITED HEARING REQUESTED |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iii

LR 7-1 CERTIFICATION ..... 1

MOTION ..... 1

MEMORANDUM OF LAW ..... 1

INTRODUCTION ..... 1

BACKGROUND ..... 4

I. For Generations, and Through Multiple Expansions, Medicaid has Remained a Program to Provide Healthcare for Those in Need ..... 4

A. Medicaid Generally ..... 4

B. Congressional Changes to Medicaid Eligibility ..... 5

1. Congressional Reforms Expanded Medicaid's Reach ..... 5

2. Congressional Changes to Medicaid Included as Part of "Welfare Reform" ..... 7

3. The ACA Represented the Largest Congressional Expansion of Medicaid ..... 8

C. CMS's Administration of Medicaid ..... 9

II. H.R. 1's Work Requirement Radically Departs from Medicaid's History and Purpose ..... 10

LEGAL STANDARD ..... 13

ARGUMENT ..... 14

I. H.R. 1's Work Requirement Exceeds Congress's Spending Power ..... 14

A. Congress's Spending Power is Subject to Key Constraints ..... 14

B. H.R. 1's Work Requirement is Unconstitutionally Coercive ..... 18

1. The Work Requirement Fundamentally Transforms Medicaid in Ways Participating States Could Not Have Foreseen ..... 18



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

2. Given the Penalties at Stake, States Have No Practical Choice but to Implement H.R. 1's Work Requirement ................ 26

II. The Court Should Declare That Disallowance of Funds Under § 1396c for Failure to Implement § 1396a(xx)(2) Would Be Unlawful .................................. 32

CONCLUSION ........................................................................................................... 32



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025) ....................31

*Becerra v. Gresham*,
142 S. Ct. 1665 (2022) ....................20, 21

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) ....................21

*Chippewa Cree Tribe v. U.S. Dep't of Interior*,
900 F.3d 1152 (9th Cir. 2018) ....................14, 15

*City & Cnty. of San Francisco v. Trump*,
816 F. Supp. 3d 1017 (N.D. Cal. 2026) ....................31

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ....................14, 15

*Golden v. Zwickler*,
394 U.S. 103 (1969) ....................13

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ....................20, 21, 25

*Gruver v. Louisiana Bd. of Supervisors*,
959 F.3d 178 (5th Cir. 2020) ....................31

*Harris v. McRae*,
448 U.S. 297 (1980) ....................4, 19

*IDK, Inc. v. Clark Cnty.*,
836 F.2d 1185 (9th Cir. 1988) ....................13

*Korab v. Fink*,
797 F.3d 572 (9th Cir. 2014) ....................7

*Mahew v. Burwell*,
772 F.3d 80 (1st Cir. 2014), *cert. denied*, 576 U.S. 1004 (2015) ....................30–31

*Massachusetts v. Oz*,
No. CV 26-12962-RGS, 2026 WL 3257397 (D. Mass. Oct. 29, 2026) ....................11

*Mathews v. Diaz*,
426 U.S. 67 (1976) ....................23



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025)....23, 26

*Mississippi Comm'n on Env't Quality v. E.P.A.*,
790 F.3d 138 (D.C. Cir. 2015)....31

*Nat'l Fed. of Indep. Bus v. Sebelius*,
567 U.S. 519 (2012).... *passim*

*Newton-Nations v. Betlach*,
660 F.3d 370 (9th Cir. 2011) ....21

*Peebler v. Reno*,
965 F. Supp. 28 (D. Or. 1997) ....13–14

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)....16

*Pharm. Research & Mfrs. of Am. v. Concannon*,
249 F.3d 66 (1st Cir. 2001), *aff'd*, 538 U.S. 644, (2003) ....19

*Philbrick v. Azar*,
397 F. Supp. 3d 11 (D.D.C. 2019), *aff'd*, No. 19-5293, 2020 WL 261222 (D.C. Cir. May 20, 2020)....20–21

*Phoenix Mem'l Hosp. v. Sebelius*,
622 F.3d 1219 (9th Cir. 2010) ....9

*Price v. Medicaid Dir.*,
838 F.3d 739 (6th Cir. 2016) ....19

*Printz v. United States*,
521 U.S. 898 (1997)....17

*Rapanos v. United States*,
547 U.S. 715 (2006)....25

*Schweiker v. Gray Panthers*,
453 U.S. 34 (1981)....4

*Schweiker v. Hogan*,
457 U.S. 569 (1982)....5, 23

*South Dakota v. Dole*,
483 U.S. 203 (1987)....14, 15, 16–17

*Steward Machine Co. v. Davis*,
301 U.S. 548 (1937)....17



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

*Stewart v. Azar*,
313 F. Supp. 3d 237 (D.D.C. 2018) ........ 8, 20, 21

*Stewart v. Azar*,
366 F. Supp. 3d 125 (D.D.C. 2019) ........ 20, 21, 23

*Univ. of Wash. Med. Ctr. v. Sebelius*,
634 F.3d 1029 (9th Cir. 2011) ........ 19

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl.1 ........ 14

**STATUTES, REGULATIONS, RULES**

28 U.S.C. § 2201 ........ 13

29 U.S.C. § 36B ........ 12, 25

42 U.S.C.
§ 601–619 ........ 7
§ 601 ........ 7
§ 607 ........ 8

42 U.S.C. § 1304 ........ 14

42 U.S.C. § 1315 ........ 9, 12

42 U.S.C.
§ 1396 ........ 4, 9, 10
§ 1396-1 ........ *passim*
§ 1396a ........ *passim*
§ 1396a(a) ........ 4, 6, 8, 9, 12
§ 1396a(e) ........ 8, 11, 12
§ 1396a(f) ........ 6
§ 1396a(xx) ........ *passim*
§ 1396b ........ 4
§ 1396b(d) ........ 4
§ 1396b(u) ........ 13, 25
§ 1396b(v) ........ 7
§ 1396c ........ *passim*
§ 1396d ........ 4, 19
§ 1396u-1 ........ 8

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, 124 Stat. 119 (2010) ........ *passim*



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Personal Responsibility and Work Opportunity Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 (1996)....7, 8, 23

Pub. L. No. 89-97, 79 Stat. 286 (1965)....4

Pub. L. No. 92-603, 86 Stat. 1329 (1972)....6

Pub. L. No. 98-369, 98 Stat. 494 (1984)....6

Pub. L. No. 99-272, 100 Stat. 82 (1986)....6

Pub. L. No. 99-509, 100 Stat. 1874 (1986)....6

Pub. L. No. 100-203, 101 Stat. 1330 (1987)....7

Pub. L. No. 100-360, 102 Stat. 683 (1988)....6

Pub. L. No. 101-239, 103 Stat. 2106 (1989)....6

Pub. L. No. 101-508, 104 Stat. 1388 (1990)....6, 7

Pub. L. No. 105-33, 111 Stat. 251 (1997)....7

Pub. L. No. 119-21, 139 Stat. 72 (2025).... *passim*

42 C.F.R.
§ 400.203....4
§ 430.10....4–5
§ 430.14–15....9
§ 430.32....9
§ 430.35....10
§ 431.806....13
§ 431.1010....13, 25
§ 435.916....12

Fed. R. Civ. P. 56....1, 13

Local Rule 7-1(a)....1

**OTHER AUTHORITIES**

171 Cong. Rec. H3147 (daily ed. July 2, 2025)....22

171 Cong. Rec. H3184 (daily ed. July 2, 2025)....22

171 Cong. Rec. S4045 (daily ed. June 30, 2025)....22

171 Cong. Rec. S4074 (daily ed. June 30, 2025)....10



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Cong. Budget Off., *Pub. L. 119-21, to Provide for Reconciliation Pursuant to Tile II of H. Con. Res. 14 Title VII, Finance, Subtitle B, Health, Chapter 1, Medicaid* (2025), https://www.cbo.gov/system/files/2025-10/PL-119-21-Medicaid%20_0.pdf ....................10, 29

Cong. Budget Off., *Estimated Budgetary Effects of Pub. L. 119-21, to Provide for Reconciliation Pursuant to Tile II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* (2025), https://www.cbo.gov/publication/61570 ....................10

Ctrs. for Medicare & Medicaid Servs., *June 2026: Medicaid and CHIP Eligibility Operations and Enrollment Snapshot* (Sep. 2026), https://www.medicaid.gov/resources-for-states/downloads/eligib-oper-and-enrol-snap-jun2026.pdf [https://perma.cc/VZL7-2R2J]....................9

H.R. Rep. No. 213, 89th Cong., 1st Sess. (1965) ....................5

KFF, *Tracking Implementation of the 2025 Reconciliation Law: Medicaid Work Requirements* (Sep. 29, 2026), https://www.kff.org/medicaid/medicaid-work-requirements-tracker-overview/ [https://perma.cc/7M98-NRBV] ....................29

Letter from Andrew Slavitt, Acting Admin., CMS, to Thomas Betlach, Dir., Ariz. Health Care Cost Containment Sys. (Sep. 30, 2016), https://www.azahcccs.gov/Resources/Downloads/1115Waiver/LetterToState09302016.pdf [https://perma.cc/8BSK-HK8X] ....................20

Letter from Dan Brillman, Deputy Admin., CMS, to State Medicaid Directors (Mar. 6, 2026), https://www.medicaid.gov/federal-policy-guidance/downloads/smd26001.pdf....................12

Letter from Elizabeth Richter, Acting Admin., CMS, to Dawn Stehle, Dep. Dir., Ark. Dep't of Human Servs. (Mar. 17, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ar-works-ca2.pdf [https://perma.cc/K6QL-AXP9]....................20

Medicaid.gov, *June 2026 Medicaid & CHIP Enrollment Data Highlights*, https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights [https://perma.cc/A6VW-NZG5] (last visited Oct. 21, 2026) ....................9

Peter Nelson et al., Off. of the Assistant Sec'y for Plan. & Eval., *ACA Exchange Enrollment in 2026* (June 26, 2026), https://aspe.hhs.gov/sites/default/files/documents/f5f29954221d5b5713070ac2541fda8e/aca-enrollment-report-2026-final-version.pdf [https://perma.cc/6QFN-F768] ....................9

S. Rep. No. 1589, 87th Cong., 2d Sess. (1962) ....................9–10



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

## LR 7-1 CERTIFICATION

Pursuant to Local Rule 7-1(a), Plaintiffs' counsel certify that they offered to confer with the Civil Chiefs of the U.S. Attorney's Office for the District of Oregon on this motion immediately after the Complaint was filed. The U.S. Attorney's Office was not in a position to confer on this motion today. Plaintiffs' counsel anticipate that Defendants will oppose this motion.

