DAN RAYFIELD
Attorney General
SCOTT KENNEDY #260337
BRIAN SIMMONDS MARSHALL #196129
TY BAIR #251894
Senior Assistant Attorneys General
BRAD MULLEN #245461
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Email: Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Ty.Bair@doj.oregon.gov
Brad.Mullen@doj.oregon.gov

*Counsel for the State of Oregon*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

STATE OF OREGON, et al.,

Plaintiffs,

v.

MEHMET OZ, in his official capacity as Administrator for the Centers for Medicare & Medicaid Services, et al.,

Defendants.

Case No. 6:26-cv-02435-AA

DECLARATION OF TRINITY WILSON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**DECLARATION OF TRINITY WILSON**

I, Trinity Wilson, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Washington. I am over the age of 18 and have personal knowledge, or knowledge based on review of information and records gathered by the Washington State Health Care Authority (HCA) and agency staff, in my capacity as Washington State Medicaid Director and CHIP Director. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am the Medicaid and Children's Health Insurance Program (CHIP) Director for Washington State. I have been employed in this position since November 2025. In this capacity, I am responsible for the overall administration, strategic direction, and operational oversight of Washington's Medicaid and CHIP programs, including policy implementation, program compliance, budget stewardship, and coordination with federal partners. I make programmatic and operational decisions impacting over 1.9 million Washingtonians on behalf of HCA and represent the state in matters related to Medicaid and CHIP administration.

3. Prior to this position, I served as the Assistant Director of the Medicaid Customer Service Division at HCA for over three and a half years. In that role, I was responsible for direct oversight of key operations of the Medicaid program including eligibility policy and operations, customer service, coordination of benefits, claims processing, provider enrollment, and Medicaid Systems IT. I have over twelve years' experience working at varying roles within Washington State's Medicaid program. Throughout my tenure, I have held progressively senior leadership roles with increasing responsibility and scope. My experience includes leading large teams, managing

cross-agency initiatives, and making determinations that directly affect program integrity and access to care, and compliance with federal Medicaid and CHIP requirements.

4. I obtained a graduate certificate in Leading Public Innovation from the University of Washington's Evans School of Public Policy in September 2024 and a Bachelor of Science from the University of Puget Sound in 2008.

5. The Health Care Authority is the single state agency responsible for administering Apple Health. Apple Health provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Apple Health's coverage includes medical, dental, mental health and substance use disorder treatment, long-term services and supports, and long-term care. The mission of HCA is "powered by the people we serve, we improve health across Washington by advancing equitable access to quality, whole-person care."

**<u>Medicaid in Washington</u>**

6. Medicaid is a joint state and federal program that provides medical coverage for eligible low-income individuals.

7. The federal government sets out general rules and regulations that all State Medicaid programs must follow, but States run and administer their own program pursuant to their State Plans which were submitted to, and approved by, Centers for Medicare & Medicaid Services ("CMS"). The State Plan must comply with the requirements in 42 U.S.C. § 1396a. A State may also depart from those requirements under a CMS-approved Section 1115 Waiver, which allows for experimental, pilot, or demonstration projects that are found to assist in promoting the objectives of the Medicaid program.

8. If a State does not comply with its CMS-approved plan—or the federal requirements for Medicaid generally—CMS may withhold federal Medicaid funding, known as "Federal Financial Participation" ("FFP"), from the State.

9. Washington administers the Apple Health program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and federal-approved waiver programs, such as the State's Section 1115 Demonstration Project. Apple Health receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers an average of 67 % of Apple Health's expenditures on eligible enrollees.

**Medicaid Expansion in Washington**

10. On January 1, 2014, Washington implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 138% of the Federal Poverty Level primarily through Apple Health.

11. Implementing the ACA expansion in Washington required substantial changes to then-existing processes. The state established an integrated state-based health insurance marketplace; implemented new Modified Adjusted Gross Income (MAGI) eligibility methodologies consistent with IRS rules; adopted self-attestation policies for certain eligibility factors; automated eligibility determinations and renewals, including prepopulated renewal processes; developed post enrollment verification procedures; modernized Medicaid eligibility and enrollment systems; and designed and administered an expanded benefit package and delivery system tailored to the needs of the newly eligible adult population. Despite the initial administrative effort that was required to implement the ACA expansion, those efforts ultimately

streamlined and simplified the enrollment process because thereafter, Medicaid eligibility determinations were based primarily on an individual's income level.

