# EXHIBIT 1

**Congressional Budget Office**
Supplemental Cost Estimate

October 28, 2025

## Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14 Title VII, Finance, Subtitle B, Health, Chapter 1, Medicaid

**As enacted on July 4, 2025**

By Fiscal Year, Billions of Dollars

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2025-2029 | 2025-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Increases or Decreases (-) in Direct Spending** | | | | | | | | | | | | |
| Budget Authority | -45 | -16,452 | -46,852 | -62,843 | -93,011 | -111,201 | -128,216 | -140,352 | -150,712 | -164,976 | -219,203 | -914,661 |
| Estimated Outlays | -45 | -16,847 | -46,747 | -62,661 | -92,944 | -111,441 | -128,616 | -139,659 | -150,708 | -164,965 | -219,244 | -914,634 |
| **Increases or Decreases (-) in Revenue** | | | | | | | | | | | | |
| Estimated Revenues | 0 | -454 | -1,460 | -2,020 | -2,798 | -3,289 | -3,899 | -4,294 | -4,588 | -5,078 | -6,732 | -27,880 |
| **Increase or Decrease (-) in the Deficit From Changes in Direct Spending and Revenues** | | | | | | | | | | | | |
| Effect on the Deficit | -45 | -16,393 | -45,287 | -60,641 | -90,146 | -108,152 | -124,717 | -135,365 | -146,120 | -159,887 | -212,512 | -886,754 |

Budget authority includes estimated and specified amounts.

As part of the reconciliation process that resulted in the enactment of the 2025 reconciliation act (Public Law 119-21), the House Committee on Energy and Commerce and the Senate Committee on Finance were instructed to recommend legislative changes that met specified budget targets over the 2025-2034 period. This document provides an explanation of CBO's estimate for the budgetary effects of title VII, Finance, subtitle B, Health, chapter 1, Medicaid, of P.L. 119-21, as enacted in July 2025. The amounts shown in the text and tables are the same as those that CBO estimated in July 2025.[1]

CBO and the staff of the Joint Committee on Taxation (JCT) estimate that implementing the provisions in chapter 1 will reduce the deficit by $886.8 billion over the 2025-2034 period. CBO estimates that the combined effects of the provisions in the chapter will increase the number of people without health insurance by 7.5 million in 2034.

### Basis of Estimate

This estimate covers the 2025-2034 period and is relative to the January 2025 baseline. Outlays of appropriated amounts were estimated using historical obligation and spending rates for similar programs. Under an agreement between CBO and the House and Senate

1. Congressional Budget Office, estimated budgetary effects of Public Law 119-21, to provide for reconciliation pursuant to title II of H. Con. Res. 14, relative to CBO's January 2025 Baseline (July 21, 2025), www.cbo.gov/publication/61570.

Committees on the Budget to focus analytical resources on reconciliation, this estimate accounts for judicial decisions and administrative actions through April 10, 2025.[2]

**Moratorium on Implementing Rules Related to Eligibility for and Enrollment in Publicly Funded Health Programs.** The Centers for Medicare & Medicaid Services (CMS) issued two final rules, one each in 2023 and 2024 (referred to in combination as the Eligibility and Enrollment final rule), that addressed publicly funded health programs. Separate sections of chapter 1 prevent parts of those rules from being implemented, administered, or enforced through the end of fiscal year 2034.

*Medicare Savings Programs.* Section 71101 of chapter 1 blocked parts of a September 2023 final rule that made changes to enrollment requirements and procedures for Medicare Savings Programs (MSPs).[3] Those programs, financed through Medicaid, subsidize Medicare premiums for low-income Medicare beneficiaries and, in some cases, cover their cost-sharing requirements. Because MSPs are funded by Medicaid, new enrollment in MSPs or beneficiaries staying enrolled in MSPs longer results in increases both in Medicaid enrollment and in Medicaid spending, even though the benefits themselves offset Medicare-related costs. Among other provisions, the 2023 rule established processes for states to facilitate MSP applications for people who were eligible for the low-income subsidy (LIS) under Medicare Part D.

Under the LIS-focused provision of the 2023 rule, states were required to use LIS data to identify people who were eligible for MSPs but not yet enrolled. States also were required to provide those people with information about the availability of full Medicaid benefits and to collect any additional information needed to assess their eligibility for full benefits. Based on administrative data, CBO estimated the number of people receiving LIS who are not currently enrolled in an MSP. CBO expects that most of the newly enrolled people would receive assistance with Medicare premiums and cost sharing only; a smaller group would be eligible for full benefits in the Medicaid program.