## MOTION

Plaintiffs move under Rule 56 for entry of summary judgment in their favor on their claim for declaratory relief. This motion is supported by the following memorandum of law and the declarations filed simultaneously with this motion. Absent a waiver, the work requirement provision of H.R. 1 that is the subject of this lawsuit applies no later than January 1, 2027. 42 U.S.C. § 1396a(xx)(1). Plaintiffs therefore request an expedited hearing to allow the Court to rule on this motion by December 31, 2026.

## MEMORANDUM OF LAW

### INTRODUCTION

Congress created the Medicaid program in 1965 as a federal-state partnership. The program's promise was straightforward: States that chose to participate would contribute administrative and financial resources, and the federal government would do the same, all with the goal of promoting healthcare coverage for the neediest among us. Over the next two decades, every State joined. The program was also incrementally expanded to include new categories of eligibility in pursuit of its original objective.

Then in 2010, Congress enacted the Patient Protection and Affordable Care Act (ACA), which marked a major change. It expanded Medicaid to include the nation's entire non-elderly population below 133 percent of the federal poverty level. Following the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*), state participation in that expansion became optional. But as with the original Medicaid program, States that chose to participate were opting into something like a contract: the States



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

had to restructure their Medicaid programs and dedicate substantial resources to implementation. In return, the federal government would provide an enormous new infusion of funding with a simple goal: "to increase the number of Americans covered by health insurance." *Id.* at 538.

In 2025, the terms of these two deals took a dramatic turn. Congress enacted H.R. 1, commonly known as the "One Big Beautiful Bill Act." Pub. L. No. 119-21 (2025). It superimposes a new eligibility system on Medicaid that, for the first time in the program's 60-year history, will make healthcare coverage contingent on work. Also for the first time, the legislation will significantly shrink the Medicaid program by threatening to throw millions of beneficiaries out of it. This will happen either because those beneficiaries failed to work sufficient hours or, in many cases, because they simply failed to properly document their work or demonstrate an exemption. Most of those disenrolled will lack any alternative source of healthcare coverage—something H.R. 1 all but ensured by cruelly deeming anyone disenrolled by the work requirement to *also* be ineligible for subsidized coverage through the ACA. Those individuals will therefore lose access to treatment for chronic conditions, preventative medicine, and most other routine medical care. The inevitable results will include increasing strain on hospitals from uncompensated emergency visits, higher rates of uncontrolled disease, increasing medical debt, and eventually, preventable deaths.

H.R. 1's new eligibility system also puts States that signed up for Medicaid and the ACA expansion in a bind. It will be the States—not the federal government—tasked with enforcing this new eligibility system by finding beneficiaries subject to the requirement who cannot document whether they satisfied it. And it will be the States delivering the bad news to those disenrolled. But those States do not have a realistic option to decline this policy. If they fail to implement it, then by operation of law, they stand to lose *all* of their Medicaid funding—a threat the Supreme Court previously characterized as "a gun to the head." *NFIB*, 567 U.S. at 581. Nor could those States realistically seek to evade the work requirement by opting out of the ACA expansion. For many States, the ACA expansion accounts for half or more of their total federal Medicaid funding. Having already built up the expectations of residents who came to rely on



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

coverage from the expansion—and having also invested substantial administrative resources into implementing that policy—it is simply too late for States to back out now *even if* they were willing to abandon the ACA's promise of increasing health coverage.

The financial penalty accompanying H.R. 1's work requirement is therefore unconstitutionally coercive and exceeds Congress's spending power. In *NFIB*, the Court held that Congress could not compel States to join the ACA expansion by threatening their existing Medicaid funding because that expansion was effectively a new program, not a mere alteration of the original one. That rationale leads to the same result here. H.R. 1's work requirement will "dramatically" change Medicaid by "surprising" States with a "shift in kind, not merely degree" around Medicaid eligibility. *Id.* at 584, 583. Under the legislation's new system, Medicaid "is no longer a program to care for the neediest among us," but instead will be "transformed into a program" that, for the first time in its 60-year history, is designed to promote *work* by leveraging healthcare. *Id.*

H.R. 1 therefore imposes a more radical transformation than even the ACA expansion. While the latter merely broadened eligibility, H.R. 1 requires state agencies to rebuild their eligibility systems to scrutinize beneficiaries' activities—a task that bears no relationship to the objective of Medicaid or the eligibility criteria that previously governed it. In fact, courts previously interpreted the Medicaid statute to effectively *forbid* States from conditioning Medicaid eligibility on work. Because States "could hardly anticipate" such the fundamental shift in H.R. 1, the federal government cannot now "penalize" those that decline implement this new eligibility system "by taking away their existing Medicaid funding." *Id.* at 583, 585. Any other result would "threaten the political accountability key to our federal system," because under these circumstances, States lack "a legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 578.

For all these reasons, the Court should declare that withholding any existing federal Medicaid funding from Plaintiff States that decline to implement H.R. 1's work requirement would be unconstitutional. Just as *NFIB* did with respect to the ACA expansion, this would



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

render state participation in H.R. 1's new eligibility system optional.

## BACKGROUND

### I. For Generations, and Through Multiple Expansions, Medicaid has Remained a Program to Provide Healthcare for Those in Need

#### A. Medicaid Generally

The Medicaid program was established in 1965 as Title XIX of the Social Security Act. *Schweiker v. Gray Panthers*, 453 U.S. 34, 36 (1981) (citing Pub. L. No. 89-97, § 121 (1965), as amended, 42 U.S.C. § 1396 *et seq.*). Its statutory grants were intended to allow States to provide "(1) medical assistance on behalf of families with dependent children and of aged, blind, or permanently and totally disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." Pub. L. No. 89-97, § 121; *as codified at* 42 U.S.C. § 1396-1.

Medicaid was created as "a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308 (1980). Under Medicaid, the federal government provides at least 50% of the costs of (1) services delivered to recipients and (2) administering the program. *See* 42 U.S.C. §§ 1396b, 1396d(b) (setting out the formula for determination of federal medical assistance percentage (FMAP), which varies based on a State's per capita income). The "Federal Government's share of a State's expenditures under the Medicaid program" is known as federal financial participation (FFP). 42 C.F.R. § 400.203. FFP payments are calculated and made to the states on a quarterly basis. 42 U.S.C. § 1396b(d).

Each State covers the remaining costs of its Medicaid program and administers it pursuant to its individualized state Medicaid plans. 42 U.S.C § 1396a. State plans provide safeguards and standards to ensure that recipients are eligible for Medicaid and that the care and services required under the program "will be provided[] in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19); *see also* 42 C.F.R.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

§ 430.10. State plans generally must comply with the requirements set out in 42 U.S.C. § 1396a. *See* 42 U.S.C. § 1396c. Failure to comply with those federal requirements may result in the Secretary of HHS withholding a State's FFP payments. *Id*; *see also NFIB*, 567 U.S. at 541–42 (to receive federal funding, States have had to "comply with federal criteria governing matters such as who receives care and what services are provided at what cost.").

**B. Congressional Changes to Medicaid Eligibility**

From its inception, Medicaid has been based on need. It originally required participating States to provide health care coverage for individuals receiving assistance under then-existing federal programs "for the aged, the blind, the disabled, and families with dependent children." *Schweiker v. Hogan*, 457 U.S. 569, 572 (1982). Congress understood that people receiving benefits under those programs were among "the most needy in the country," and that "it is appropriate for medical care costs to be met, first, for these people." H.R. Rep. No. 213, 89th Cong., 1st Sess., 66 (1965). Congress also allowed States to offer Medicaid benefits to individuals who fell within one of the categories, but whose income was too high to qualify for aid under the standards. *Hogan*, 457 U.S. at 573. Those individuals were described as the "medically needy." *Id.* "Most States promptly elected to participate in the Medicaid program," and many also chose to provide coverage to the "medically needy." *Id.* at 575. "By 1982[,] every State had chosen to participate in Medicaid." *NFIB*, 567 U.S. at 542.

As described below, Congress has steadily expanded the population covered by Medicaid. Even the broad Congressional changes to public assistance programs in the 1990s did not shift Medicaid from its aim of promoting healthcare coverage for those who need it most. And Congress's expansionary changes culminated in the passage of the ACA, which resulted in a new era of Medicaid coverage.

**1. Congressional Reforms Expanded Medicaid's Reach**

Since Medicaid's creation in 1965, Congress has repeatedly expanded eligibility for the program, gradually uncoupling Medicaid from cash assistance programs, and adding new coverage for persons with disabilities, low-income children, pregnant and post-partum



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

individuals, and more. In 1972, for example, Congress created the Supplemental Security Income (SSI) cash assistance program for low-income elderly people and people with disabilities, Pub. L. No. 92-603, § 301 (1972), and it required States either to cover SSI recipients as a new eligibility group or to allow aged, blind, and disabled individuals to qualify for Medicaid by deducting their medical care expenses from their income, *see* 42 U.S.C. § 1396a(a)(10)(A)(i), 1396a(f).