12. Enrollees in Apple Health as part of the ACA expansion population receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for Apple Health under the ACA expansion requires that an individual (1) be an adult 19 to 64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 138% of the Federal Poverty Level.

13. The monthly average caseload of the ACA expansion population is approximately 602,000 in state fiscal year 2026. The average monthly federal Medicaid funding is $1.34. billion.

14. Under the ACA, States receive an enhanced FMAP for the costs of covering the expansion population. In 2026, the FMAP for Washington's expansion population is 90%, and Washington covers the remaining 10%.

15. Studies have shown that Medicaid expansion under the ACA has been associated with improvements in a wide range of public health metrics, including:

- Overall mortality has decreased, including mortality related to cancer, cardiovascular disease, and liver disease.
- Covered individuals have an improved ability to manage chronic disease and diabetes.
- Maternal and infant health outcomes have improved.
- Individuals are better able to access mental health care and manage health conditions such as depression.

16. The improved public health arising from increased coverage under the ACA expansion also contributed to broader positive trends for states and providers, including:

- A decline in uninsured patients accessing emergency and non-emergency care. As a result, the overall payer mix has improved.
- A decline in uncompensated care costs, particularly for hospitals and other providers in rural areas.

**<u>Washington's Efforts to Implement H.R. 1's Work Requirement</u>**

17. I and my staff at the Washington State Health Care Authority have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

18. H.R. 1's work requirement pertains to so-called "applicable individuals," which includes a state's ACA expansion population. These applicable individuals must now meet the work requirement for each month that they are enrolled in the plan. They can do so by (1) working at least 80 hours, (2) completing 80 hours of community service, (3) participating in a work program for at least 80 hours, (4) being enrolled in an educational program at least-half time, (5) engaging in a combination of those activities for at least 80 hours, (6) having a monthly income that is greater than the federal minimum wage multiplied by 80 hours, or (7) meeting a similar monthly income level and being a seasonal worker. 42 U.S.C. § 1396a(xx)(2).

19. H.R. 1 excluded certain individuals from having to comply with the work requirement. For example, those who are "medically frail," a group which includes individuals who are blind, have a substance use disorder, or have a serious or complex medical condition, are excluded from having to comply. 42 U.S.C. § 1396a(xx)(9)(A)(ii).

20. Prior to the enactment of H.R. 1, neither the Medicaid Act nor the ACA required financially eligible individuals to document their work, volunteer activities, time in school, or

other community engagement requirements to establish Medicaid eligibility. Consequently, since H.R. 1's passage, HCA has been forced to create a new system for verifying applicable individuals' work, volunteer, or other community engagement activities, or determining whether those individuals are subject to an exclusion such as the medical frailty exclusion. Specifically, HCA had to begin the process of dramatically overhauling its existing procedures, staffing, and IT infrastructure for determining Medicaid eligibility in the following ways:

- Statutory analysis and policy updates.
- Developed system specifications and built system infrastructure including meetings with the CMS data and systems group twice monthly to review the state's minimum viable product check list.
- Budget allocation and expenditures on systems, vendors, and workforce.
- Drafted new member notices and application questions.
- Developed a medical code list to define medical frailty.
- Initiated public outreach including multiple webinars, publications, and paid media campaigns.

21. Since November 2025, those efforts also included consultation with CMS, which has been providing guidance on implementation of the work requirement. That process is ongoing, and Washington continues to receive updated information from CMS.

22. HCA first began notifying individuals that would be affected by the work requirement on September 1, 2026. Those notifications contained information about H.R. 1's work requirements, the reason the affected individual was receiving the notice, an explanation of different kinds of Medicaid coverage available in Washington, ways to verify whether an individual is required to comply with the work requirements in H.R. 1, ways to satisfy the work

requirements, ways to prove satisfaction of the work requirements, and an explanation of what might happen if an individual required to comply with the work requirements does not. A sample notification is available online at: https://www.hca.wa.gov/assets/free-or-low-cost/work-requirements-renewals-notice.pdf.