Increases in MSP enrollment also affect Medicare spending. CBO expected that under the 2023 rule, beneficiaries who received cost-sharing assistance would be more likely to use Medicare-covered services, resulting in higher spending for Medicare. Under section 71101, enrollees who no longer receive that assistance will have higher out-of-pocket costs, which would be expected to curtail their use of Medicare services and reduce Medicare spending.

Because the blocked provisions of the rule were not yet enforceable, and states had made only limited progress in implementation, CBO expects that under section 71101, states will maintain or reinstate earlier administrative practices and that Medicaid enrollment will return to trends in place before the rule was made final.

---

2. That agreement supplements a long-standing agreement between CBO and the Budget Committees. See Congressional Budget Office, *CBO Explains How It Incorporates Administrative and Judicial Actions When Updating Its Baseline Projections and Preparing Cost Estimates* (December 2024), www.cbo.gov/publication/60846.

3. Centers for Medicare & Medicaid Services, "Streamlining Medicaid; Medicare Savings Program Eligibility Determination and Enrollment," final rule, 88 *Fed. Reg.* 65230 (September 21, 2023), https://tinyurl.com/2up3bvw4.

CBO estimates that implementing section 71101 will decrease deficits by $66.0 billion over the 2026-2034 period and that the number of people without health insurance in 2034 will not change. Those estimates account for CBO's assessment that most people who are affected by section 71101 will remain enrolled in Medicare, but that Medicaid enrollment among dual enrollees will decrease by about 800,000 people in 2034.

*Medicaid and the Children's Health Insurance Program.* Section 71102 blocked several provisions of the 2024 rule.[4] Among other changes, the rule specified that states may conduct annual eligibility determinations only for people who are aged, blind, or disabled; that is, less frequently than under some states' practices before the rule was issued. The 2024 rule also specified that states could not require those enrollees to attend in-person interviews for eligibility redetermination. States were directed to provide Medicaid enrollees with clear guidance and adequate time to confirm their continuing eligibility, and to take extra steps before terminating coverage because of returned mail.

CBO estimates that enrollment in each Medicaid eligibility category would have been higher under the April 2024 rule because administrative barriers to enrollment and renewal would have been lower. Using information provided in CMS's analysis of the rule, CBO estimates that eligibility groups other than the aged or disabled populations would have been about 1 percent higher. For populations whose eligibility is determined by age or disability and to project the effect of reducing administrative terminations on those groups, CBO's estimate also incorporates administrative data on the rate at which beneficiaries lose and regain coverage. CBO estimates that enrollment would have been about 1.5 percent higher for those groups.

CBO expects that under section 71102, states will reinstate earlier administrative practices and that enrollment will return to trends in place before the 2024 rule took effect. CBO's expectation for section 71102, as for section 71101, reflects the fact that the blocked provisions were not yet subject to full compliance and that any preliminary steps states may have taken are not likely to result in continued adoption of the new practices once the policies are blocked.

CBO and JCT estimate that implementing section 71102 will decrease deficits by $53.6 billion over the 2025-2034 period. CBO estimates that the number of people without health insurance will increase by 400,000 in 2034.

**Eligibility Redeterminations.** Section 71107 requires states to conduct Medicaid eligibility redeterminations every six months, rather than annually, beginning in January 2027 for adults who gained Medicaid eligibility under the Affordable Care Act (ACA).

CBO estimates that 10 percent of that group will no longer have coverage after the first 6-month redetermination. That estimate is based on disenrollment probabilities drawn from experience with 12-month redeterminations, adjusted for the effects of more frequent reviews. As a result, some people are expected to be removed from the program earlier than

4. Centers for Medicare & Medicaid Services, "Medicaid Program; Streamlining the Medicaid, Children's Health Insurance Program, and Basic Health Program Application, Eligibility Determination, and Renewal Processes," final rule, 89 *Fed. Reg.* 22780 (April 2, 2024), https://tinyurl.com/y9ebx2pt.

would have occurred before the 2025 reconciliation act became law.

Drawing from national research and CBO's analyses of the phaseout of continuous enrollment protections during the coronavirus public health emergency, CBO estimates that 30 percent of enrollees who will no longer have coverage under section 71107 will be ineligible for Medicaid at the time of the redetermination. CBO expects that the other 70 percent will no longer have coverage because of procedural reasons (such as missed paperwork), because of problems with communication, or because of difficulty with navigating reenrollment.