Then, throughout the 1980s, Congress broadened Medicaid eligibility based on family status and income. In 1984, Congress required States to cover children under age five and first-time pregnant women who had previously been excluded from the Aid to Families with Dependent Children (AFDC) program—and thus Medicaid—because of the presence of two parents in the household. Pub. L. No. 98-369, § 2361 (1984). In 1986, Congress further expanded Medicaid coverage to all pregnant women who met the financial eligibility threshold for AFDC. Pub. L. No. 99-272, § 9501 (1986). And States were given the option to offer Medicaid coverage for low-income pregnant women and young children whose family incomes exceeded the AFDC threshold. Pub. L. No. 99-509, § 9401 (1986). But in 1988, that option was turned into a requirement, as Congress decoupled Medicaid eligibility from AFDC standards and instead phased-in federal poverty level eligibility standards. *See* Pub. L. No. 100-360, § 302 (1988).

By 1992, Medicaid coverage reached (1) all children up to age five and pregnant women with family incomes under 133% of the federal poverty level, and (2) children from five to 18 with family incomes under 100% of the federal poverty level. *Id.*; *see also* Pub. L. No. 101-239, § 6401 (1989); Pub. L. No. 101-508, § 4601(a)(1) (1990). As Congress reformed Medicaid eligibility for children and pregnant women, it also began lowering the eligibility floor for lower-income elderly people and persons with disabilities. *See* Pub. L. No. 99-509, § 9403 (1986); Pub. L. No. 100-360, § 301 (1988) (requiring States to implement a new Medicaid option for States to receive federal payments toward coverage of Medicare premiums and cost-sharing for persons with incomes below the poverty line).

In 1990, Congress required States to phase in a cost-sharing approach for Medicaid



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

coverage for people with family incomes up to 120% of the federal poverty line. Pub. L. No. 101-508, § 4501 (1990). The 1990s also saw Congress make additional improvements and expansions to Medicaid, including providing improved services to individuals in nursing homes, *see* Pub. L. No. 100-203, §§ 4211–13 (1987), and allowing States greater flexibility in administration through the creation of managed care delivery systems, such as HMOs, *see* Pub. L. No. 105-33, § 4701(a) (1997).

**2. Congressional Changes to Medicaid Included as Part of "Welfare Reform"**

The Personal Responsibility and Work Opportunity Act of 1996 (PRWORA), Pub. L. No. 104-193 (1996), made changes to public assistance programs generally. For example, PRWORA limited certain immigrants' ability to obtain any federally-funded benefit, including Medicaid. *See Korab v. Fink*, 797 F.3d 572, 575 (9th Cir. 2014). Congress had previously imposed immigration status-based restrictions for federal benefit programs. *See, e.g.*, Pub. L. 99-509, § 9406 (1986) (codified in 42 U.S.C. § 1396b(v)(1)) (barring States from receiving FFP for medical assistance payments for undocumented individuals). PRWORA continued that trend by, for example, creating a waiting period of five years from entry before certain "qualified aliens" could obtain any federally funded benefit (including Medicaid). *Korab*, 797 F.3d at 575 n.3. However, PRWORA did not significantly alter Medicaid's purpose or eligibility criteria. Instead, it reflected a "national immigration policy." *Id.* at 575. Thus, PRWORA's immigration-related eligibility changes were rooted not in Congress's spending power, but in its "broad power over immigration and naturalization," which includes an "extensive power over the terms of immigrants' residence." *Id.* at 579.

PRWORA also replaced the Aid to Families with Dependent Children (AFDC) program with block grants to States for Temporary Assistance for Needy Families (TANF). *See* 42 U.S.C. §§ 601–19. Congress emphasized that TANF was intended to be transitional and temporary. *See* 42 U.S.C. § 601(a)(2). To that end—and in sharp contrast to Medicaid—Congress conditioned TANF funding on States achieving certain minimum work participation rates for families



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

receiving TANF assistance, and it granted States the option to sanction individuals who failed to comply with TANF-based work requirements by terminating their cash assistance, subject to "good cause or other exception established by the State." *See* 42 U.S.C. § 607(a), (e). PRWORA also gave States the *option* of terminating Medicaid for individuals whose TANF cash assistance was terminated for "refusing to work." 42 U.S.C. § 1396u-1(b)(3)(iii). But that option did not apply to individuals who were not seeking cash assistance, and PRWORA did not create a work requirement for Medicaid itself. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 246 (D.D.C. 2018) ("While other welfare programs" such as TANF "condition benefits on working, there is no equivalent for the Medicaid program.").

### 3. The ACA Represented the Largest Congressional Expansion of Medicaid

Congress enacted the ACA in 2010. Pub. L. No. 111-148. It was designed "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB*, 567 U.S. at 538. The ACA pursued that goal, in part, by expanding Medicaid eligibility to all individuals under age 65 who have incomes below 133% of the federal poverty line. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII); *see also id*. § 1396a(e)(14) (explaining that income for the purposes of expanded eligibility is determined according to modified adjusted gross income (MAGI)).

As enacted by Congress, the ACA required all States to "provide Medicaid coverage to adults with incomes up to 133[%] of the federal poverty level." *NFIB*, 567 U.S. at 542 (noting that before the ACA, many States covered adults with children if their income was considerably lower than the 133% threshold and often did not cover childless adults at all). But as discussed in greater detail below, *NFIB* struck that requirement, thereby allowing States to choose whether to opt in to the expansion and cover the ACA expansion population. *See id.* at 587.

As of 2026, 40 States and the District of Columbia have chosen to participate in the ACA



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

expansion. Medicaid.gov, *June 2026 Medicaid & CHIP Enrollment Data Highlights*[1] (last visited Oct. 21, 2026). In June 2026, 66 million individuals were enrolled in Medicaid. Ctrs. for Medicare & Medicaid Servs., *June 2026: Medicaid and CHIP Eligibility Operations and Enrollment Snapshot* (Sep. 2026).[2] Of that total, approximately 20 million are eligible under the ACA's Medicaid expansion. Peter Nelson et al., Off. of the Assistant Sec'y for Plan. & Eval., *ACA Exchange Enrollment in 2026* (June 26, 2026).[3] In Oregon, the Medicaid program insures approximately 1.3 million people, roughly 564,177 (44%) of whom are enrolled as part of the expansion population. Sandoe Decl. ¶ 13. Similarly, in Washington, approximately 602,000 people are enrolled under the expansion. Wilson Decl. ¶ 13.

### C. CMS's Administration of Medicaid

Centers for Medicare and Medicaid Services (CMS) oversees States' compliance with their Medicaid plans and the federal requirements governing them. 42 U.S.C. § 1396a(a)(6); 42 C.F.R. §§ 430.14–15, 430.32. As relevant here, CMS has two critical responsibilities.

First, under the so-called "Section 1115" waiver process, CMS may allow a State to depart from some federal Medicaid requirements. *See* 42 U.S.C. § 1315(d). Specifically, under Section 1115 of the Social Security Act, a State may request authorization to adopt "experimental or demonstration projects with the goal of encouraging states to adopt innovative programs that promote the objectives of Medicaid." *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1222 (9th Cir. 2010); *see also* 42 U.S.C. § 1315. An approved demonstration project results in the waiver of certain general federal requirements for Medicaid state plans that are set out in 42 U.S.C. § 1396a. *Phoenix Mem'l Hosp.*, 622 F.3d at 1222. Experimental projects were "expected to be selectively approved by the Department and to be those which are designed to

---

[1] https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights [https://perma.cc/A6VW-NZG5].

[2] https://www.medicaid.gov/resources-for-states/downloads/eligib-oper-and-enrol-snap-jun2026.pdf [https://perma.cc/VZL7-2R2J].

[3] https://aspe.hhs.gov/sites/default/files/documents/f5f29954221d5b5713070ac2541fda8e/aca-enrollment-report-2026-final-version.pdf [https://perma.cc/6QFN-F768].



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

improve the techniques of administering assistance." S. Rep. No. 1589, 87th Cong., 2d Sess. 19 (1962).

Second, as part of its oversight of state plans, CMS may withhold FFP payments from a State to bring that State's plan into compliance with the federal requirements. *See* 42 C.F.R. § 430.35. Under 42 U.S.C. § 1396c, the Secretary of HHS may withhold FFP payments if a state plan fails to comply with the requirements of 42 U.S.C. § 1396a. This is intended to bring a state plan into compliance. *See* 42 C.F.R. § 430.35.

## II. H.R. 1's Work Requirement Radically Departs from Medicaid's History and Purpose

Medicaid's goal has always been to promote healthcare coverage and related services for those who need it most. *See* 42 U.S.C. § 1396-1. That longstanding purpose changed when Congress enacted H.R. 1 in 2025. *See* Pub. L. No. 119-21. H.R. 1 imposes a work requirement—euphemistically referred to as a "community engagement" requirement—for "applicable individuals" within the ACA expansion population. *See* 42 U.S.C. § 1396a(xx). The Congressional Budget Office (CBO) estimates that this requirement will cause 5.3 million people to lose healthcare coverage. Cong. Budget Off., *Pub. L. 119-21, to Provide for Reconciliation Pursuant to Tile II of H. Con. Res. 14 Title VII, Finance, Subtitle B, Health, Chapter 1, Medicaid* 5–6 (2025) (Kennedy Decl. Ex. 1). Adding a work requirement to Medicaid allowed Congress to include permanent tax cuts and other deficit-increasing measures in H.R. 1. *See id.*; *see also* Cong. Budget Off., *Estimated Budgetary Effects of Pub. L. 119-21, to Provide for Reconciliation Pursuant to Tile II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* Summary Table, Title VII (2025) (Kennedy Decl. Ex. 2). That, in turn, allowed the bill to bypass the filibuster and pass in an evenly divided Senate with the Vice President's tie breaking vote. *See* 171 Cong. Rec. S4074 (daily ed. June 30, 2025) (Senate Roll Call Vote).