23. After sending those notifications, HCA received an increased communications from individuals reaching out with questions about the work requirement, including how they were affected, whether they qualified for an exception, and how they could meet the requirement.

24. To finish overhauling its eligibility verification infrastructure and otherwise implementing H.R. 1's work requirement, HCA must engage in further administrative work, including:

- End-to-end system testing and finalization of data connections; including verification hub, internal workload management system, Medicaid Eligibility Services Hub (MESH), and Interactive Voice Response (IVR) phone system.
- Revising medical frailty approach.
- Continuing outreach and education efforts.
- Completing customer service and eligibility staff training.
- Ongoing communications including direct client outreach, provider and stakeholder webinars, and paid media campaigns.

**H.R. 1's Work Requirement Will Strain HCA's Resources and Transform Its Eligibility Verification System**

25. Complying with H.R. 1's work requirement has diverted HCA's resources from other work, created new implementation costs, and led to administrative upheaval.

26. Because the federal government has never imposed work or community engagement requirements across Medicaid eligibility categories, Apple Health's eligibility system

was not built to support such requirements and cannot easily be reconfigured to incorporate the factors necessary to evaluate compliance with the work requirement.

27. HCA has received some federal funding to implement the work requirement, but that allocation has not covered all implementation costs, nor will it cover all such costs that will continue to accrue in the future. As a result, Washington has shifted funding from other critical priorities to cover these expenses.

28. HCA has also made significant personnel and support staff changes to implement the work requirement. Those changes include contracting with professional project management and technology services and hiring state staff to fill operations, policy, communications and technology roles.

29. These ongoing costs and staffing changes will be necessary because unlike eligibility determinations under the ACA expansion, which were largely focused on income, eligibility determinations under H.R. 1's work requirement will often be complex. For example, specially trained staff will need to assess nuanced issues such as determining whether someone meets medical frailty, assessing community engagement compliance and work hours and qualifying employer status associated with work requirements.

30. The additional staffing costs discussed above will be needed for other reasons as well. As more individuals are impacted and denied coverage or disenrolled, Apple Health expects more calls, more documents to process, and more appeals of adverse actions. HCA will also need to continually educate beneficiaries and other stakeholders about what H.R. 1's work requirement means and how it can be met.

31. Another significantly impacted area is re-determination of Medicaid eligibility. As an initial matter, re-determinations of eligibility must now be conducted twice as frequently, occurring at least every six months. 42 U.S.C. § 1396a(e)(14)(L).

32. Verification that an applicable individual has satisfied the work requirement may be conducted ex parte—without action from the applicable individual—when HCA has access to reliable information showing that the work requirement has been satisfied. 42 U.S.C. § 1396a(xx)(5). But if such information is not available, HCA must contact the individual and request that they submit additional information. *Id.*

**Impact If Washington Did Not Comply With H.R. 1's Work Requirement**

33. The consequences of declining to implement H.R. 1's work requirement would be devastating for Washington. Under 42 U.S.C. § 1396c, all of Washington's Medicaid funding, which totals $13.3 billion and makes up about 12 percent of Washington's budget, would be placed at risk if Washington failed to implement the work requirement.

34. Even losing funding for Washington's ACA expansion population would be devastating. $6.5 billion—which is 41% of Washington's total FFP—comes from FFP for the ACA expansion population. Also, 90% of Apple Health's funding for the ACA expansion population comes from the federal government.