CBO and JCT estimate that implementing section 71107 will decrease deficits by $58.0 billion over the 2025-2034 period. CBO estimates that the number of people without health insurance will increase by 700,000 in 2034.

**Provider Taxes.** Section 71115 prevents states from increasing existing taxes on providers and bars states from creating new tax arrangements for providers. For states that expanded Medicaid coverage under the ACA, the section also reduces what is termed the hold-harmless threshold by 0.5 percentage points annually on taxable amounts that providers collect for certain services. In 2028, the threshold will be reduced from 6.0 percent to 5.5 percent, and it will fall to 3.5 percent in 2032 and subsequent fiscal years.[5]

Almost all states finance a portion of their Medicaid spending through taxes collected from health care providers.[6] Those amounts finance additional payments to Medicaid providers, leaving them at least no worse off (that is, held harmless) than they were before the tax. States also use the revenue to cover additional services or expand enrollment. Provider taxes increase Medicaid spending, which in turn raises federal matching payments. Historically and through 2027, federal law effectively allows states to use such arrangements when the taxes they collect do not exceed 6 percent of a provider's net profit from treating patients, as long as similar types of providers are taxed at uniform rates.

CBO anticipates that implementing section 71115 will reduce the amount of revenue available to states to finance their portion of Medicaid funding and that states will not replace all of the lost revenue with revenue from other sources. Instead, CBO expects that states will reduce spending in the program areas that had been supported by provider tax revenues by reducing payment rates to providers or reducing Medicaid enrollment by revising eligibility policies and procedures. Because the lower threshold on the allowable tax rate affects only the states that expanded coverage under the ACA, CBO estimates an increased likelihood that some states will discontinue that expanded coverage and that none will expand coverage in the future. As a result, CBO estimates that Medicaid enrollment will decrease by 2.4 million people in 2034, mostly adults covered under the ACA, and that 1.3 million of those people will obtain coverage from other sources.

Based on historical provider tax collections, CBO and JCT estimate that implementing

---

5. In rare situations, CMS allows states to tax providers above the threshold, as long as they ensure that providers are not indirectly held harmless for the tax.

6. Medicaid and CHIP Payment and Access Commission. *Issue Brief: Health Care-Related Taxes in Medicaid* (May 2021), https://tinyurl.com/3acjh37m.

section 71115 will decrease deficits by $182.7 billion over the 2025-2034 period, and CBO estimates that the number of people without health insurance will increase by 1.1 million in 2034.

**State-Directed Payments.** Section 71116 lowers the upper limit on state-directed payments that managed care organizations can make to hospitals and nursing facilities and for physician services provided at academic medical centers. State-directed payments are also used for other services, including behavioral health and primary care, but payments for those services are not affected by the legislation. State-directed payments often supplement the base rates that providers receive for Medicaid services and make up a growing share of federal Medicaid spending. In 2024, CBO estimated that federal spending was $64 billion for state-directed payments.

Section 71116 reduces the payment limit from the commercial rate to 100 percent of Medicare's payment rates in expansion states and 110 percent in states that did not expand Medicaid under the ACA. Under section 71116, current state-directed payments above Medicare's rates can continue until fiscal year 2028; after that they must be reduced by 10 percentage points annually until they meet the applicable cap.

Using data from CMS, including state applications for state-directed payments, and information from the RAND Corporation on rates paid by commercial insurers, CBO estimates that implementing section 71116 will decrease federal outlays for Medicaid by $149.4 billion over the 2025-2034 period.[7] Federal spending will decline, CBO estimates, because spending on hospitals, nursing facilities, and physician services at academic medical centers will fall as states lower their payments to match Medicare's rates. CBO estimates that implementing section 71116 will not affect the number of people without health insurance.

**Community Engagement Requirements.** Section 71119 directs states to require certain Medicaid enrollees to spend at least 80 hours each month in activities, such as work, job training, education, or community service, as a condition of eligibility. The requirement applies to able-bodied adults between the ages of 19 and 64 who have no dependents under the age of 14.