"Applicable individuals" are those who—"other than a specified excluded individual"—are (1) eligible for or enrolled in a state Medicaid plan's coverage in the ACA expansion population; or (2) enrolled under the State's Section 1115 Waiver and are between the ages of 19



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

and 64, not pregnant, not entitled to or enrolled in Medicare Part A or B, and not eligible to enroll in mandatory coverage under the Medicaid state plan. 42 U.S.C. § 1396a(xx)(9)(A)(i). The statute also changes the frequency of re-determinations of eligibility for expansion population enrollees, requiring re-determinations every six months rather than annually. *Id.* § 1396a(e)(14)(L); *see also id*. § 1396a(xx)(4) (allowing States to verify compliance with work requirements even more frequently).

H.R. 1 excludes certain individuals from the work requirement. *Id*. § 1396a(xx)(9)(A)(ii). For example, individuals who are "medically frail"—a term which includes those who are blind, disabled, have a substance use disorder, or have a serious or complex medical condition—need not satisfy the requirement. *Id*. § 1396a(xx)(9)(A)(ii)(V). Earlier this year, the Plaintiff States challenged aspects of CMS's regulatory implementation of H.R. 1's work requirement claiming, among other things, that it impermissibly narrowed the statutory definition of "medically fail." *Massachusetts v. Oz,* No. CV 26-12962-RGS, 2026 WL 3257397, at *3 (D. Mass. Oct. 29, 2026). The district court vacated that portion of the rule, finding it contrary to law under the Administrative Procedure Act. *Id.* at *6. The parties in that case did not challenge—and the court did not address—the constitutionality of the statutory work requirement itself. *See generally id.*

H.R. 1 specifies the ways in which an "applicable individual" can, each month, satisfy the newly-created requirements, all of which generally require 80 hours per month of work or a largely equivalent activity. 42 U.S.C. § 1396a(xx)(2). They include (1) working at least 80 hours, (2) completing 80 hours of community service, (3) participating in a work program for at least 80 hours, (4) being enrolled in an educational program at least half-time, (5) engaging in a combination of those activities for at least 80 hours, (6) having a monthly income that is greater than the federal minimum wage multiplied by 80 hours, or (7) meeting a similar monthly income level for seasonal workers. *Id.* State plans may provide exceptions from the work requirements for specific short-term hardship events. *Id*. § 1396a(xx)(3)(B). If an individual fails to satisfy the work requirement, they lose eligibility for Medicaid expansion coverage. *See id*. § 1396a(xx)(1), (6).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Astonishingly, an individual who fails to show compliance with the work requirement is *also* barred by H.R. 1 from obtaining subsidized coverage through the ACA. *Id.* § 1396a(xx)(7)(B). Under the new provision, a person who would have been eligible for Medicaid expansion coverage "but for a failure to meet the" work requirement is nonetheless deemed, through a cruel legal fiction, to have "minimum essential coverage." *Id.* Because these individuals are *deemed* to have minimum essential coverage (despite having none), they cannot receive advance premium tax credits that would otherwise allow them to purchase subsidized coverage. 29 U.S.C. § 36B.

Although Section 1115 allows the Secretary to waive any requirement of Section 1396a if it would "promot[e] the objectives" of the Medicaid program, 42 U.S.C. § 1315(a), there is a unique prohibition against waiving the work requirement, *see id*. § 1396a(xx)(10). CMS may, in its discretion, grant a limited-term exemption for a State's good faith effort to comply with the newly imposed work requirements. *Id*. § 1396a(xx)(11). Determinations of good faith are based on (1) actions taken by the State toward compliance; (2) whether there are significant funding, design, development, procurement, or installation challenges; (3) the State's detailed plan and timeline for full compliance; and (4) any other relevant criteria. *Id*. § 1396a(xx)(11)(B)(i)–(iv). But any exemption expires by December 31, 2028, and it may not be renewed beyond that date. *Id*. § 1396a(xx)(11)(c)(i).

In conjunction with the work requirement, H.R. 1 imposes new eligibility verification standards for the Medicaid expansion population and a strict compliance regime for States. First, States must now conduct renewals of eligibility for the Medicaid expansion and Section 1115 Waiver populations—the groups subject to the work requirements—every six months. *Id.* § 1396a(e)(14)(L). Previously, States were required to conduct eligibility redeterminations no more than once every 12 months for those populations. *See* 42 C.F.R. § 435.916 (2023); *see also* Letter from Dan Brillman, Deputy Admin., CMS, to State Medicaid Directors (Mar. 6, 2026). (Kennedy Decl. Ex. 3). The six-month reverification requirement begins on January 1, 2027. 42 U.S.C. § 1396a(e)(14)(L)(i).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Second, H.R. 1 amends the Medicaid Eligibility Quality Control (MEQC) program to impose severe financial penalties on States that have eligibility errors. *See* Pub. L. No. 119-21, § 71106. By regulation, the MEQC has been merged into Medicaid's Payment Error Rate Measurement (PERM) program. 42 C.F.R. § 431.806. Under 42 U.S.C. § 1396b(u)(1)(A), the Secretary of HHS has authority to reduce a State's FFP if the State's erroneous excess payments for medical assistance exceed three percent. *See also* 42 C.F.R. § 431.1010. Specifically, the Secretary can reduce a State's FFP by a percentage point for every percentage point by which the eligibility payment error rate exceeds three percent. 42 U.S.C. § 1396b(u)(1)(A); 42 C.F.R. § 431.1010(a)(3). For example, a five percent eligibility payment error rate will result in a two percent reduction in FFP for all of the State's Medicaid expenditures. Previously, the Secretary could waive that reduction if a "State is unable to reach the allowable error rate for a period or fiscal year despite a good faith effort by [the] State." 42 U.S.C. § 1396b(u)(1)(B); 42 C.F.R. § 431.1010(b)(2) (allowing a State to receive a good faith waiver if it participates in a Medicaid Eligibility Quality Control pilot program and implements a corrective action plan). H.R. 1 removes that flexibility, barring the Secretary from waiving reductions in FFP for payments above the three percent threshold. *See* Pub. L. No. 119-21, § 71106(a)(2). These changes will apply beginning in October 2029. *Id.* § 71106(b).

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is therefore an appropriate vehicle for resolving a facial challenge to legislation that involves a pure question of law. *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1189–90 (9th Cir. 1988). A court may adjudicate a constitutional challenge under the Declaratory Judgment Act, 28 U.S.C. § 2201, when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy an[d] reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (internal citation and quotation marks omitted); *see also Peebler v. Reno*, 965 F. Supp. 28, 30–31 (D. Or. 1997)



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

(explaining the similarities between a standing inquiry and a court's inquiry into a constitutional challenge under the Declaratory Judgment Act).

## ARGUMENT

### I. H.R. 1's Work Requirement Exceeds Congress's Spending Power

#### A. Congress's Spending Power is Subject to Key Constraints

The Spending Clause permits Congress to "lay and collect Taxes[] . . . and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl.1. Under that power, Congress typically may "attach conditions on the receipt of federal funds" to advance policies that, in Congress's view, will promote the general welfare. *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).[4] But far from being "unlimited," this fundamental power is subject to equally fundamental constraints. *Id.* at 207.

One of those limits ensures "Congress cannot use its spending power as a bludgeon." *Chippewa Cree Tribe v. U.S. Dep't of Interior*, 900 F.3d 1152, 1160 (9th Cir. 2018) (citing *Dole*, 483 U.S. at 211). Specifically, when Congress imposes funding conditions that "take the form of threats to terminate other significant independent grants," then "the conditions are properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580. Such "financial inducement" is permissible when it amounts to "relatively mild encouragement." *Id.* at 581. But it crosses the line when it "leaves the States with no real option but to acquiesce." *Id.* at 582. "Accordingly, Congress may offer conditional funding only if the State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019).

The Supreme Court has yet to "fix the outermost line where [such] persuasion gives way to coercion," *NFIB*, 567 U.S. at 585, but decisions applying this principle are instructive. On the one hand, cases involving conditions found to be *non-coercive* abound. These decisions comprise "the typical case," in which Congress leverages carefully tailored funding to *encourage* the

---

[4] Except where noted, in all quotations, citations, internal quotation marks, and brackets have been omitted, and emphases have been added.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

adoption of new policies, and sovereigns have the realistic option to "defend their prerogatives" by declining the funds. *Id.* at 579.

In *Dole*, for example, Congress permissibly incentivized states to adopt a minimum drinking age of 21 by threatening to withhold "a *relatively small* percentage of *certain* federal highway funds" from states that declined. 483 U.S. at 211 (noting that "all South Dakota would lose" from resisting the federal drinking age would be "5% of the funds otherwise obtainable under specified highway grant programs"). Similarly, when Congress conditioned funding for a mere "discrete infrastructure project" on a tribe's waiver of certain procedural rights, the Ninth Circuit concluded that condition was not coercive because the tribe naturally "could have refrained from applying" for funds for an isolated project. *Chippewa Cree Tribe*, 900 F.3d at 1161. Notably, in every case where the Ninth Circuit has applied *NFIB's* anti-coercion analysis to a funding condition, the condition passed scrutiny because the magnitude of the threat was too insubstantial to be unduly coercive. *See id.*; *see also City of Los Angeles*, 929 F.3d at 1176 (approving of a grant condition involving a "subtle incentive" that was "far less than" even the permissible "coercion in *Dole*").