35. As a result, providing coverage for the ACA expansion population in Washington solely by using state funds would be practically impossible. Indeed, Washington is already operating under serious financial constraints in part because of the other fiscal impacts of H.R. 1. Washington's Legislature will, in the 2027 Legislative Session, adopt a biennial budget covering the 2027–2029 fiscal years (July 1, 2027–June 30, 2029). This comes at a time of significant fiscal constraints, with the cost of current services outpacing the amount of revenue that Washington can

expect. This is because of inflation, cuts in federal funding (including those in H.R. 1), Washington's population growth, and ongoing economic uncertainty in addition to various other factors. Washington's Office of Financial Management asked agencies, including the Health Care Authority, to provide budget requests that "focus only on addressing mandatory increases while not expanding existing programs and services." Such budget requests were due on Monday, September 14, 2026, and HCA provided such requests to the Office of Financial Management. It did not include a request for Washington State to fully fund the ACA Medicaid expansion population.

**Human and Public Health Costs of H.R. 1's Work Requirement**

36. The purpose of the ACA was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the work requirement included in H.R. 1 is expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility with appropriate documentation.

37. As noted above, there have been significant public health benefits from the ACA expansion. Each of those improvements will be undermined by the large-scale disenrollment of members due to the work requirement.

38. For example, HCA estimates that at least 20% of Washington Apple Health's ACA expansion members will be disenrolled at some point due to the combination of community engagement requirements and six-month redeterminations. And Washington's uninsured rates will increase by up to 23% as a result.

39. In addition to these disenrollments due to loss of eligibility, many other members will lose coverage due to inability to document compliance with the work requirement or

administrative error. Unfortunately, this type of disenrollment is a statistical inevitability given the size of the ACA expansion population.

40. Some of the individuals disenrolled because of the work requirement may subsequently re-establish eligibility and re-gain coverage. But when they do, some of those individuals will have experienced a deterioration in their overall health because, for example, they may have chronic conditions that went untreated during the lapse in their coverage. This means those individuals will not only suffer unnecessarily, but also, they will become costlier to insure. This type of "churn" in Medicaid enrollment both raises costs for HCA and decreases quality of care for members.

41. H.R. 1's changes also prevent an individual who is disenrolled for failing to meet the work requirement from purchasing subsidized coverage through an ACA exchange. 42 U.S.C. § 1396a(xx)(7)(B) now provides that a person who would have been eligible for Medicaid expansion coverage "but for a failure to meet the" work requirement is nonetheless deemed to have minimum essential coverage. Because they are defined to have minimum essential coverage—despite not *actually* having such coverage—they are completely disqualified from receiving advance premium tax credits to allow them to purchase subsidized coverage. 29 U.S.C. § 36B. As a result, disenrolled individuals are at greater risk of incurring catastrophic health expenditures.

42. HCA has spent years conducting outreach and building relationships with Apple Health enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

43. The burdens from the work requirement imposed by H.R. 1 also fall on Washington more generally. As noted above, Apple Health members will face increased denials and

disenrollments, which will likely impact Apple Health's most medically needy members. Washington's budget will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage. As the uninsured rate increases, there will be a greater financial strain on providers—particularly rural, community, and safety net hospitals as well as community health centers—that will be called upon to provide even greater levels of uncompensated care. Patients without coverage who seek emergency care will particularly strain publicly run hospitals, which are generally required by federal law to treat patients seeking emergency care regardless of those patients' ability to pay. Some of the costs of that uncompensated care will be shifted to the broader healthcare delivery system and the State.

44. Individuals who are disenrolled from Apple Health will likely lose access to primary, preventive, and other routine medical care, resulting in more individuals either deferring care or seeking high-cost, emergency care. The harms associated with such a large-scale deferral and disruption of care are likely to be high. There will be fewer opportunities for early-stage disease detection, higher risks for adverse health effects during pregnancy and childbirth, fewer opportunities for substance abuse treatment, and increased morbidity and mortality for late-stage disease, among other negative health outcomes.

45. The adverse consequences arising from large-scale disenrollment will also create more strain on HCA. For example, a lack of preventative care may result in increased communicable disease outbreaks—including measles, polio, and sexually transmitted infections—that risk impacting Washington's population as a whole. Reduced prenatal care will lead to higher rates of complications for newborns, such as low birth weight and congenital defects. In sum, HCA expects poorer health outcomes across Washington, as fewer people will be able to access appropriate care and manage chronic conditions.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 3rd day of November 2026.

Trinity Wilson
Medicaid Director
Washington State Health Care Authority