Under section 71119, enrollees who do not meet the requirement or qualify for an exception will lose eligibility for Medicaid. Exceptions are mandatory for people who are medically frail, pregnant, recently incarcerated, or members of an American Indian or Alaska Native tribe. States may request exceptions for people who require a stay in a hospital or nursing facility within the month, live in a county with a Presidential declaration of an emergency or disaster, or live in a county with an unemployment rate that is either above 8 percent or 1.5 times higher than the national average. Under section 71119, states may begin imposing the requirement starting on January 1, 2027, but must do so by January 1, 2029.

CBO expects that implementing section 71119 will reduce Medicaid enrollment because some people will not meet the community engagement requirement and some will be unable

7. Christopher M. Whaley and others, *Prices Paid to Hospitals by Private Health Plans: Findings From Round 5.1 of an Employer-Led Transparency Initiative* (RAND, December 2024), https://tinyurl.com/3xch4kvh.

to verify their status. Based on data from the Census Bureau's Current Population Survey, CBO estimates that most Medicaid enrollees who are subject to the requirement either will satisfy it or will qualify for an exception; the rest, about 2.9 million in 2034, will lose coverage.

Based on research and data from states that have implemented community engagement demonstrations, as well as an analysis of the phaseout of continuous enrollment during the coronavirus public health emergency, CBO anticipates that about 2.8 million additional people will lose Medicaid coverage in 2034 because the requirement will add steps to the application process. Applicants will need to provide evidence that they either have met the requirement or that they qualify for an exception, and states will need to verify that information during the application process. States can automate some of the process by using available data on some enrollees' work status and other relevant information, but CBO expects that such information is not readily obtainable for all types of work, community engagement activities, or conditions that qualify for an exception. In some cases, verification will be more difficult for states to administer and for enrollees to navigate. Because of that administrative difficulty, CBO also expects that about 5 percent of the enrollees who could lose coverage because they do not work or qualify for an exemption will keep their Medicaid coverage because of verification errors or less rigorous enforcement in some states.

CBO expects that most people who lose Medicaid coverage under the section will become uninsured. A few will have access to and enroll in employment-based coverage, and, as specified in section 71119, none will be eligible to claim the premium tax credit.

CBO and JCT estimate that implementing section 71119 will decrease deficits by $317.0 billion over the 2025-2034 period. CBO also estimates that the number of people without health insurance will increase by 5.3 million in 2034.

**Other Medicaid-Related Effects and Interactions Among Policies.** CBO and JCT estimate that implementing the remaining Medicaid-related policies in chapter 1, and accounting for interactions among all of the related policies, will, on net, decrease deficits by $60.1 billion over the 2025-2034 period and, CBO estimates, result in no additional net effects on the number of people without health insurance in 2034.

### Uncertainty

CBO's estimates of the budgetary and coverage effects of implementing the Medicaid policies in the 2025 reconciliation act are subject to significant uncertainty.

The changes in policy would affect the reactions of states, employers, insurers, and individual Medicaid enrollees; those responses are generally uncertain. For example, in CBO's estimate, no additional states will expand Medicaid in the future, mainly because of the changes to provider taxes that were enacted in section 71115. If states do expand Medicaid under the ACA in the future, or if more states that already expanded Medicaid decide to withdraw the expansion, federal spending associated with that provision could increase or decrease.

Significant uncertainty surrounds states' implementation of the community engagement requirements in section 71119; to date, only Arkansas and Georgia have implemented similar

requirements. CBO relied on those states' experiences to inform the estimate. To the extent that those states do not represent any practices that will be adopted by other states, the number of people losing Medicaid coverage could be higher or lower than estimated.

Considerable uncertainty also surrounds the degree to which states and providers will respond to the Medicaid-financing changes in the legislation. For example, it is uncertain whether or to what extent states will shift toward other supplemental payment mechanisms in response to the reduced upper-payment limit on state-directed payments in section 71116. If states increase other types of supplemental payments by more or less than expected to offset the reduction in state payments, the budgetary effects of implementing section 71116 could differ from those estimated here.

## Estimate Prepared By

Federal Costs:

Aaron Pervin (Medicaid)
Robert Stewart (Medicaid)
Carolyn Ugolino (Medicaid)
Emily Vreeland (private coverage)
Amy Zettle (Medicaid)

## Estimate Reviewed By

Sean Dunbar
Chief, Low-Income Health Programs and Prescription Drugs Cost Estimates Unit

Chad Chirico
Director of Budget Analysis

## Estimate Approved By

Phillip L. Swagel
Director, Congressional Budget Office