On the other hand, the Supreme Court has recognized that when Congress incentivizes States to adopt a new policy by threatening the vast funding from the Medicaid program, that "is far from the typical case." *NFIB*, 567 U.S. at 579. *NFIB* examined the ACA's expansion of Medicaid. The plurality opinion[5] emphasized that "[t]he original program was designed to cover medical service" for just "four particular categories of the needy," and prior "amendments to Medicaid eligibility merely altered and expanded the boundaries of those categories." *Id.* at 583.

---

[5] *NFIB* is a fractured opinion, and neither the Supreme Court nor the Ninth Circuit have comprehensively addressed which aspects of *NFIB's* Spending Clause analysis are controlling precedent. This motion assumes for the sake of argument that Chief Justice Roberts' plurality opinion at Part IV-A is controlling in its entirety, as some other courts have. *E.g., Miss. Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 176 n.22 (D.C. Cir. 2015). It therefore occasionally refers to the plurality opinion as "the Court's" opinion. Even so, this motion also occasionally cites the joint dissent of Justices Scalia, Kennedy, Thomas, and Alito—whose votes were essential to the Court's judgment with respect to the Spending Clause analysis—on issues where the dissent is *consistent with* the plurality opinion.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

By contrast, the ACA expansion "accomplish[ed] *a shift in kind*, not merely degree," with respect to Medicaid eligibility. *Id.* The Court ultimately concluded that the terms of the expansion were unduly coercive because States that declined it stood "to lose not merely a relatively small percentage of its existing Medicaid funding, but *all* of it"—a threat it characterized as "a gun to the head." *Id.* at 581. Critically, the Court reached this conclusion even though "Congress ha[d] not threatened to withhold funds earmarked for any *other* program" aside from the one for which it was changing eligibility. *Id.* at 633 (Ginsburg, J., concurring) (criticizing the breadth of the plurality opinion).

*NFIB's* holding relied on—and in some respects, expanded—several constitutional principles. *First*, *NFIB* reiterated that the spending power does not permit "surprising participating States with post-acceptance or retroactive conditions" on funding. *Id.* at 584 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)). This is because "Spending Clause legislation [is] much in the nature of a *contract.*" *Id.* at 577 (emphasis in original). Any conditions on funding must therefore be "unambiguous[]" so that States may "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207. This principle ensures "that a State at least knows what it is getting into" when it accepts funding. *NFIB*, 567 U.S. at 676 (Scalia, J., dissenting). That idea was central to *NFIB* because the States "could hardly anticipate" the ACA expansion when they accepted Medicaid funding, so it would have been unfair to let Congress compel implementation of the expansion by threatening that funding. *Id.* at 584. In this way, *NFIB* incorporated *Pennhurst* into the anti-coercion analysis: if Congress does not "warn the States" that, by accepting funds, they may one day have to implement an unforeseeable policy shift, then such a shift can trigger a coercion inquiry. *NFIB*, 567 U.S. at 637 (Ginsburg, J., concurring) (highlighting the plurality's novel construction of *Pennhurst*).

*Second*, Spending Clause cases scrutinize whether conditions on funding are "directly related to one of the main purposes for which" the threatened "funds are expended." *Id.* at 580 (quoting *Dole*, 483 U.S. at 208); *see also Dole*, 483 U.S. at 209 (noting "conditions on federal



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

grants might be illegitimate if they are unrelated to the federal interest in," or the "goal of," that program). This principle animated *NFIB's* holding because the original purpose of Medicaid was to "care for the neediest among us," whereas the ACA expansion was "an element of a comprehensive national plan to provide universal health insurance coverage." *NFIB*, 567 U.S. at 583. As with unfair surprise, *NFIB* therefore incorporated a novel construction of the relatedness requirement into the coercion analysis: if Congress reworks Spending Clause legislation to pursue a fundamentally different goal, that signals a surprising "transformation," which can trigger a coercion inquiry. *Id.* at 584.

*Third*, *NFIB* also emphasized that the anti-coercion doctrine is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.* at 577. Because the Constitution limits federal power and reserves the rest for States, it "simply does not give Congress the authority to require the States to regulate." *Id.* at 578. Any contrary rule would "threaten the political accountability key to our federal system," because "it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications." *Id.* This principle has led the Court to "strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *Id.* at 577 (citing *Printz v. United States*, 521 U.S. 898, 933 (1997)). And in *NFIB*, that principle led the Court to "scrutinize" the ACA "to ensure that Congress [was] not using financial inducements to exert a power akin to undue influence" that could force States to adopt an unforeseeable policy shift. *Id.* (citing *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

None of this is to say that *NFIB* prevents Congress from attaching new conditions to old funds—or even withdrawing funds altogether. To the contrary, in the Medicaid context, Congress reserved its right to "alter" or "amend" the program's contours, 42 U.S.C. § 1304, and it exercised that prerogative repeatedly (and permissibly) by incrementally expanding eligibility long before the ACA, *e.g.*, *NFIB*, 567 U.S. at 583 (identifying prior expansions); *supra* pp. 5-7 (same). Moreover, *NFIB* acknowledged that while Congress could have avoided a coercion



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

inquiry by "repealing the existing" Medicaid program and replacing it with the ACA, political and pragmatic constraints—not constitutional ones—impose a meaningful check on such a "massive undertaking." *Id.* at 583 n.14. Thus, the only thing Congress may *not* do under *NFIB's* construction of the spending power is "transform" an established spending program—and force acquiescence by threatening substantial existing funds from that program—under the guise of merely "alter[ing]" it. *Id.* at 584. But that is what Congress did in H.R. 1.

### B. H.R. 1's Work Requirement is Unconstitutionally Coercive

The constitutional principles that guided the Court's decision in *NFIB*—including concerns about unfair surprise, fundamental changes in purpose, and state sovereignty—are dispositive here. They reveal that, "while Congress may have styled" H.R. 1's work requirement as "a mere alteration of existing Medicaid," it is "in reality" a "transformation" of the program. *NFIB*, 567 U.S. at 582, 584. It is also one "that Congress is forcing [the States] to accept" by "threatening the funds for the existing Medicaid program." *Id.* at 582–83. This effectively "force[s] unwilling States" to comply with a "dramatic" transformation of the program "effected by the [H.R. 1]," which exceeds the spending power. *Id.* at 580.

#### 1. The Work Requirement Fundamentally Transforms Medicaid in Ways Participating States Could Not Have Foreseen

H.R. 1's work requirement transforms Medicaid in ways that are irreconcilable with its established purpose, and in a manner that States "could hardly anticipate" when they joined the original program *or* accepted the ACA expansion. *NFIB*, 567 U.S. at 584. That is because, if the requirement is implemented, then Medicaid "is no longer a [healthcare] program to care for the neediest among us," nor even "an element of a comprehensive national plan to provide universal health insurance coverage." *Id.* at 583. Instead, "Medicaid [will be] transformed into a program" that, for the first time in its 60-year history, is designed to incentivize *work* by threatening to withdraw healthcare coverage from beneficiaries. *Id.*

First, both legislation and litigation have elucidated that Medicaid's core objective was—and until H.R. 1, remained—promoting healthcare coverage and related services for those in



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

need. In place of a traditional statement of purpose, the original Medicaid statute contains a provision explicitly stating the reason for the program's appropriation. *See* 42 U.S.C. § 1396-1. It establishes that Congress funded Medicaid "for the purpose of enabling each state, as far as practicable," to furnish 1) "medical assistance" (i.e., insurance coverage)[6] for those in need, and 2) "rehabilitation and other services" that promote independence. *Id.* Multiple courts have construed that provision to mean that "[t]he *primary* purpose of Medicaid is to enable states to provide medical services to those whose income and resources are insufficient to meet the costs of necessary medical services." *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), *aff'd*, 538 U.S. 644, (2003); *Price v. Medicaid Dir.*, 838 F.3d 739, 742 (6th Cir. 2016); *see also Univ. of Wash. Med. Ctr. v. Sebelius,* 634 F.3d 1029, 1031, 1034–35 (9th Cir. 2011) (relying on § 1396-1 to define Medicaid as "a federal grant program that encourages states to provide certain medical services"); *Harris*, 448 U.S. at 301 (noting, independently from § 1396-1, that "[t]he Medicaid program was created . . . for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons."). If Spending Clause legislation is akin to a "contract," then this clarity of purpose naturally shaped participating States' "knowing[] accept[ance] of the terms" and their expectations about how the program would evolve. *NFIB*, 567 U.S. at 577.

Subsequent events reinforced these expectations. After Medicaid's inception, eligibility for the program grew to promote increasing levels of coverage for those in need. Indeed, "[s]ince 1965, Congress has amended the Medicaid program on more than 50 occasions, sometimes quite sizably," and practically always with the goal of *expanding* healthcare coverage for the needy. *Id*. at 627 (Ginsburg, J., concurring in part) (discussing amendments that expanded Medicaid eligibility); *see supra* pp. 5-7 (same); *see also NFIB,* 567 U.S. at 583 (acknowledging that Medicaid had incrementally expanded for decades prior to the ACA).

While the ACA plainly "transformed" Medicaid in some respects, *id.*, it did not alter

[6] A separate provision defines "medical assistance" to mean "payment of part or all of the cost of" certain medical "care and services"—i.e., health insurance coverage. 42 U.S.C. § 1396d(a).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Medicaid's core objective. To the contrary, the ACA's goal was to "to increase the number of Americans covered by health insurance." *Id.* at 538. Section 1396-1's statement of Medicaid's "purpose to provide medical assistance" therefore applies "to the [ACA] expansion population as well." *Stewart v. Azar*, 313 F. Supp. 3d 237, 261 (D.D.C. 2018) (*Stewart I*); *see also Stewart v. Azar*, 366 F. Supp. 3d 125, 138–39 (D.D.C. 2019) (*Stewart II*) (rejecting a party's assertion that "the objectives of Medicaid for the expansion population are different from those for the original Medicaid population"). Thus, the ACA expansion further reinforced participating States' expectation that Medicaid remained a program designed to promote healthcare coverage for the vulnerable.

This construction of Medicaid's objective also historically led CMS to reject Section 1115 waivers that would have allowed state-based work requirements. In 2016, for example, CMS rejected an attempt by Arizona to implement a work requirement because it would have "undermine[d] access to care" and therefore failed to "support the objectives of the [Medicaid] program." Letter from Andrew Slavitt, Acting Admin., CMS, to Thomas Betlach, Dir., Ariz. Health Care Cost Containment Sys. (Sep. 30, 2016) (Kennedy Decl. Ex. 4). CMS subsequently approved an Arkansas plan including a work requirement in 2018. However, the following Administration withdrew that approval and reverted to CMS's longstanding policy. *See* Letter from Elizabeth Richter, Acting Admin., CMS, to Dawn Stehle, Deputy Dir., Ark. Dep't of Human Servs. (Mar. 17, 2021) (Kennedy Decl. Ex. 5). It did so because "early evidence [from] Arkansas" demonstrated that the "community engagement [requirement]" had "create[d] a risk of substantial loss of health care coverage" for beneficiaries that was inconsistent with Medicaid's objectives. *Id.* at 2.

Relatedly, courts have repeatedly held that, prior to H.R. 1, the Medicaid statute essentially *forbade* CMS from permitting state-based work requirement programs because they undermined the statute's objective of promoting coverage. *See Stewart I* and *Stewart II* (discussed *supra*); *see also Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020), *vacated and remanded as moot sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022); *Philbrick v. Azar*, 397



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

F. Supp. 3d 11 (D.D.C. 2019), *aff'd*, No. 19-5293, 2020 WL 261222 (D.C. Cir. May 20, 2020), *vacated and remanded as moot sub nom*. *Becerra v. Gresham*, 142 S. Ct. 1665 (2022).

In 2017, for example, Kentucky crafted an experimental state plan imposing "community-engagement requirements" for certain Medicaid enrollees. *Stewart I*, 313 F. Supp. 3d at 243. Like H.R. 1, Kentucky's plan would have required those enrollees to "work (or participate in other qualifying activities) for at least 80 hours each month as a condition of receiving health coverage." *Id.* A district court vacated that approval. It rejected HHS's rationale that Kentucky's program would "assist in promoting [Medicaid's] objectives" because the Secretary failed to consider evidence that it would substantially *reduce* healthcare coverage. *Id.* at 245, 262.

A year later, HHS provided a new rationale in re-approving an almost identical Kentucky plan, and the court again rejected that rationale for similar reasons. *Stewart II*, 366 F. Supp. 3d at 138. The court reasoned that, even assuming "fiscal sustainability is an independent objective" of Medicaid,[7] a work requirement that allegedly "enhances financial sustainability" could still be irreconcilable with "the objectives of Medicaid if it significantly impedes or curtails Medicaid services or coverage." *Id.* at 148–52. In so concluding, that court relied on Ninth Circuit decisions similarly rejecting Section 1115 waiver approvals that prioritized "sav[ing] money" while neglecting coverage consequences. *Newton-Nations v. Betlach*, 660 F.3d 370, 381 (9th Cir. 2011); *Beno v. Shalala*, 30 F.3d 1057, 1069 (9th Cir. 1994).

The D.C. Circuit subsequently rejected, for similar reasons, HHS's approval of a waiver for an Arkansas Medicaid plan with a work requirement. *Gresham*, 950 F.3d at 96.[8] It "is indisputably correct," the D.C. Circuit explained, "that the principal objective of Medicaid is

---

[7] The court cast doubt on whether fiscal sustainability is, in fact, an "independent objective" of Medicaid, but it assumed for the sake of argument that HHS's interpretation of the Medicaid statute on that issue was due deference under the now-defunct *Chevron* doctrine. *Id.* at 149.

[8] The Supreme Court's subsequent vacatur of *Gresham* on mootness grounds, *see Becerra v. Gresham*, 142 S. Ct. 1665 (2022), eliminates its precedential effect in the D.C. Circuit. But the Court cast no doubt upon the decision's persuasive value.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

providing health care coverage," and that the ACA expansion was fully "consistent with" that objective. *Id.* at 99–100 (reviewing numerous authorities supporting that conclusion). By contrast, HHS's approval of the Arkansas work requirement plan reflected "alternative objectives" that are absent from the Medicaid statute. *Id.* at 101. Nor would a goal of promoting beneficiaries' "financial independence" reflect the objective of Medicaid. *Id.* at 101–02. Thus, because Arkansas's work requirement had disenrolled "about 25% of those subject to" the requirement, it was irreconcilable with the Medicaid program's objective. *Id.* at 102–03.

The only plausible inference from H.R. 1's text is that, much like the state-based experiments that preceded it, the statute's new eligibility system is intended to promote *work* by threatening to eliminate healthcare coverage—an objective fundamentally at odds with Medicaid's core purpose. Specifically, H.R. 1 conditions applicable individuals' healthcare coverage on "demonstrate[ing] community engagement"—meaning participation in one of several approved activities. 42 U.S.C. § 1396a(xx)(2). H.R. 1's legislative history further underscores the goal made manifest by the text. *See, e.g.*, 171 Cong. Rec. H3184 (daily ed. July 2, 2025) (statement of Speaker Mike Johnson) ("More Americans will be working, volunteering, and serving their communities because . . . work requirements will restore dignity and purpose to those on taxpayer-funded benefits."); 171 Cong. Rec. S4045 (daily ed. June 30, 2025) (statement of Sen. Roger Marshall) (discussing an amendment removing the proposed work requirement: "Yes, we want to encourage people to go back to work. . . ."); 171 Cong. Rec. H3147 (daily ed. July 2, 2025) (statement of Rep. Jodey Arrington) ("There is the fallacy that work requirements are somehow punitive when we know that they restore the dignity of work and lead to better opportunities and bigger paychecks."). For all these reasons, H.R. 1's work requirement does not just depart from Medicaid's core objective—it reimagines it in ways participating States "could hardly anticipate." *NFIB*, 567 U.S. at 584.

Purpose aside, Medicaid's history also shows that H.R. 1's work requirement represents a dramatic departure from Medicaid's traditional *eligibility criteria*—even more so than the ACA expansion. Medicaid's history illustrates that the program's primary touchstone for eligibility



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

was—and until H.R. 1, remained—need. Indeed, Congress originally "created Medicaid in 1965 to subsidize state efforts to provide healthcare to families and individuals *whose income and resources are insufficient* to meet the costs of necessary medical services." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 363 (2025). For that reason, the program was initially targeted at individuals who had received assistance through programs designed "for the aged, the blind, the disabled, and families with dependent children." *Hogan*, 457 U.S. at 572, 573; *see also* 42 U.S.C. § 1396-1. Core to *NFIB's* rationale was the fact that subsequent "amendments to Medicaid eligibility merely altered and expanded the boundaries of" those "four particular categories of the needy," but did *not* fundamentally change them. *NFIB*, 567 U.S. at 583.[9]

The ACA expansion was also consistent with Medicaid's need-based eligibility system. To be sure, *NFIB* concluded that the ACA expansion did fundamentally transform Medicaid eligibility. *Id.* at 576. But *NFIB* reached that conclusion even though the ACA did *not* alter Medicaid's fundamental characteristic as a need-based program—it only broadened who qualifies as needy (albeit "dramatically" so). *Id.* at 584; *see also Stewart II*, 366 F. Supp. 3d at 138–39 (explaining that, like the original program, the ACA expansion remained focused on promoting coverage for "vulnerable populations"). Thus, from its inception through the ACA expansion, Medicaid remained principally a need-based safety net program.

By contrast, H.R. 1 superimposes an unrecognizable eligibility system onto Medicaid. Indeed, the legislation requires each Plaintiff State's Medicaid agency to *rebuild* its eligibility infrastructure and "create a *new system* for verifying applicability individuals" activities. Sandoe Decl. ¶¶ 20–21, 24, 26, 28–29, 34; Wilson Decl. ¶¶ 20, 24, 26, 28–31. After implementation, each of those state agencies must continually investigate and scrutinize circumstances fundamentally unlike the criteria that previously governed eligibility. Sandoe Decl. ¶¶ 24, 26, 29,

[9] As noted above, *supra* p. 7–8, unlike H.R. 1, PRWORA did not disturb the fundamentally need-based criteria that traditionally governed Medicaid. Instead, PRWORA's changes reflected a broad carve-out from federally funded benefit programs for certain immigrants based not on Congress's spending power, but on its broad power over naturalization and immigration. And in exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

31–32, 35; Wilson Decl. ¶¶ 26, 29–32.

Indeed, prior to H.R. 1, eligibility determinations for applicable individuals were focused primarily on a single, streamlined criterion: whether the individual's income was below 133% of the federal poverty level. Sandoe Decl.¶ 29; Wilson Decl. ¶ 29. But going forward, the Plaintiff States' agencies must continually enforce H.R. 1's new eligibility system by pursuing nuanced, fact-intensive determinations bearing no resemblance to traditional Medicaid eligibility assessments. These include scrutinizing whether an individual is (1) working sufficient hours for a qualifying employer, (2) studying for sufficient hours at a qualifying educational institution, or (3) excluded from the requirement due to medical frailty. Sandoe Decl. ¶ 29 (noting the variety of employment scenarios that Oregon Health Authority (OHA) must analyze, including "gig work, seasonal work, what points in time an individual was employed, and whether those types of employment are appropriate and meet new policy definitions"); Wilson Decl. ¶ 29. Those determinations have, in turn, compelled state agencies to hire new personnel or contractors, and extensively retrain others, to analyze applicants' information and continually educate current and potential beneficiaries about how to meet and document the new requirements. Sandoe Decl. ¶¶ 21, 24, 28–30, 35 (detailing that OHA has trained over 2,700 individuals to help applicants); Wilson Decl. ¶¶ 24, 28.[10]

All of this will be compounded by other shifts that participating States "could hardly anticipate." *NFIB*, 567 U.S. at 584. State Medicaid agencies will be required to enforce H.R. 1's eligibility system under a financial threat fundamentally unlike anything in Medicaid's history: if CMS finds that a state agency failed to enforce H.R. 1's work requirement with adequate vigor, H.R. 1 requires CMS to impose exceedingly harsh penalties by withholding future FFP to recoup excess payments above the three percent error PERM threshold. *See supra* p. 13 (citing Pub. L.

---

[10] Congress also implicitly acknowledged the magnitude of the task it assigned to these agencies by appropriating $200 million to offset their implementation costs (though even that sum covers only a portion of the expense). *See* H.R. 1, Pub. L. No. 119-21, § 44141(d) (appropriating $200 million to "development of government efficiency grants to states"); *see also* Sandoe Decl. ¶ 27; Wilson Decl. ¶ 27.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

No. 119-21, § 71106; 42 U.S.C. § 1396b(u)(1)(A)–(B); 42 C.F.R. § 431.1010). Moreover, H.R. 1 will prevent those disenrolled by the work requirement from obtaining subsidized coverage through an ACA exchange. *See supra* p. 12 (citing 42 U.S.C. § 1396a(xx)(7)(B); 29 U.S.C. § 36B). To States that joined Medicaid—and in particular, those that accepted the ACA expansion—these kinds of "surprising . . . post-acceptance" conditions will render the program almost unrecognizable. *NFIB*, 567 U.S. at 584.

All of the above establishes that H.R. 1's work requirement has not "merely altered" the existing "categories" of Medicaid eligibility. *Id.* at 583. Instead, it plainly "accomplishes a shift in kind, not merely degree" around eligibility. *Id*. It does so by creating an eligibility criterion that is not only wholly new—as the ACA expansion was—but also wholly *unlike* those that preceded it. Congress has never before "conditioned the receipt of Medicaid benefits on fulfilling work requirements." *Gresham*, 950 F.3d at 102.

Importantly, the foregoing discussion of Medicaid's purpose and history serves a distinct role in the Spending Clause analysis. None of this suggests Congress is powerless to incrementally "alter" or "amend" Spending Clause legislation—or even "repeal" it altogether—after States accept funds. *NFIB*, 567 U.S. at 583 & n.14. Nor does any of this suggest that, because Medicaid was created to promote healthcare coverage for those in need, Congress must pursue that objective no matter what—after all, "no law pursues its purpose at all costs." *Rapanos v. United States*, 547 U.S. 715, 752 (2006). Instead, all of this reveals that conditioning eligibility on a work requirement is fundamentally "transform[ative]" to Medicaid because it is a "surprising" turn the Plaintiff States "could hardly anticipate" when they accepted the terms of Medicaid and the ACA expansion. *NFIB*, 567 U.S. at 583, 580. Because both of those programs are akin to a "contract," *id.* at 577, their established objective naturally shaped the Plaintiff States' expectations about how the programs would evolve. This means the Plaintiff States must now be given "a genuine choice whether to participate" in the new eligibility system created by H.R. 1. As discussed below, however, Congress's chosen penalty for non-compliance leaves the Plaintiff States with "no real option but to acquiesce." *Id.* at 582.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

### 2. Given the Penalties at Stake, States Have No Practical Choice but to Implement H.R. 1's Work Requirement

Under H.R. 1, the Plaintiff States now face a Hobson's choice bleaker than the one held unconstitutional in *NFIB*: either endure an intolerable financial penalty with devastating public health consequence or surrender their administrative apparatus to enforce a deeply unpopular and damaging federal policy.

The penalty associated with H.R. 1's work requirement leaves States "no real option." *NFIB*, 567 U.S. at 582. The legislation did not include a stand-alone penalty for state non-compliance. Instead, as with the ACA expansion, non-complying States are subject to 42 U.S.C. § 1396c, which "provides that if a State's Medicaid plan does not comply with the Act's requirements, [CMS] may declare that further payments will not be made to the State." *NFIB*. 567 U.S. at 581.[11] A State that "opts out of" H.R. 1's work requirement "thus stands to lose not merely a relatively small percentage of its existing Medicaid funding, but *all* of it" under § 1396c. *Id.*; *see also Medina*, 606 U.S. at 364 (acknowledging that "if a State fails to comply substantially with . . . *any*[] congressionally specified condition" in § 1396a for the Medicaid program, "the Secretary may withhold some or *all* of the State's federal funding"). *NFIB* held precisely that threat to be unconstitutionally coercive. *See* 567 U.S. at 581–82.

This potential penalty—loss of all pre-existing Medicaid funding under § 1396c—further confirms that Congress leveraged a "significant independent grant[]" to force States into complying with H.R. 1's new eligibility system. *Id*. at 580. After all, Congress could have—but conspicuously declined to—include in H.R. 1 a penalty that is tailored to the work requirement. For example, Congress could have tailored the size of any funding penalty by threatening to withhold a percentage of Medicaid funding proportional to the population expected to lose eligibility from the requirement. By all accounts, that would comprise a minority of any State's ACA expansion population. Sandoe Decl. ¶ 44 (estimating that 33% of Oregon's ACA

[11] Specifically, H.R. 1 amended 42 U.S.C. § 1396a, which outlines certain conditions—now including the work requirement—that each participating state's Medicaid plan must meet to receive federal Medicaid funds. That, in turn, renders a State's non-compliance with the work requirement subject to the penalty outlined in § 1396c.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

expansion population will be disenrolled due to the work requirement); Wilson Decl. ¶ 38 (estimating that 20% of Washington Apple Health's ACA expansion members will be disenrolled due to the work requirement). Why, then, would Congress leverage *all* of a State's Medicaid funding—or at a minimum, all of a State's expansion funding—if not to compel acquiescence? "[I]f Congress had thought that" it was a "realistic possibility" States might decline to implement the work requirement, then it "would have provided a backup scheme" for those that did decline, but "no such scheme is to be found anywhere in" H.R. 1. *NFIB*, 567 U.S. at 672 (Scalia, J., dissenting).

Defendants may argue that the Plaintiff States could avoid the work requirement—and thus, the potential loss of all Medicaid funding—by reversing their acceptance of the ACA's expansion funding. *See* 42 U.S.C. § 1396a(xx)(1), (9) (providing that only "applicable individuals," primarily including members of the ACA expansion population, must meet the requirement). But multiple "[p]ractical constraints would plainly inhibit, if not preclude," States that already accepted from now declining the expansion. *NFIB*, 567 U.S. at 583 n.14.

The budgetary consequences, for one, would be dire. For many States, federal funding for the expansion population comprises almost half of that State's total federal Medicaid funding. For example, Oregon receives $5.1 billion in FFP for the ACA expansion population, which amounts to 54% of its total FFP. Sandoe Decl. ¶ 37. That $5.1 billion in FFP constitutes approximately 7% of Oregon's state budget. *Id.* Similarly, Washington receives $6.5 billion in FFP for its ACA expansion population, which constitutes 41% of its total FFP and approximately 5.86% of its state budget. *See* Wilson Decl. ¶ 33–34. Consequently, States would not realistically have the budgetary option of covering those individuals with their own funding, and an enormous number of their residents would lose coverage as a result. Sandoe Decl. ¶ 38 ("[P]roviding coverage for the ACA expansion population solely by using state funds would be practically impossible" given budget constraints created by H.R. 1.); Wilson Decl. ¶ 35 (describing similar H.R. 1-created budgetary pressures). Specifically, if Oregon were to withdraw from the ACA expansion, 560,000 individuals would lose coverage. Sandoe Decl. ¶ 39



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

(explaining that figure would amount to 13% of Oregon's population and 16% of its adult population). Similarly, if Washington were to withdraw, approximately 602,000 individuals would lose coverage. Wilson Decl. ¶ 13.

For those reasons, if a Plaintiff State reversed its acceptance of the ACA expansion, that State would suffer by far the largest sudden loss of medical coverage on a per capita basis in the nation's history. Sandoe Decl. ¶ 40; *see also* Wilson Decl. ¶ 13. The public health and economic consequences would be catastrophic. The gains in public health achieved by the ACA—reductions in overall mortality, improved abilities to manage chronic disease, improvements to maternal and infant health, and increased access to mental health care, among others—would be erased. Sandoe Decl. ¶¶ 15, 43; Wilson Decl. ¶¶ 15, 37. Individuals will have—among countless other negative health outcomes—fewer opportunities for early-stage disease detection, higher risks of pregnancy- and childbirth-related complications, limited opportunities for substance abuse treatment, and higher risks of morbidity and mortality due to late-stage disease. Sandoe Decl. ¶ 52; Wilson Decl. ¶ 44. The health of those individuals risks affecting the entire population due to increased disease outbreaks, including preventable diseases such as measles and polio. Sandoe Decl. ¶ 53; Wilson Decl. ¶ 45.

The economic consequences would be similarly severe. Disenrolled individuals have a greater risk of incurring catastrophic health expenditures. Sandoe Decl. ¶ 48–49; Wilson Decl. ¶ 41. Such expenditures lead to massive medical debt and increased likelihood of bankruptcy. Sandoe Decl. ¶ 49. In a cruel irony, disenrollment will also make former beneficiaries less able to find and retain employment. *Id.* (explaining that health coverage under the ACA led to increased employment, a relationship that is reversed when an individual is disenrolled and "struggle[s] to find employment due to their lack of healthcare coverage"). The economic effects would also be felt by the public more broadly. Hospitals and other providers would bear the costs of uncompensated care and likely shift those costs to the healthcare system and States. Sandoe Decl. ¶¶ 41, 51; Wilson Decl. ¶ 43. And if disenrolled individuals are subsequently re-enrolled, they are likely to be sicker and costlier to insure. Sandoe Decl. ¶ 47; Wilson Decl. ¶ 40.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

Reversal of the ACA expansion would be impracticable to the Plaintiff States for other reasons as well. "[T]he States have developed intricate statutory and administrative regimes" in order "to implement their objectives under" the ACA expansion. *NFIB*, 567 U.S. at 581 (recognizing the impracticability of states avoiding the ACA expansion by declining Medicaid). For example, Oregon and Washington have each built complex IT systems to administer their ACA expansion programs. Sandoe Decl. ¶ 10; Wilson Decl. ¶ 11. And changing them to create a state-level replacement for the ACA expansion would require significant additional expenditures, impact existing contracts, and necessitate significant personnel changes. Sandoe Decl. ¶ 39; *see also* Wilson Decl. ¶ 35 (noting that the window for such a significant budgetary request has passed in Washington). Thus, the administrative burden alone would amount to a "massive undertaking" that, as a practical matter, makes opting out of the ACA expansion unrealistic. *NFIB*, 567 U.S. at 583 n.14. Moreover, Congress likely also recognized that, "when a heavy federal tax is levied to support a federal program that offers large grants to the States, States may, as a practical matter, be unable to refuse to participate in the federal program and to substitute a state alternative." *Id.* at 680 (Scalia, J., dissenting).

Of course, Congress knew all of this when it passed H.R. 1, which is why "Congress was certain that" H.R. 1's work requirement "was one that no State could refuse." *Id.* at 672. (Scalia, J. dissenting). Indeed, the CBO score for the legislation assumed that all States required to implement it would do so. *See supra*, Cong. Budget Off., *Pub. L. 119-21, to Provide for Reconciliation* 5–6 (Kennedy Decl. Ex. 1). That prediction has proven correct, as no State has declined to begin the implementation process for the work requirement or otherwise taken steps to replace their Medicaid expansion program with a fully state-funded alternative. *See* KFF, *Tracking Implementation of the 2025 Reconciliation Law: Medicaid Work Requirements* (Sep. 29, 2026)[12] (explaining that, although some States were still making work requirement-related policy decisions, all were taking steps to comply). Congress also made clear there was no

[12] https://www.kff.org/medicaid/medicaid-work-requirements-tracker-overview/ [https://perma.cc/7M98-NRBV].



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

alternative to implementation: a State may only receive a limited-term, good faith exemption from the work requirement if it has taken steps toward compliance and has a detailed plan and timeline to ensure full compliance. 42 U.S.C. § 1396a(xx)(11)(B)(i), (iii). Otherwise, it risks falling out of compliance with 42 U.S.C. § 1396a and losing all its federal Medicaid funding. *Id.* § 1396c(2).

Because States cannot realistically decline or avoid implementation of the work requirement, they are left with only one option: "[p]ermitting the Federal Government to force [them] to implement" a new eligibility system that Congress grafted onto the Medicaid program. *NFIB*, 567 U.S. at 578. That "threaten[s] the political accountability [that is] key to our federal system," because it is "state officials" who could "bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated." *Id.* After all, it will be up to States to identify Medicaid enrollees who have not satisfied the requirement or demonstrated an exception. And when those enrollees ultimately receive notices disenrolling them from Medicaid, those notices will not come from the federal government—they will come from state agencies, bearing the name of state programs. *See* 42 U.S.C. § 1396a(xx)(6) ("If *a State* is unable to verify that an applicable individual has met the requirement to demonstrate community engagement . . . *the State* shall . . . provide such individual with the notice of noncompliance" and subsequently "disenroll such individual from the plan").

Decisions applying *NFIB* further illustrates how, "wherever the line may be" between persuasion and coercion, "this statute is surely beyond it." *NFIB*, 567 U.S. at 585. In *Mahew v. Burwell*, for example, the First Circuit examined the ACA's maintenance of effort (MOE) requirement, which prevented Maine from dropping Medicaid coverage for low-income 19- and 20-year-olds. 772 F.3d 80, 81 (1st Cir. 2014), *cert. denied*, 576 U.S. 1004 (2015). The court rejected Maine's argument that this provision, as applied to the state's proposed coverage change, was unconstitutionally coercive. *Id.* In so concluding, the First Circuit emphasized that the MOE requirement was not transformative because it did not alter "Medicaid eligibility *at all*," but instead simply "require[d] states to maintain eligibility standards for a population . . .



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

that has historically been covered," and had even been "subject to expansion" in the past. *Id.* at 89, 90. The ACA's MOE requirement therefore "accomplishe[d] a shift in degree rather than in kind." *Id.* at 90. Similarly, the Fifth Circuit rejected Louisiana's coercion challenge to a decades-old statutory provision that "d[id] not resemble the creation of a brand-new legislative program." *Gruver v. Louisiana Bd. of Supervisors*, 959 F.3d 178, 183–84 (5th Cir. 2020). And much like the Ninth Circuit's decisions applying *NFIB* (discussed *supra*, p. 15), the D.C. Circuit rejected Texas's coercion claim in large part because, unlike in this case, the magnitude of the funding threat there was carefully tailored and relatively minor. *See Miss. Comm'n on Env't Quality*, 790 F.3d at 177–78 (noting that the allegedly coercive threat Texas invoked would likely affect only a *fraction* of the highway funding for a *single* Texas county).

Cases from both within and without the Ninth Circuit therefore yield an important inference: appellate courts that have declined to extend *NFIB*'s coercion holding were faced with issues much further afield from *NFIB*, and none were faced with circumstances resembling this case. Moreover, while the Ninth Circuit rejected two coercion claims involving insubstantial funds, district courts in this circuit have favorably applied and extended *NFIB's* coercion inquiry in contexts far outside Medicaid, signaling the decision was neither fact-bound nor anomalous. *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 960–63 (N.D. Cal. 2025) (finding a threat to university funding unconstitutionally coercive); *City & Cnty. of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1038–39 (N.D. Cal. 2026) (finding "merit" in localities' claim that a federal funding threat based on their "sanctuary" status was unconstitutionally coercive).

Thus, for all the reasons outlined above, the rationale that led the Court in *NFIB* to bar the federal government from penalizing States under § 1396c should lead this Court to the same result. Considering the contractual nature of Spending Clause legislation, it is imperative "that a State at least knows what it is getting into" when it accepts conditioned funds. *NFIB*, 567 U.S. at 678 (Scalia, J., dissenting). But the new eligibility system imposed by H.R. 1 is simply not the deal the States signed up for when they joined Medicaid or accepted the ACA expansion.



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

## II. The Court Should Declare That Disallowance of Funds Under § 1396c for Failure to Implement § 1396a(xx) Would Be Unlawful

*NFIB* specifies the appropriate relief for this constitutional violation. "What Congress is not free to do" under that decision is "penalize States that choose not to participate in [a] new program by taking away their existing Medicaid funding." *Id.* at 585. Yet "§ 1396c gives the Secretary of Health and Human Services the authority to do just that." *Id.* The Court should therefore declare that Defendants "cannot apply § 1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in" § 1396a(xx). *Id.*

This relief would not render § 1396a(xx) wholly invalid or ineffective. As the relief from *NFIB* did with the ACA expansion, this would simply give States the option to implement that provision or not. Thus, there would be no question going forward that States like Arkansas—which, as discussed above, was previously denied the opportunity to implement a Medicaid work requirement—would now have Congressional approval to do so. But the relief requested in this lawsuit is essential to ensure that "the constitutional violation" identified above is "fully remedie[d]." *NFIB*, 567 U.S. at 586.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment and declare that Defendants cannot apply 42 U.S.C § 1396c to withdraw existing Medicaid funds from the Plaintiff States for failure to comply with the requirements set out in 42 U.S.C. § 1396a(xx).



Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880 / Fax: 971-673-5000

DATED November 5, 2026.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Scott Kennedy*
SCOTT KENNEDY #260337
BRIAN SIMMONDS MARSHALL #196129
TY BAIR #251894
Senior Assistant Attorneys General
BRAD MULLEN #245461
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Ty.Bair@doj.oregon.gov
Brad.Mullen@doj.oregon.gov

*Counsel for the State of Oregon*

**KEITH ELLISON**
Attorney General
State of Minnesota

By: *s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7403 (Voice)
(651) 282-5832 (Fax)
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: *s/ Mark Noferi*
MARK NOFERI
Senior Litigation Counsel
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov

*Counsel for the State of New Mexico*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ William McGinty*
WILLIAM MCGINTY
Deputy Solicitor General
CRISTINA SEPE
Managing Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
william.mcginty@atg.wa.gov
cristina.sepe@atg.wa.gov

*Counsel for the State of Washington*