# EXHIBIT 5

DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

March 17, 2021

Dawn Stehle
Deputy Director for Health & Medicaid
Arkansas Department of Human Services
112 West 8th Street, Slot S401
Little Rock, AR 72201-4608

Dear Ms. Stehle:

On February 12, 2021, the Centers for Medicare & Medicaid Services (CMS) sent you a letter regarding the March 5, 2018 amendment to the section 1115 demonstration project "Arkansas Works" (Project Number 11-W-00287/6). The letter advised that CMS would commence a process of determining whether to withdraw the authorities previously approved in the Arkansas Works demonstration that permit the state to require work and other community engagement activities as a condition of Medicaid eligibility. It explained that in light of the ongoing disruptions caused by the COVID-19 pandemic, Arkansas's community engagement requirement risks significant coverage losses and harm to beneficiaries. For the reasons discussed below, CMS is now withdrawing approval of the community engagement requirement in the March 5, 2018 amendment to Arkansas Works, which is not currently in effect and which, in any event, would expire by its terms on December 31, 2021.

Section 1115 of the Social Security Act (the Act) provides that the Secretary of Health and Human Services (HHS) may approve any experimental, pilot, or demonstration project that, in the judgment of the Secretary, is likely to assist in promoting the objectives of certain programs under the Act. In so doing, the Secretary may waive Medicaid program requirements of section 1902 of the Act, and approve federal matching funds per section 1115(a)(2) for state spending on costs not otherwise matchable under section 1903 of the Act, which permits federal matching payments only for "medical assistance" and specified administrative expenses.[1] Under section 1115 authority, the Secretary can allow states to undertake projects to test changes in Medicaid eligibility, benefits, delivery systems, and other areas across their Medicaid programs that the Secretary determines are likely to promote the statutory objectives of Medicaid.

As stated in the above referenced letter sent on February 12, 2021, under section 1115 and its implementing regulations, CMS has the authority and responsibility to maintain continued oversight of demonstration projects in order to ensure that they are currently likely to assist in promoting the objectives of Medicaid. CMS may withdraw waivers or expenditure authorities if it "find[s] that [a] demonstration project is not likely to achieve the statutory purposes." 42 C.F.R. § 431.420(d); see 42 U.S.C. § 1315(d)(2)(D).

---

[1] 42 U.S.C. § 1315.

As the February 12, 2021 letter explained, the Arkansas Works community engagement requirement is not in effect. Although implementation began in June 2018, it was halted by court order in March 2019. Before that court ruling, per the state's reporting, more than 18,000 beneficiaries lost coverage for non-compliance with the community engagement requirement.[2] The early evidence for Arkansas, especially considered in light of the COVID-19 pandemic and its expected aftermath, makes clear that community engagement is infeasible. In addition, implementation of the community engagement requirement is currently prohibited by the Families First Coronavirus Response Act (FFCRA), Pub. L. No. 116-127, Div. F, § 6008(a) and (b), 134 Stat. 208 (2020), which conditioned a state's receipt of an increase in federal Medicaid funding during the pandemic on the state's maintenance of certain existing Medicaid parameters. Arkansas has chosen to claim the 6.2 percentage point FFCRA Federal Medical Assistance Percentage (FMAP) increase, and therefore, while it does so, must maintain the enrollment of beneficiaries who were enrolled as of, or after, March 18, 2020.

The February 12, 2021 letter noted that, although the FFCRA's bar on disenrolling such beneficiaries will expire after the COVID-19 public health emergency ends, CMS still has serious concerns about testing policies that create a risk of substantial loss of health care coverage and harm to beneficiaries even after the expiration of the bar on disenrolling beneficiaries. The COVID-19 pandemic has had a significant impact on the health of Medicaid beneficiaries. Uncertainty regarding the current crisis and the pandemic's aftermath, and the potential impact on economic opportunities (including job skills training and other activities used to satisfy community engagement requirements, i.e., work and other similar activities), and access to transportation and affordable child care have greatly increased the risk that implementation of the community engagement requirement approved in this demonstration will result in substantial coverage loss. In addition, the uncertainty regarding the lingering health consequences of COVID-19 infections further exacerbates the harms of coverage loss for Medicaid beneficiaries.

Accordingly, the February 12, 2021 letter indicated that, taking into account the totality of circumstances, CMS had preliminarily determined that allowing the community engagement requirement to take effect in Arkansas would not promote the objectives of the Medicaid program. Therefore, CMS provided the state notice that we were commencing a process of determining whether to withdraw the authorities approved in the Arkansas Works demonstration that permit the state to require work and other community engagement activities as a condition of Medicaid eligibility. See Special Terms and Conditions ¶ 13. The letter explained that if CMS ultimately determined to withdraw those authorities, it would "promptly notify the state in writing of the determination and the reasons for the amendment and withdrawal, together with the effective date, and afford the state an opportunity to request a hearing to challenge CMS's determination prior to the effective date." *Id*. The February 12, 2021 letter indicated that, if the state wished to submit to CMS any additional information that in the state's view may warrant not withdrawing those authorities, such information should be submitted to CMS within 30 days.

---

[2] Arkansas Department of Human Services (DHS). (2018). Arkansas Works Section 1115 Demonstration Annual Report. Retrieved from https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-works-annl-rpt-jan-dec-2018.pdf.

The additional information that Arkansas submitted did not assuage the concerns we raised in the February 12, 2021 letter. The state did not dispute that the COVID-19 pandemic has had a significant impact on the health of Medicaid beneficiaries and that there is uncertainty about the lingering health effects of COVID-19. Nor did the state demonstrate that it has the infrastructure in place—such as subsidies for job-skills training and transportation, for example—that may be necessary to make compliance with the community engagement requirement feasible for beneficiaries and prevent large-scale coverage losses, and it did not provide evidence that such infrastructure would be in place in the aftermath of the pandemic. Indeed, as discussed below, the state's experience during the period in which the community engagement requirement was in effect in Arkansas indicates that there was inadequate infrastructure in place even to make beneficiaries aware of the requirement, and significant coverage loss occurred during that period. The state also did not address how it would assure that all beneficiaries would successfully be able to meet the requirement, understanding that the COVID-19 public health emergency will potentially have long-term effects on economic activities and opportunities.

In light of these concerns, for the reasons set forth below, CMS has determined that, on balance, the authorities that permit Arkansas to require work and community engagement as a condition of eligibility are not likely to promote the objectives of the Medicaid statute. Therefore, we are withdrawing the community engagement authorities that were added in the Secretary's March 5, 2018 amendment approval for the Arkansas Works demonstration.

**Background of Arkansas's Demonstration**

The Arkansas Works demonstration was originally approved by CMS as the "Arkansas Health Care Independence Program (Private Option)" demonstration on September 27, 2013. It provided certain new adult group Medicaid beneficiaries (beneficiaries authorized under 1902(a)(10)(a)(i)(VIII) of the Act) with premium assistance to purchase qualified health plan (QHP) coverage through the Health Insurance Marketplace (the Marketplace). The current Arkansas Works section 1115 demonstration project was approved by CMS on December 7, 2016 and continued the use of premium assistance to allow certain new adult group beneficiaries to purchase QHP coverage offered through the individual market in the Marketplace. The 2016 Arkansas Works approval also created a mandatory employer sponsored insurance (ESI) program for certain beneficiaries with an offer of ESI and instituted a monthly premium requirement for beneficiaries with incomes over 100 percent of the federal poverty level, but did not make premium payment a condition of eligibility.

On March 5, 2018, CMS approved an amendment to the demonstration that required, among other things, non-exempt demonstration beneficiaries ages 19 to 49 to participate for a minimum of 80 hours per month in work or work-related activities, such as employment, education, job skills training, or community service. Additionally, beneficiaries were required to report monthly on their compliance with, or exemption from, the community engagement requirement. Three months of non-compliance with the requirement in a calendar year could result in the beneficiary being disenrolled and locked out of coverage until the next plan year, which would begin on January 1 of each year. The amendment exempted certain beneficiaries from the community engagement requirement, including beneficiaries who are medically frail or temporarily incapacitated, beneficiaries who are pregnant or within the 60-day post-partum

period, full-time students, beneficiaries caring for an incapacitated person or living in a home with a dependent child age 17 or younger, beneficiaries exempt from Supplemental Nutrition Assistance Program (SNAP) or Transitional Employment Assistance Cash Assistance work requirements, beneficiaries receiving unemployment benefits and beneficiaries participating in a treatment program for alcohol or substance use disorders.

**Early Experience from the Community Engagement Requirement in Arkansas**

Early experience with the community engagement requirement in Arkansas indicated that such a requirement risks rapid coverage loss.

Arkansas began implementing the community engagement requirement on June 1, 2018 for demonstration beneficiaries ages 30 to 49 and on January 1, 2019 for demonstration beneficiaries ages 19 to 29. The community engagement requirement was effective through March 27, 2019, when the U.S. District Court for the District of Columbia vacated the Secretary's approval of the demonstration amendment that authorized this requirement. Before the court halted the community engagement requirement, the state reported that from August 2018 through December 2018, a total of 18,164 individuals were disenrolled from coverage for "noncompliance with the work requirement." During these five months, the monthly rate of coverage loss as a percentage of those who were required to report work and community engagement activities fluctuated between 20 and 47 percent.[3]

Findings from a survey-based peer-reviewed study published in the New England Journal of Medicine showed that the uninsured rate among low-income Arkansans ages 30 to 49 — the group potentially subject to the community engagement requirement beginning in June 2018 — rose from 10.5 percent in 2016 to 14.5 percent in 2018, after the community engagement requirement took effect.[4] Furthermore, a follow-up study by the same researchers found that the policy led to a significant drop in Medicaid or Marketplace coverage by 13.2 percentage points and an increase in the uninsured rate of 7.1 percentage points among Arkansans ages 30 to 49, relative to other age groups and states.[5,6] (The group of individuals aged 19 to 29 was one of the comparison groups in this study because they were not subject to the community engagement

---

[3] Arkansas Department of Human Services (DHS). (2018 & 2019). Arkansas Works Section 1115 Demonstration Annual Reports. Retrieved from https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-works-annl-rpt-jan-dec-2018.pdf; https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ar-works-annl-rpt-jan-dec-2019.pdf.

[4] The study compares changes in outcomes before and after implementation of the community engagement requirement in Arkansas among individuals 30 to 49 years of age, as compared with Arkansans 19 to 29 years of age and those 50 to 64 years of age (who were not subject to the requirement in 2018) and with adults in three comparison states — Kentucky, Louisiana, and Texas.

[5] Sommers, B. D., Chen, L., Blendon, R. J., Orav, E. J., & Epstein, A. M. (2020). Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care. Health Affairs, 39(9), 1522-1530. Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538

[6] The target group comprised respondents 30 to 49 years of age in Arkansas. "Other ages" were the groups of respondents 19 to 29 years of age and those 50 to 64 years of age. Kentucky, Louisiana, and Texas were the comparison states.

requirement until January 2019,[7] and therefore, were not subject to disenrollment from coverage for failure to meet the community engagement requirement during 2018.) Similar increases in uninsured rates were not observed for low-income Arkansans outside the 30 to 49 age range or for low-income people aged 30 to 49 in other, similar states, where the community engagement requirement did not apply.[8,9,10]

In addition, based on the same research, Arkansans ages 30 to 49 reporting disenrollment from Medicaid or Marketplace coverage at any point in the prior year experienced significantly higher medical debt and financial barriers to care, compared to Arkansans ages 30 to 49 who maintained that coverage. Specifically, 50 percent reported serious problems paying off medical bills; 56 percent delayed seeking health care because of cost; and 64 percent delayed taking medications because of cost.[11] Evidence also indicates that those with chronic conditions were more likely to lose coverage.[12] All these findings indicate the serious and potentially long-term implications of the demonstration's community engagement requirement in terms of lost coverage and forgone health care among those who most need it, in sharp contrast to Arkansas's continued argument that the demonstration would lead to improved health among those subject to the requirements.

Despite state assurances in the demonstration's Special Terms and Conditions that Arkansas would provide the necessary outreach to Medicaid beneficiaries, a survey of beneficiaries subject to the community engagement requirement conducted in November and December of 2018 found that 33 percent of the adults 30 to 49 years of age who had Medicaid or Marketplace coverage had not heard anything about the requirement, while 44 percent of the adults 30 to 49 years of age who had Medicaid or Marketplace coverage or no insurance were unsure whether the policy applied to them.[13] Other studies also found evidence of widespread beneficiary

---

[7] Arkansas Department of Human Services (DHS). (2018). Arkansas Works Section 1115 Demonstration Annual Report. Retrieved from https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ar/Health-Care-Independence-Program-Private-Option/ar-works-annl-rpt-jan-dec-2018.pdf.

[8] Sommers, B.D., Goldman, A.L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2019). Medicaid work requirements—results from the first year in Arkansas. New England Journal of Medicine, 381(11), 1073-1082. Retrieved from https://www.nejm.org/doi/full/10.1056/nejmsr1901772

[9] Wagner, J., & Schubel, J. (2020). States' Experiences Confirm Harmful Effects of Medicaid Work Requirements. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/states-experiences-confirm-harmful-effects-of-medicaid-work-requirements

[10] Kentucky, like Arkansas, expanded Medicaid under the Affordable Care Act (ACA) in 2014 and planned to introduce work requirements in 2018, but the requirements were blocked by a federal court before implementation. Louisiana (expanded Medicaid in 2016) and Texas (has not expanded Medicaid) have not implemented a community engagement demonstration. All four study states are in the Southern census region and have poverty rates in the highest quartile of the United States.

[11] Sommers, B.D., Chen, L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2020). Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care. Health Affairs, 39(9), 1522-1530. Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538

[12] Chen, L. & Sommers, B.D. (2020). Work Requirements and Medicaid Disenrollment in Arkansas, Kentucky, Louisiana, and Texas, 2018. American Journal of Public Health, 110, 1208-1210. DOI https://doi.org/10.2105/AJPH.2020.305697

[13] Sommers, B.D., Goldman, A.L., Blendon, R.J., Orav, E.J., & Epstein, A. M. (2019). Medicaid Work Requirements—Results from the First Year in Arkansas. New England Journal of Medicine, 381(11), 1073-1082. Retrieved from https://www.nejm.org/doi/full/10.1056/nejmsr1901772

confusion and lack of awareness about the program requirements.[14,15] Policy awareness was found to be lower among beneficiaries with less education.[16] Overall, outreach and education efforts appear to have lacked the diversity of methods needed to successfully reach the target audience, and the beneficiaries that were reached had difficulty understanding the complexity of the information presented.[17] In addition to beneficiary confusion about the demonstration requirement, there was evidence of additional barriers, such as lack of internet access that prevented beneficiaries from reporting their compliance or qualification for an exemption when the state initially required all such reporting to be done online.[18] This lack of knowledge, as well as confusion, and practical barriers to monthly reporting exacerbated the administrative challenges to maintaining coverage.[19] Fortunately, evidence suggests that most of the Medicaid coverage losses in 2018 were regained in 2019, and the overall uninsured rates returned to levels seen before the community engagement requirement, after the court order vacating the approval of the demonstration amendment that authorized the community engagement requirement.[20]

Furthermore, there was no associated increase in employment or other community engagement activities among low-income individuals subject to the community engagement requirement either in the first year when the policy was still in effect or nine months after the policy was blocked.[21,22] Instead, data suggest that nearly everyone who was targeted by the Arkansas Works community engagement requirement (97 percent of the survey respondents 30 to 49 years of age

---

[14] Musumeci, M., Rudowitz, R., & Lyons, B. (2018). Medicaid Work Requirements in Arkansas: Experience and Perspectives of Enrollees. Kaiser Family Foundation. Retrieved from http://files.kff.org/attachment/Issue-Brief-Medicaid-Work-Requirements-in-Arkansas-Experience-and-Perspectives-of-Enrollees

[15] Hill, I., Burroughs, E. (2019). Lessons from Launching Medicaid Work Requirements in Arkansas. Retrieved from https://www.urban.org/sites/default/files/publication/101113/lessons_from_launching_medicaid_work_requirements_in_arkansas_3.pdf

[16] Greene, J. (2019). Medicaid Recipient Awareness of Work Requirements: Importance and Challenges. Health Affairs Blog, December 10, 2019. DOI: 10.1377/hblog20191205.883142.

[17] Musumeci, M., Rudowitz, R. & Lyons, B. (2018). Medicaid Work Requirements in Arkansas: Experience and Perspectives of Enrollees. Kaiser Family Foundation. Retrieved from http://files.kff.org/attachment/Issue-Brief-Medicaid-Work-Requirements-in-Arkansas-Experience-and-Perspectives-of-Enrollees

[18] Musumeci, M., Rudowitz, R. & Lyons, B. (2018). Medicaid Work Requirements in Arkansas: Experience and Perspectives of Enrollees. Kaiser Family Foundation. Retrieved from http://files.kff.org/attachment/Issue-Brief-Medicaid-Work-Requirements-in-Arkansas-Experience-and-Perspectives-of-Enrollees

[19] Sommers, B.D., Chen, L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2020). Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care. Health Affairs, 39(9), 1522-1530. Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538

[20] Sommers, B.D., Chen, L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2020). Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care. Health Affairs, 39(9), 1522-1530. Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538

[21] Sommers, B.D., Goldman, A.L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2019). Medicaid work requirements—results from the first year in Arkansas. New England Journal of Medicine, 381(11), 1073-1082. Retrieved from https://www.nejm.org/doi/full/10.1056/nejmsr1901772

[22] Sommers, B.D., Chen, L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2020). Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care. Health Affairs, 39(9), 1522-1530. Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538

in Arkansas in the Sommers et al. (2019) study) already met the requirement or was exempt from it, so there was little margin for the program to increase work or community engagement.[23]

Those outcomes are consistent with research indicating more generally that most Medicaid beneficiaries are already working or are likely to be exempt from a potential community engagement requirement.[24,25,26,27] For example, in a study published in 2018, researchers found that nearly 80 percent of adults with Medicaid coverage live in families with a working adult, and 6 in 10 are working themselves.[28] Similarly, a study published in 2017 found that, out of the 22 million adults covered by Medicaid nationwide (representing 58 percent of all adults covered by Medicaid) who could be subject to a community engagement requirement designed like that in Arkansas Works, 50 percent were already working, 14 percent were looking for work, and 36 percent were neither working nor looking for work.[29] For those beneficiaries not working or looking for work, 29 percent indicated that they were caring for a family member, 17 percent were in school, and 33 percent noted that they could not work because of a disability (despite excluding from analysis those qualifying for Medicaid on the basis of disability, highlighting the difficulty with disability determination), with the remainder citing layoff, retirement, or a temporary health problem.

Thus, overall, prior to the pandemic, the available data indicated that the vast majority of the population that would be targeted by a community engagement requirement, as in Arkansas's demonstration, were already meeting the potential terms of such a requirement or would qualify for an exemption from it. This makes it challenging for the community engagement requirement to produce any meaningful impact on employment outcomes by incentivizing behavioral changes in a small fraction of beneficiaries, all the while risking substantial coverage losses among those subject to the requirements.

In addition to Arkansas, New Hampshire and Michigan, the two other states where a community engagement requirement as a condition of Medicaid eligibility was in effect, provide additional

---

[23] Sommers, B.D., Goldman, A.L., Blendon, R.J., Orav, E.J., & Epstein, A.M. (2019). Medicaid work requirements—results from the first year in Arkansas. New England Journal of Medicine, 381(11), 1073-1082. Retrieved from https://www.nejm.org/doi/full/10.1056/nejmsr1901772

[24] Garfield, R., Rudowitz, R. & Damico, A. (2018). Understanding the intersection of Medicaid and work. Washington, D.C.: Kaiser Family Foundation. Retrieved from http://files.kff.org/attachment/Issue-Brief-Understanding-the-Intersection-of-Medicaid-and-Work

[25] Huberfeld, N. (2018). Can work be required in the Medicaid program? N Engl J Med;378:788-791. DOI: 10.1056/NEJMp1800549

[26] Goldman, A.L., Woolhandler, S, Himmelstein, D.U., Bor, D.H. & McCormick, D. (2018). Analysis of work requirement exemptions and Medicaid spending. JAMA Intern Med, 178:1549-1552. DOI:10.1001/jamainternmed.2018.4194

[27] Solomon, J. (2019). Medicaid Work Requirements Can't Be Fixed: Unintended Consequences are Inevitable Result. Center of Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/medicaid-work-requirements-cant-be-fixed

[28] Garfield, R., Rudowitz, R. & Damico, A. (2018). Understanding the intersection of Medicaid and work. Washington, D.C.: Kaiser Family Foundation. Retrieved from http://files.kff.org/attachment/Issue-Brief-Understanding-the-Intersection-of-Medicaid-and-Work

[29] Leighton Ku, L & Brantley, E. (2017). Medicaid Work Requirements: Who's At Risk? Health Affairs Blog. Retrieved from https://www.healthaffairs.org/do/10.1377/hblog20170412.059575/full/

early data on potential enrollment impacts that accords with the Arkansas experience.[30] In New Hampshire, for instance, within the span of just over a month when the community engagement requirement was in effect, almost 17,000 beneficiaries (about 40 percent of those subject to the community engagement requirement, and representing one-third of the demonstration's total enrollment) were set to be suspended for non-compliance and lose Medicaid coverage.[31,32,33] In Michigan, before the policy was vacated by the courts, 80,000 beneficiaries—representing nearly 33 percent of individuals subject to the community engagement requirement—were at risk of suspension, if not loss of coverage, for failing to report compliance with the community engagement requirement.[34] Similar to Arkansas, there was widespread evidence of confusion and lack of awareness among beneficiaries in these other states.[35] Moreover, in all three states, evidence suggests that even individuals who were working or those who had serious health needs, and therefore should have been eligible for exemptions, lost coverage or were at risk of losing coverage because of complicated administrative and paperwork requirements.[36]

Additionally, consistent and stable employment is often out of reach for beneficiaries subject to community engagement requirements. Many low-income beneficiaries face a challenging job market, which often offers only unstable or low-paying jobs with unpredictable or irregular hours, sometimes resulting in spells of unemployment, particularly in seasonal work.[37,38,39,40]

---

[30] Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, Washington, DC. (2021). Issue Brief No. HP-2021-03, Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence. Retrieved from https://aspe.hhs.gov/pdf-report/medicaid-demonstrations-andimpacts.

[31] Wagner, J., & Schubel, J. (2020). States' experiences confirming harmful effects of Medicaid work requirements. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/states-experiences-confirm-harmful-effects-of-medicaid-work-requirements

[32] New Hampshire Department of Health and Human Services. (2019). DHHS Community Engagement Report: June 2019. Retrieved from https://www.dhhs.nh.gov/medicaid/granite/documents/ga-ce-report-062019.pdf

[33] Hill, I., Burroughs, E., & Adams, G. (2020). New Hampshire's Experience with Medicaid Work Requirements: New Strategies, Similar Results. Urban Institute. Retrieved from https://www.urban.org/research/publication/new-hampshires-experiences-medicaid-work-requirements-new-strategies-similar-results

[34] Wagner, J., & Schubel, J. (2020). States' Experiences Confirm Harmful Effects of Medicaid Work Requirements. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/states-experiences-confirm-harmful-effects-of-medicaid-work-requirements

[35] Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, Washington, DC. (2021). Issue Brief No. HP-2021-03, Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence. Retrieved from https://aspe.hhs.gov/pdf-report/medicaid-demonstrations-andimpacts.

[36] Wagner, J., & Schubel, J. (2020). States' Experiences Confirm Harmful Effects of Medicaid Work Requirements. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/states-experiences-confirm-harmful-effects-of-medicaid-work-requirements

[37] Butcher, K., Schanzenbach, D. (2018). Most Workers in Low-Wage Labor Market Work Substantial Hours, in Volatile Jobs. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/poverty-and-inequality/most-workers-in-low-wage-labor-market-work-substantial-hours-in

[38] Center on Budget and Policy Priorities. (2020). Taking Away Medicaid for Not Meeting Work Requirements Harms Low-Wage Workers. Retrieved from https://www.cbpp.org/research/health/taking-away-medicaid-for-not-meeting-work-requirements-harms-low-wage-workers

[39] Gangopadhyaya, A., Johnston, E., Kenney, G., Zuckerman, S. (2018). Kentucky Medicaid Work Requirements: What Are the Coverage Risks for Working Enrollees? Urban Institute. Retrieved from https://www.urban.org/sites/default/files/publication/98893/2001948_kentucky-medicaid-work-requirements-what-are-the-coverage-risks-for-working-enrollees.pdf

[40] New Hampshire Fiscal Policy Institute. (2019). Medicaid Work Requirements and Coverage Losses. Retrieved from https://nhfpi.org/resource/medicaid-work-requirements-and-coverage-losses/

The rigid monthly requirement for reporting 80 or more hours in general is also of concern for low-income working adults who could be subject to a community engagement requirement. For example, 46 percent of this group as well as 25 percent of those working as many as 1,000 hours during a year (which would be sufficient for meeting the 80-hour monthly requirement) could be at risk of losing coverage for one or more months because they would not meet the minimum in every month.[41]

Furthermore, research examining the outcomes of statutorily authorized work requirements in other public assistance programs, such as Temporary Assistance for Needy Families (TANF) and Supplemental Nutrition Assistance Program (SNAP) indicates that such requirements generally have only modest and temporary effects on employment, failing to increase long-term employment or reduce poverty.[42,43,44] Additionally, studies have found that imposing work requirements in the SNAP program led to substantial reductions in enrollment, even after controlling for changes in unemployment and poverty levels.[45] In fact, evidence suggests that there were large and rapid caseload losses in selected areas after SNAP work requirements went into effect, similar to the coverage losses that occurred when Arkansas began implementing the community engagement requirement for beneficiaries of Arkansas Works ages 30 to 49.

Therefore, existing evidence from states that have implemented community engagement requirements, evidence from other public programs with work requirements, and the overall work patterns and job market opportunities for the low-income adults who would be subject to such requirements highlight the potential ineffectiveness of community engagement requirements at impacting employment outcomes for the target population. And while there are variations in the design and implementation of community engagement requirements in each state that has implemented such a requirement, as well as differences in employment and economic opportunities, findings from the states that implemented community engagement requirements point in the general direction of coverage losses among individuals subject to such requirements.

Thus, CMS is not aware of any reason to expect that the community engagement requirement as a condition of eligibility in Arkansas's Medicaid demonstration project would have a different

---

[41] Solomon, J. (2019). Medicaid Work Requirements Can't Be Fixed: Unintended Consequences are Inevitable Result. Center of Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/medicaid-work-requirements-cant-be-fixed

[42] Katch, H., Wagner, J. & Aron-Dine, A. (2018). Taking Medicaid Coverage Away From People Not Meeting Work Requirements Will Reduce Low-Income Families' Access to Care and Worsen Health Outcomes. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/health/taking-medicaid-coverage-away-from-people-not-meeting-work-requirements-will-reduce

[43] Danziger, S.K., Danziger, S., Seefeldt, K.S. & Shaefer, H.L. (2016). From Welfare to a Work-Based Safety Net: An Incomplete Transition. Journal of Policy Analysis & Management, 35(1), 231-238. DOI: https://doi.org/10.1002/pam.21880

[44] Pavetti, L. (2016). Work Requirements Don't Cut Poverty, Evidence Shows. Center on Budget and Policy Priorities. Retrieved from https://www.cbpp.org/research/poverty-and-inequality/work-requirements-dont-cut-poverty-evidence-shows

[45] Ku, L., Brantley, E. & Pillai, D. (2019). The Effects of SNAP Work Requirements in Reducing Participation and Benefits From 2013 to 2017. American Journal of Public Health 109(10), 1446-1451. DOI: https://doi.org/10.2105/AJPH.2019.305232. Retrieved from https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305232

outcome in the future than what was observed during the initial implementation of such a requirement in Arkansas and other states. Arkansas's experience with implementing the Arkansas Works community engagement requirement between June 2018 and March 2019 shows rapid, significant coverage loss without an increase in employment or other community engagement. Accordingly, there is risk that Arkansas's demonstration project, as amended in 2018, will lead to coverage losses, a risk that is exacerbated by the ongoing COVID-19 public health emergency and its likely aftermath.

**Impact of COVID-19 and its Aftermath**

The COVID-19 pandemic and the uncertainty surrounding the long-term effects on economic activity and opportunities across the nation exacerbate the risks associated with tying a community engagement requirement to Medicaid eligibility, making such requirements infeasible under the current circumstances. There is a substantial risk that the COVID-19 pandemic and its aftermath will have a negative impact on economic opportunities for Medicaid beneficiaries. If employment opportunities are limited, Medicaid beneficiaries may find it difficult to obtain paid work in the aftermath of the COVID-19 pandemic.[46,47]

As discussed above, prior to the pandemic, most Medicaid adults who did not face a barrier to work were working.[48] However, one in three adult Medicaid beneficiaries was only working part-time during the COVID-19 public health emergency due to fewer opportunities for full-time employment and reduced availability of child care due to the public health emergency and its related economic effects.[49]

Job and income loss have also been more acute among the low-income population, those who have the least wherewithal to withstand economic shocks and are disproportionately enrolled in Medicaid.[50] Fifty-two percent of lower income adults (annual income below $37,500) live in

---

[46] Garfield, R., Rudowitz, R., Guth, M., Orgera, K. & Hinton, E. (2021). Work Among Medicaid Adults: Implications of Economic Downturn and Work Requirements. Kaiser Family Foundation. Retrieved from https://www.kff.org/report-section/work-among-medicaid-adults-implications-of-economic-downturn-and-work-requirements-issue-brief/.

[47] Gangopadhyaya, A. & Garrett, B. (2020). Unemployment, Health Insurance, and the COVID-19 Recession. Urban Institute. Retrieved from https://www.urban.org/sites/default/files/publication/101946/unemployment-health-insurance-and-the-covid-19-recession_1.pdf

[48] Garfield, R., Rudowitz, R., Guth, M., Orgera, K. & Hinton, E. (2021). Work Among Medicaid Adults: Implications of Economic Downturn and Work Requirements. Kaiser Family Foundation. Retrieved from https://www.kff.org/report-section/work-among-medicaid-adults-implications-of-economic-downturn-and-work-requirements-issue-brief/

[49] Garfield, R., Rudowitz, R., Guth, M., Orgera, K. & Hinton, E. (2021). Work Among Medicaid Adults: Implications of Economic Downturn and Work Requirements. Kaiser Family Foundation. Retrieved from https://www.kff.org/report-section/work-among-medicaid-adults-implications-of-economic-downturn-and-work-requirements-issue-brief/

[50] Despard, M., Weiss-Grinstein, M., Chun, Y. & Roll, S. (2020). COVID-19 Job and Income Loss Leading to More Hunger and Financial Hardship. Brookings Institution. Retrieved from https://www.brookings.edu/blog/up-front/2020/07/13/covid-19-job-and-income-loss-leading-to-more-hunger-and-financial-hardship/

households where someone has lost a job or taken a pay cut due to the pandemic.[51] And, understandably, households with a job or income loss were two-to-three times more likely to experience economic hardship than those who did not experience such a loss.[52,53] Fifty-nine percent of lower-income adults said they worry every day or almost every day about paying their bills.[54] There is also racial and ethnic disparity in the likelihood of reporting hardships; for example, compared to White households, Black households reported significantly higher chances of putting off filling prescriptions and difficulties making housing and other bill payments. Also, Hispanic households were more likely to experience food insecurity compared to White households.[55,56]

The pandemic may also exacerbate existing disparities, such as low-income individuals' lack of access to computers and reliable internet. For example, 29 percent of adults in households with annual incomes below $30,000 did not own a smartphone, and 44 percent did not have home broadband services in 2019.[57] Moreover, fewer than 8 percent of Americans with earnings below the 25th percentile have the capabilities to work remotely.[58] These disparities will result in fewer opportunities for beneficiaries to satisfy a community engagement requirement, particularly as more jobs have shifted to telework or "work from home" during the public health

---

[51] Parker, K., Horowitz, J.M., & Brown, A. (2020). About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19. Pew Research Center. Retrieved from https://www.pewresearch.org/social-trends/2020/04/21/about-half-of-lower-income-americans-report-household-job-or-wage-loss-due-to-covid-19/

[52] Despard, M., Weiss-Grinstein, M., Chun, Y. & Roll, S. (2020). COVID-19 Job and Income Loss Leading to More Hunger and Financial Hardship. Brookings Institution. Retrieved from https://www.brookings.edu/blog/up-front/2020/07/13/covid-19-job-and-income-loss-leading-to-more-hunger-and-financial-hardship/

[53] Gangopadhyaya, A. & Garrett, B. (2020). Unemployment, Health Insurance, and the COVID-19 Recession. Urban Institute. Retrieved from https://www.urban.org/sites/default/files/publication/101946/unemployment-health-insurance-and-the-covid-19-recession_1.pdf

[54] Parker, K., Horowitz, J.M., & Brown, A. (2020). About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19. Pew Research Center. Retrieved from https://www.pewresearch.org/social-trends/2020/04/21/about-half-of-lower-income-americans-report-household-job-or-wage-loss-due-to-covid-19/

[55] Despard, M., Weiss-Grinstein, M., Chun, Y. & Roll, S. (2020). COVID-19 Job and Income Loss Leading to More Hunger and Financial Hardship. Brookings Institution. Retrieved from https://www.brookings.edu/blog/up-front/2020/07/13/covid-19-job-and-income-loss-leading-to-more-hunger-and-financial-hardship/

[56] Gangopadhyaya, A. & Garrett, B. (2020). Unemployment, Health Insurance, and the COVID-19 Recession. Urban Institute. Retrieved from https://www.urban.org/sites/default/files/publication/101946/unemployment-health-insurance-and-the-covid-19-recession_1.pdf

[57] Anderson, M. & Kumar, M. (2019). Digital Divide Persists Even as Lower-Income Americans Make Gains in Tech Adoption. Pew Research Center. Retrieved from https://www.pewresearch.org/fact-tank/2019/05/07/digital-divide-persists-even-as-lower-income-americans-make-gains-in-tech-adoption/

[58] Maani, N., Galea, S. (2020). COVID-19 and Underinvestment in the Health of the US Population. The Milbank Quarterly. Retrieved from https://www.milbank.org/quarterly/articles/covid-19-and-underinvestment-in-the-health-of-the-us-population/

emergency, thereby increasing the risk that implementation of the community engagement requirement approved in this demonstration will result in unintended coverage loss.[59,60]

The impact of the COVID-19 public health emergency on the economy has been significant, and, importantly, experience with previous recessions suggest the impact is likely to persist for an extended period of time. While the unemployment rate has declined from 14.8 percent in April 2020 to 6.2 percent in February 2021, the labor force participation rate has shown no improvement since June 2020 and remains 1.9 percentage points below pre-pandemic levels.

Evidence shows that losing a job can have significant long term effects on an individual's future earnings. Studies have found that workers who lose their jobs in mass layoffs still earn 20 percent less than similar workers who kept their jobs, 15 to 20 years after the layoff,[61] and the impacts are greater for individuals who lose their jobs during a recession. On average, men lost 2.8 years of pre-layoff earnings when the mass layoff occurred in a time when the unemployment rate was above eight percent.[62] Further, workers who enter the labor market during a recession face long-term consequences for their earnings.[63] Also, nonwhites and individuals with lower educational attainment have experienced larger and more persistent earning losses than other groups who enter the labor market during recessions.[64] These layoffs can also impact an individual's mortality risk. For example, workers experienced mortality rates that were 50-100 percent higher than expected in the year after a layoff occurred, and 20 years later, mortality rates remained 10-15 percent higher for these individuals.[65] Furthermore, displaced workers have lower levels of healthcare utilization, and healthcare coverage losses and lack of care continuity could play a role in long-term effects on mortality rates.[66]

---

[59] Garfield, R., Rudowitz, R., Guth, M., Orgera, K. & Hinton, E. (2021). Work Among Medicaid Adults: Implications of Economic Downturn and Work Requirements. Kaiser Family Foundation. Retrieved from https://www.kff.org/report-section/work-among-medicaid-adults-implications-of-economic-downturn-and-work-requirements-issue-brief/

[60] Gangopadhyaya, A. & Garrett, B. (2020). Unemployment, Health Insurance, and the COVID-19 Recession. Urban Institute. Retrieved from https://www.urban.org/sites/default/files/publication/101946/unemployment-health-insurance-and-the-covid-19-recession_1.pdf

[61] Schwandt, H. & von Wachter, T.M. (2018). Unlucky Cohorts: Estimating the Long-term Effects of Entering the Labor Market in a Recession in Large Cross-sectional Data Sets. NBER Working Paper 25141. Retrieved from https://www.nber.org/papers/w25141

[62] Davis, S.J. & von Wachter, T. (2011). Recessions and the Costs of Job Loss. Brookings Papers on Economic Activity. Retrieved from https://www.brookings.edu/wp-content/uploads/2011/09/2011b_bpea_davis.pdf

[63] Schwandt, H. & von Wachter, T.M. (2018). Unlucky Cohorts: Estimating the Long-term Effects of Entering the Labor Market in a Recession in Large Cross-sectional Data Sets. NBER Working Paper 25141. Retrieved from https://www.nber.org/papers/w25141

[64] Schwandt, H. & von Wachter, T.M. (2018). Unlucky Cohorts: Estimating the Long-term Effects of Entering the Labor Market in a Recession in Large Cross-sectional Data Sets. NBER Working Paper 25141. Retrieved from https://www.nber.org/papers/w25141

[65] Sullivan, D. & von Wachter, T. (2009). Job Displacement and Mortality: An Analysis Using Administrative Data. Quarterly Journal of Economics. Retrieved from http://www.econ.ucla.edu/tvwachter/papers/sullivan_vonwachter_qje.pdf

[66] Schaller, J., Stevens, A. (2015). Short-Run Effects of Job Loss on Health Conditions, Health Insurance, and Health Care Utilization. Journal of Health Economics, 43, 190-203. DOI: 0.1016/j.jhealeco.2015.07.003. Retrieved from https://www.sciencedirect.com/science/article/pii/S0167629615000788

The pandemic could also bring long-term changes in the labor market, as levels of remote work are likely to remain higher than pre-pandemic levels, reducing the need for support staff and service industry workers in many cities. The disproportionate level of disruption in certain sectors also presents a significant concern about potential inequities in the economic recovery, as declines in employment have been much higher for Black and Hispanic women and in certain low-wage service sectors, such as hospitality and leisure, while certain sectors, such as financial services, have seen virtually no change.[67] In April 2020, the estimated unemployment rates (including individuals who were employed but absent from work and those not in the workforce but who wanted employment) for Black and Hispanic populations were as high as 32 and 31 percent, respectively, compared 24 percent for White populations.[68] Hispanic populations specifically are more likely to be affected due to their disproportionate representation in industries such as hospitality and construction, which have been most affected by the pandemic-related layoffs.[69,70,71]

As discussed below, Arkansas has not provided assurances that state-subsidized infrastructure is in place to ensure that barriers to compliance will not result in significant coverage losses. In addition, the approval of the amendment's community engagement requirement is not currently in effect and expires by its terms on December 31, 2021, which would not afford sufficient time to obtain reliable data regarding the effect of that demonstration in any event.

Given the short- and long-term negative consequences from the loss of timely access to necessary healthcare, the potential for coverage loss would be particularly harmful in the aftermath of the pandemic. During the pandemic, individuals have delayed or postponed seeking care, either due to concerns with out-of-pocket expenses, or to avoid risk of contact with infected individuals in healthcare settings. For example, one study showed that screenings for breast, colon, prostate, and lung cancers were between 56 and 85 percent lower in April 2020 than in the previous year.[72] Results of another survey-based study show that 40 percent of respondents canceled upcoming appointments due to the pandemic, and another 12 percent reported they needed care but did not schedule or receive services. These pandemic-related delays in seeking

---

[67] Rouse, C. (2021). The Employment Situation in February. Retrieved from https://www.whitehouse.gov/briefing-room/blog/2021/03/05/the-employment-situation-in-february/

[68] Fairlie, R., Couch, K. & Xu, H. (2020). The Impacts of COVID-19 on Minority Unemployment: First Evidence from April 2020 CPS Microdata. National Bureau of Economic Research. Retrieved from https://www.nber.org/system/files/working_papers/w27246/w27246.pdf

[69] Garfield, R., Rudowitz, R., Guth, M., Orgera, K. & Hinton, E. (2021). Work Among Medicaid Adults: Implications of Economic Downturn and Work Requirements. Kaiser Family Foundation. Retrieved from https://www.kff.org/report-section/work-among-medicaid-adults-implications-of-economic-downturn-and-work-requirements-issue-brief/

[70] Industries like health care and transportation have been less affected by the pandemic, and that has provided some cushion for black workers. See Despard et al. (2020).

[71] Krogstad, J.M., Gonzalez-Barrera, A. & Noe-Bustamante, L. (2020). U.S. Latinos among hardest hit by pay cuts, job losses due to coronavirus. Pew Research Center. Retrieved from https://www.pewresearch.org/fact-tank/2020/04/03/u-s-latinos-among-hardest-hit-by-pay-cuts-job-losses-due-to-coronavirus/

[72] Patt, D., Gordan, L., Diaz, M., Okon, T., Grady, L., Harmison, M., Markward, N., Sullivan, M., Peng, J., Zhau, A. (2020). Impact of COVID-19 on Cancer Care: How the Pandemic Is Delaying Cancer Diagnosis and Treatment for American Seniors. JCO Clinical Cancer Informatics, 4, 1059-1071. DOI: 10.1200/CCI.20.00134. Retrieved from https://ascopubs.org/doi/full/10.1200/CCI.20.00134

care are estimated to increase annual healthcare costs by a range of $30 to $65 billion.[73] Moreover, unmet need in healthcare may lead to substantial increases in subsequent mortality and morbidity.[74] In addition, the uncertainty regarding the lingering health consequences of COVID-19 infections further exacerbates the harms of any potential coverage loss for Medicaid beneficiaries.

Furthermore, as reported, the pandemic has had a disparate effect on the physical and mental health of Medicaid beneficiaries. Racial minorities and people living in low-income households are more likely to work in industries that are considered "essential services," which have remained open during the pandemic.[75] Additionally, occupations with more frequent exposure to COVID-19 infections, and that require close proximity to others (such as personal care aides and bus drivers) employ Black individuals at higher rates than Whites.[76] As a result, Black people may be at higher risk of contracting COVID-19 through their employment. The pandemic's mental health impact also has been pronounced among populations experiencing disproportionately high rates of COVID-19 cases and deaths. Specifically, Black and Hispanic adults have been more likely than White adults to report symptoms of anxiety and/or depressive disorder during the pandemic.[77]

**Evidence Submitted by Arkansas**

On March 12, 2021, Arkansas submitted a response to CMS's letter of February 12, 2021. As noted above, the February 12 letter informed Arkansas that we had preliminarily determined that allowing the community engagement requirement to take effect in Arkansas would not promote the objectives of the Medicaid program. The February 12 letter explained that in light of the COVID-19 public health emergency, Arkansas's community engagement requirement risks significant unintended coverage losses at a time when losing access to health care coverage would cause substantial harm to beneficiaries.

Arkansas' response does not assuage the concerns raised we raised in the February 12, 2021 letter. In its response, Arkansas requested that CMS reconsider withdrawing authority for the community engagement requirement and requested an additional ninety days to "review [its] enrollment data in the time periods prior to the implementation of the community engagement requirement until the administration of it ceased due to litigation." It argued that such an extension is necessary to perform data matches for the more than 18,000 beneficiaries who were

---

[73] McKinsey & Company (2020). Understanding the Hidden Costs of COVID-19's Potential on U.S. Healthcare. Retrieved from https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/understanding-the-hidden-costs-of-covid-19s-potential-impact-on-us-healthcare#

[74] Chen, J. & McGeorge, R. (2020). Spillover Effects Of The COVID-19 Pandemic Could Drive Long-Term Health Consequences For Non-COVID-19 Patients. Health Affairs Blog, DOI: 10.1377/hblog20201020.566558. Retrieved from https://www.healthaffairs.org/do/10.1377/hblog20201020.566558/full/

[75] Raifman, M.A., & Raifman, J.R. (2020). Disparities in the Population at Risk of Severe Illness From COVID-19 by Race/Ethnicity and Income. American Journal of Preventive Medicine, 59(1), 137–139. https://doi.org/10.1016/j.amepre.2020.04.003

[76] Hawkins, D. (2020). Differential Occupational Risk for COVID-19 and Other Infection Exposure According to Race and Ethnicity. American Journal of Industrial Medicine, 63(9):817-820. DOI: 10.1002/ajim.23145

[77] Panchal, N., Kamal, R., Cox, C. & Garfield, R. (2021). The Implications of COVID-19 for Mental Health and Substance Use. Kaiser Family Foundation. Retrieved from https://www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/

disenrolled during the project's first five months to determine how many of those disenrollments are attributable to the community engagement requirement. The state did not dispute that the COVID-19 pandemic has had a significant impact on the health of Medicaid beneficiaries and that there is uncertainty about the lingering health effects of COVID-19. Nor did the state dispute the pandemic's likely impact on economic opportunities for beneficiaries. There is significant uncertainty as to whether there will be employment opportunities for those beneficiaries who are not already working or exempt from the requirements, even once the public health emergency has ended. Moreover, although beneficiaries can satisfy the requirements through certain unpaid activities, Arkansas did not demonstrate that it has the infrastructure in place—such as subsidies for job-skills training, transportation, and child care—that may be necessary to make compliance with the community engagement requirements feasible for beneficiaries and prevent large-scale coverage losses.

Indeed, there is serious doubt that the necessary infrastructure was in place when the community engagement requirement was first implemented, as noted above. The state itself reported that from August 2018 through December 2018, a total of 18,164 individuals were disenrolled from coverage for failing to report the required number of hours or a qualifying exemption. Although Arkansas' March 12, 2021 letter suggests that this coverage loss was not attributable to the community engagement requirement, that claim is inconsistent with the state's contemporaneous report that it disenrolled those 18,164 individuals because they failed to report the required number of hours or a qualifying exemption.[78] Moreover, most of the Medicaid coverage losses in 2018 were regained in 2019, after the court order vacating the approval of the amendment to Arkansas Works that authorized the community engagement requirement.

The state's procedural objections are not well taken for the reasons set out in CMS's separate letter of February 12, 2021, indicating that CMS was rescinding the January 4, 2021 letters to which Arkansas refers.

**<u>Withdrawal of Community Engagement Requirement in the March 5, 2018 Amendment to the Arkansas Works Demonstration</u>**

Based on the foregoing, and pursuant to our obligation under section 1115 of the Act to review demonstration projects and ensure they remain likely to promote the objectives of Medicaid, CMS has determined that, on balance, the amendment approval authorizing Arkansas to implement a community engagement requirement as a condition of eligibility is not likely to promote the objectives of the Medicaid program. At a minimum, in light of the significant risks and uncertainties described above about the adverse effects of the pandemic and its aftermath, the information available to CMS does not provide an adequate basis to support an affirmative judgment that the community engagement requirement is likely to assist in promoting the objectives of Medicaid. Accordingly, pursuant to its authority and responsibility under applicable statutes and regulations to maintain ongoing oversight of whether demonstration projects are currently likely to promote those objectives, CMS is hereby withdrawing its approval of that portion of the March 5, 2018 amendment that permits the state to require work and community engagement as a condition of eligibility under the Arkansas Works

[78] The Center for Budget and Policy Priorities. (2019). Research Note: Medicaid Enrollment Decline among Adults and Children Too Large to be Explained by Declining Employment.

demonstration. The provisions of CMS's letter approving the March 5, 2018 amendment and the corresponding provisions of the waivers and Special Terms and Conditions that authorize the community engagement requirement are withdrawn.

The withdrawal of these authorities is effective on the date that is thirty days after the date of this letter, unless the state timely appeals, as discussed below. The waivers, expenditure authorities, and Special Terms and Conditions reflecting this change are attached to this letter and will govern the Arkansas Works demonstration from the effective date of the withdrawal of the community engagement authorities until the demonstration expires on December 31, 2021.

As indicated in CMS's February 12, 2021 letter, CMS is also reviewing the other authorities that CMS previously approved in the Arkansas Works demonstration. That review remains ongoing. The state and CMS will work together to update the evaluation design, as needed, to reflect all the key policies that are implemented during the approval period. The current established timeline for the interim and summative evaluation reports will remain in effect. CMS looks forward to continuing to work with the state on the evaluation design, interim and summative evaluation reports.

**Procedure to Appeal This Decision**

In accordance with Special Terms and Conditions 13 and 42 C.F.R. § 430.3, the state may request a hearing to challenge CMS's determination prior to the above-referenced effective date by appealing this decision to the Departmental Appeals Board (DAB or Board), following the procedures set forth at 45 C.F.R. part 16. This decision shall be the final decision of the Department unless, within 30 calendar days after the state receives this decision, the state delivers or mails (the state should use registered or certified mail to establish the date) a written notice of appeal to the DAB.

A notice of appeal may be submitted to the DAB by mail, by facsimile (fax) if under 10 pages, or electronically using the DAB's electronic filing system (DAB E-File). Submissions are considered made on the date they are postmarked, sent by certified or registered mail, deposited with a commercial mail delivery service, faxed (where permitted), or successfully submitted via DAB E-File. The Board will notify the state of further procedures. If the state faxes its notice of appeal (permitted only if the notice of appeal is under 10 pages), you should use the Appellate Division's fax number, (202) 565-0238.

To use DAB E-File to submit your notice of appeal, the state's Medicaid Director or representative must first become a registered user by clicking "Register" at the bottom of the DAB E-File homepage, https://dab/efile.hhs.gov/; entering the information requested on the "Register New Account" form; and clicking the "Register Account" button. Once registered, the state's Medicaid Director or representative should login to DAB E-File using the e-mail address and password provided during registration; click "File New Appeal" on the menu; click the "Appellate" button; and provide and upload the requested information and documents on the "File New Appeal-Appellate Division" form. Detailed instructions can be found on the DAB E-File homepage.

Due to the COVID-19 public health emergency, the DAB is experiencing delays in processing documents received by mail. To avoid delay, the DAB strongly encourages the filing of materials through the DAB E-File system. However, should the state so choose, written requests for appeal should be delivered or mailed to U.S. Department of Health and Human Services, Departmental Appeals Board MS 6127, Appellate Division, 330 Independence Ave., S.W., Cohen Building Room G-644, Washington, DC 20201. Refer to 45 C.F.R. Part 16 for procedures of the Departmental Appeals Board.

The state must attach to the appeal request, a copy of this decision, note its intention to appeal the decision, a statement that there is no dollar amount in dispute but that the state disputes CMS's withdrawal of certain section 1115 demonstration authorities, and a brief statement of why the decision is wrong. The Board will notify the state of further procedures. If the state chooses to appeal this decision, a copy of the notice of appeal should be mailed or delivered (the state should use registered or certified mail to establish the date) to Judith Cash, Acting Deputy Director, Center for Medicaid and CHIP Services at 7500 Security Blvd, Baltimore, MD 21244.

If you have any questions, please contact Judith Cash at (410) 786-9686.

Sincerely

[redacted]

Elizabeth Richter
Acting Administrator

# CENTERS FOR MEDICARE AND MEDICAID SERVICES
# EXPENDITURE AUTHORITY

**NUMBER:** **11-W-00287/6**

**TITLE:** **Arkansas Works Section 1115 Demonstration**

**AWARDEE:** **Arkansas Department of Human Services**

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made by the state for the items identified below, which are not otherwise included as expenditure under section 1903 shall, for the period of this demonstration be regarded as expenditures under the state's Title XIX plan but are further limited by the special terms and conditions (STCs) for the Arkansas Works Section 1115 demonstration.

As discussed in the Centers for Medicare & Medicaid Services' (CMS) approval letter, the Secretary of Health and Human Services has determined that the Arkansas Works section 1115 demonstration, including the granting of the waiver and expenditure authorities described below, is likely to assist in promoting the objectives of title XIX of the Social Security Act.
The following expenditure authorities shall enable Arkansas to implement the Arkansas Works section 1115 demonstration:

1. **Premium Assistance and Cost Sharing Reduction Payments.** Expenditures for part or all of the cost of private insurance premiums in the individual market, and for payments to reduce cost sharing under such coverage for certain beneficiaries as described in these STCs.

**Requirements Not Applicable to the Expenditure Authority:**

1. **Cost Effectiveness** — **Section 1902(a)(4) and 42 CFR 435.1015(a)(4)**

   To the extent necessary to permit the state to offer, with respect to beneficiaries through qualified health plans, premium assistance and cost sharing reduction payments that are determined to be cost effective using state developed tests of cost effectiveness that differ from otherwise permissible tests for cost effectiveness as described in these STCs.

**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**WAIVER LIST**

**NUMBER:** **11-W-00287/6**

**TITLE:** **Arkansas Works Section 1115 Demonstration**

**AWARDEE:** **Arkansas Department of Human Services**

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in accompanying expenditure authorities, shall apply to the demonstration project effective March 5, 2018 through December 31, 2021. In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of state plan requirements contained in section 1902 of the Act are granted for the Arkansas Works Section 1115 demonstration, subject to the STCs.

**1. Freedom of Choice** — **Section 1902(a)(23)(A)**

To the extent necessary to enable Arkansas to limit beneficiaries' freedom of choice among providers to the providers participating in the network of the beneficiary's Qualified Health Plan. No waiver of freedom of choice is authorized for family planning providers.

**2. Payment to Providers** — **Section 1902(a)(13) and Section 1902(a)(30)**

To the extent necessary to permit Arkansas to provide for payment to providers equal to the market-based rates determined by the Qualified Health Plan.

**3. Prior Authorization** — **Section 1902(a)(54) insofar as it incorporates Section 1927(d)(5)**

To permit Arkansas to require that requests for prior authorization for drugs be addressed within 72 hours, and for expedited review in exigent circumstances within 24 hours, rather than 24 hours for all circumstances as is currently required in their state policy. A 72- hour supply of the requested medication will be provided in the event of an emergency.

**4. Premiums** — **Section 1902(a)(14) insofar as it incorporates Sections 1916 and 1916A**

To the extent necessary to enable Arkansas to collect monthly premium payments, for beneficiaries with incomes above 100 up to and including 133 percent of the federal poverty level (FPL) as described in these STCs.

**5. Comparability** **Section 1902(a)(10)(B)**

To the extent necessary to enable the state to impose targeted cost sharing on beneficiaries as described in these STCs.

**6. Retroactive Eligibility** **Section 1902(a)(34)**

To enable the state to not provide beneficiaries in table 1 retroactive eligibility but for 30 days prior to the date of the application for coverage under the demonstration.

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**
**SPECIAL TERMS AND CONDITIONS**

**NUMBER:** **11-W-00287/6**

**TITLE:** **Arkansas Works**

**AWARDEE:** **Arkansas Department of Human Services**

## I. PREFACE

The following are the amended Special Terms and Conditions (STCs) for the Arkansas Works section 1115(a) Medicaid demonstration (hereinafter demonstration) to enable the Arkansas Department of Human Services (state) to operate this demonstration. The Centers for Medicare & Medicaid Services (CMS) has granted waivers of requirements under section 1902(a) of the Social Security Act (Act), and expenditure authorities authorizing federal matching of demonstration costs that are not otherwise matchable, and which are separately enumerated. These STCs set forth in detail the nature, character, and extent of federal involvement in the demonstration and the state's obligations to CMS during the life of the demonstration. Enrollment into the demonstration is statewide and is approved through December 31, 2021. The STCs have been arranged into the following subject areas:

I. Preface
II. Program Description and Objectives
III. General Program Requirements
IV. Arkansas Works Program Populations Affected
V. Arkansas Works Premium Assistance Enrollment
VI. Premium Assistance Delivery System
VII. Benefits
VIII. Premiums & Cost Sharing
IX. Appeals
X. General Reporting Requirements
XI. General Financial Requirements
XII. Monitoring Budget Neutrality
XIII. Evaluation
XIV. Monitoring
Attachments

## II. PROGRAM DESCRIPTION AND OBJECTIVES

Under the Arkansas Works demonstration, the state has been providing premium assistance to support the purchase by beneficiaries eligible under the new adult group under the state plan of coverage from qualified health plans (QHPs) offered in the individual market through the Marketplace. Enrollment activities for the new adult population began on October 1, 2013 for QHPs with eligibility effective January 1, 2014. Beginning in 2014, individuals eligible for coverage under the new adult group are described at Section 1902(a)(10)(A)(i)(VIII) of the

Social Security Act and are further specified in the state plan (collectively Arkansas Works beneficiaries). Arkansas Works beneficiaries receive a state plan Alternative Benefit Plan ("ABP").

Effective January 1, 2017, Arkansas Works beneficiaries with incomes above 100 percent of the FPL are charged monthly premium payments. The state will eliminate its ESI premium assistance program under the demonstration. All Arkansas Works beneficiaries who were enrolled in ESI premium assistance and who remain eligible for Arkansas Works will transition to QHP coverage.

Over the demonstration period, the state seeks to demonstrate several demonstration goals. The state's goals will inform the state's evaluation design hypotheses, subject to CMS approval, as described in these STCs. The state's goals include, and are not limited to the following:

- Providing continuity of coverage for individuals,
- Improving access to providers,
- Improving continuity of care across the continuum of coverage,
- Requiring beneficiaries to pay a monthly premium to promote more efficient use of health care services, and
- Furthering quality improvement and delivery system reform initiatives that are successful across population groups.

Arkansas proposes that the demonstration will provide integrated coverage for low-income Arkansans, leveraging the efficiencies and experience of the private market to improve continuity, access, and quality for Arkansas Works beneficiaries that should ultimately result in lowering the rate of growth in premiums across population groups. The state proposes that the demonstration will also drive structural health care system reform and more competitive premium pricing for all individuals purchasing coverage through the Marketplace by at least doubling the size of the population enrolling in QHPs offered through the Marketplace.
The state proposes to demonstrate the following key features:

***Continuity of coverage and care -*** The demonstration will allow qualifying households to stay enrolled in the same plan regardless of whether their coverage is subsidized through Medicaid, or Advanced Premium Tax Credits/Cost Sharing Reductions (APTC/CSRs).

***Support equalization of provider reimbursement and improve provider access -*** The demonstration will support equalization of provider reimbursement across payers, toward the end of expanding provider access and eliminating the need for providers to cross-subsidize. Arkansas Medicaid provides rates of reimbursement lower than Medicare or commercial payers, causing some providers to forego participation in the program and others to "cross subsidize" their Medicaid patients by charging more to private insurers.

***Integration, efficiency, quality improvement and delivery system reform -*** Arkansas is proposing taking an integrated and market-based approach to covering uninsured Arkansans. It is anticipated that QHPs will bring the experience of successful private sector models that can

improve access to high quality services and lead delivery system reform. One of the benefits of this demonstration should be to gain a better understanding of how the private sector uses incentives to engage individuals in healthy behaviors.

## III. GENERAL PROGRAM REQUIREMENTS

1. **Compliance with Federal Non-Discrimination Statutes.** The state must comply with all applicable federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2. **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP, expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), apply to the demonstration.

3. **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The state must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in federal law, regulation, or policy affecting the Medicaid or CHIP program that occur during this demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable. In addition, CMS reserves the right to amend the STCs to reflect such changes and/or changes without requiring the state to submit an amendment to the demonstration under STC 7. CMS will notify the state 30 days in advance of the expected approval date of the amended STCs to provide the state with additional notice of the changes.

4. **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy.**

    a. To the extent that a change in federal law, regulation, or policy requires either a reduction or an increase in federal financial participation (FFP) for expenditures made under this demonstration, the state must adopt, subject to CMS approval, a modified budget neutrality agreement as well as a modified allotment neutrality worksheet for the demonstration as necessary to comply with such change. The modified budget neutrality agreement will be effective upon the implementation of the change.

    b. If mandated changes in the federal law require state legislation, the changes must take effect on the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5. **State Plan Amendments.** If the eligibility of a population eligible through the Medicaid or CHIP state plan is affected by a change to the demonstration, a conforming amendment to the appropriate state plan may be required, except as otherwise noted in these STCs. In all such instances the Medicaid state plan governs.

Should the state amend the state plan to make any changes to eligibility for this population, upon submission of the state plan amendment, the state must notify CMS demonstration staff in writing of the pending state plan amendment, and request a corresponding technical correction to the demonstration.

6. **Changes Subject to the Amendment Process.** If not otherwise specified in these STCs, changes related to demonstration features including eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary in accordance with section 1115 of the Act. The state must not implement changes to these elements without prior approval by CMS either through an approved amendment to the Medicaid state plan and/or amendment to the demonstration. Amendments to the demonstration are not retroactive and FFP will not be available for changes to the demonstration that have not been approved through the amendment process set forth in STC 7 below.

7. **Amendment Process.** Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change and may not be implemented until approved. CMS reserves the right to deny or delay approval of a demonstration amendment based on non-compliance with these STCs, including but not limited to failure by the state to submit required reports and other deliverables in a timely fashion according to the deadlines specified herein. Amendment requests must include, but are not limited to, the following:

    a. An explanation of the public process used by the state, consistent with the requirements of STC 15, prior to submission of the requested amendment;

    b. A data analysis worksheet which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality agreement. Such analysis shall include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment, which isolates (by Eligibility Group) the impact of the amendment;

    c. An up-to-date CHIP allotment neutrality worksheet, if necessary;

    d. A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation; and

    e. A description of how the evaluation design will be modified to incorporate the amendment provisions.

**8. Extension of the Demonstration.** States that intend to request demonstration extensions under sections 1115(e) or 1115(f) are advised to observe the timelines contained in those statutes. Otherwise, no later than 12 months prior to the expiration date of the demonstration, the governor or chief executive officer of the state must submit to CMS either a demonstration extension request that meets federal requirements at 42 CFR 431.412(c) or a transition and phase-out plan consistent with the requirements of STC 9.

a. Compliance with Transparency Requirements at 42 CFR Section 431.412.

b. As part of the demonstration extension requests the state must provide documentation of compliance with the transparency requirements 42 CFR Section 431.412 and the public notice and tribal consultation requirements outlined in STC 15.

**9. Demonstration Phase Out.** The state may only suspend or terminate this demonstration in whole, or in part, consistent with the following requirements.

a. **Notification of Suspension or Termination.** The state must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a transition and phase-out plan. The state must submit its notification letter and a draft plan to CMS no less than six (6) months before the effective date of the demonstration's suspension or termination. Prior to submitting the draft plan to CMS, the state must publish on its website the draft transition and phase-out plan for a 30-day public comment period. In addition, the state must conduct tribal consultation in accordance with its approved tribal consultation state plan Amendment, if applicable. Once the 30-day public comment period has ended, the state must provide a summary of each public comment received, the state's response to the comment and how the state incorporated the received comment into the revised plan.

b. **Prior CMS Approval**. The state must obtain CMS approval of the transition and phase-out plan prior to the implementation of the phase-out activities. Implementation of activities must be no sooner than 14 calendar days after CMS approval of the plan.

c. **Transition and Phase-out Plan Requirements**. The state must include, at a minimum, in its plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the state will conduct administrative reviews of Medicaid eligibility prior to the termination of the program for the affected beneficiaries, and ensure ongoing coverage for those beneficiaries determined eligible, as well as any community outreach activities including community resources that are available.

d. **Phase-out Procedures.** The state must comply with all notice requirements found in 42 CFR Sections 431.206, 431.210, and 431.213. In addition, the state must

assure all appeal and hearing rights afforded to demonstration participants as outlined in 42 CFR Sections 431.220 and 431.221. If a demonstration participant is entitled to requests a hearing before the date of action, the state must maintain benefits as required in 42 CFR Section 431.230. In addition, the state must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category. 42 CFR Section 435.916.

e. **Exemption from Public Notice Procedures 42 CFR Section 431.416(g).** CMS may expedite the federal and state public notice requirements in the event it determines that the objectives of title XIX and XXI would be served or under circumstances described in 42 CFR Section 431.416(g).

f. **Federal Financial Participation (FFP).** If the demonstration is terminated or any relevant waivers suspended by the state, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services, continued benefits as a result of participant's appeals and administrative costs of disenrolling participants.

**10. Pre-Approved Transition and Phase Out Plan.** The state may elect to submit a draft transition and phase-out plan for review and approval at any time, including prior to when a date of termination has been identified. Once the transition and phase-out plan has been approved, implementation of the plan may be delayed indefinitely at the option of the state.

**11. Federal Financial Participation (FFP).** If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services and administrative costs of disenrolling beneficiaries.

**12. Expiring Demonstration Authority.** For demonstration authority that expires prior to the demonstration's expiration date, the State must submit a transition plan to CMS no later than six months prior to the applicable demonstration authority's expiration date, consistent with the following requirements:

a. **Expiration Requirements.** The State must include, at a minimum, in its demonstration expiration plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the State will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for eligible individuals, as well as any community outreach activities.

b. **Expiration Procedures**. The State must comply with all notice requirements found in 42 CFR Sections 431.206, 431.210 and 431.213. In addition, the State must assure all appeal and hearing rights afforded to demonstration beneficiaries

as outlined in 42 CFR Sections 431.220 and 431.221. If a demonstration beneficiary requests a hearing before the date of action, the State must maintain benefits as required in 42 CFR Section 431.230. In addition, the State must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category as discussed in October 1, 2010, State Health Official Letter #10-008.

c. **Federal Public Notice.** CMS will conduct a 30-day federal public comment period consistent with the process outlined in 42 CFR Section 431.416 in order to solicit public input on the State's demonstration expiration plan. CMS will consider comments received during the 30-day period during its review and approval of the State's demonstration expiration plan. The State must obtain CMS approval of the demonstration expiration plan prior to the implementation of the expiration activities. Implementation of expiration activities must be no sooner than 14 days after CMS approval of the plan. d. Federal Financial Participation (FFP): FFP shall be limited to normal closeout costs associated with the expiration of the demonstration including services and administrative costs of disenrolling beneficiaries.

13. **Withdrawal of Demonstration Authority.** CMS reserves the right to amend and withdraw waivers or expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of Title XIX, including if federal monitoring of data indicates features of this demonstration may not adequately incentivize beneficiary participation or are unlikely to result in improved health outcomes, or that other demonstration features are not operating as intended. CMS will promptly notify the State in writing of the determination and the reasons for the amendment and withdrawal, together with the effective date, and afford the State an opportunity to request a hearing to challenge CMS' determination prior to the effective date. If a waiver or expenditure authority is withdrawn or amended, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services and administrative costs of disenrolling beneficiaries.

14. **Adequacy of Infrastructure.** The State must ensure the availability of adequate resources for implementation and monitoring of the demonstration, including education, outreach, and enrollment; maintaining eligibility systems; compliance with cost sharing requirements; and reporting on financial and other demonstration components.

15. **Public Notice, Tribal Consultation, and Consultation with Interested Parties.** The State must comply with the State Notice Procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994). The State must also comply with the tribal consultation requirements in section 1902(a)(73) of the Act as amended by section 5006(e) of the American Recovery and Reinvestment Act (ARRA) of 2009, the implementing regulations for the Review and Approval Process for Section 1115 demonstrations at 42 CFR Section 431.408, and the tribal consultation requirements contained in the State's

approved state plan, when any program changes to the demonstration are proposed by the State.

a. In States with federally recognized Indian tribes consultation must be conducted in accordance with the consultation process outlined in the July 17, 2001 letter or the consultation process in the State's approved Medicaid state plan if that process is specifically applicable to consulting with tribal governments on waivers (42 CFR Section 431.408(b)(2)).

b. In States with federally recognized Indian tribes, Indian health programs, and/or Urban Indian organizations, the State is required to submit evidence to CMS regarding the solicitation of advice from these entities prior to submission of any demonstration proposal, amendment and/or renewal of this demonstration (42 CFR Section 431.408(b)(3)).

c. The State must also comply with the Public Notice Procedures set forth in 42 CFR Section 447.205 for changes in statewide methods and standards for setting payment rates.

16. **Federal Financial Participation (FFP).** No federal matching for administrative or service expenditures for this demonstration will take effect until the effective date identified in the demonstration approval letter.

17. **Common Rule Exemption.** The state shall ensure that the only involvement of human subjects in research activities that may be authorized and/or required by this demonstration is for projects which are conducted by or subject to the approval of CMS, and that are designed to study, evaluate, or otherwise examine the Medicaid or CHIP program – including procedures for obtaining Medicaid or CHIP benefits or services, possible changes in or alternatives to Medicaid or CHIP programs and procedures, or possible changes in methods or levels of payment for Medicaid benefits or services. The Secretary has determined that this demonstration as represented in these approved STCs meets the requirements for exemption from the human subject research provisions of the Common Rule set forth in 45 CFR 46.101(b)(5).

## IV. ARKANSAS WORKS PROGRAM POPULATIONS AFFECTED

The State will use this demonstration to ensure coverage for Arkansas Works eligible beneficiaries provided primarily through QHPs offered in the individual market instead of the fee-for-service delivery system that serves the traditional Medicaid population. The State will provide premium assistance to aid Arkansas Works beneficiaries in enrolling in coverage through QHPs in the Marketplace.

18. **Populations Affected by the Arkansas Works Demonstration.** Except as described in STCs 19 and 20, the Arkansas Works demonstration affects adults aged 19 through 64 eligible under the state plan under 1902(a)(10)(A)(i)(VIII) of the Act, 42 CFR Section 435.119. Eligibility and coverage for Arkansas Works beneficiaries is subject to all

applicable Medicaid laws and regulations in accordance with the Medicaid state plan, except as expressly waived in this demonstration and as described in these STCs. Any Medicaid state plan amendments to this eligibility group, including the conversion to a modified adjusted gross income (MAGI) standard on January 1, 2014, will apply to this demonstration.

**Table 1. Eligibility Groups**

| Medicaid State Plan Mandatory Groups | Federal Poverty Level | Funding Stream | Expenditure and Eligibility Group Reporting |
|---|---|---|---|
| New Adult Group | This group includes adults up to and including 133 percent of the FPL who meet the other criteria specified in Section 1902(a)( 10)(A)(i)(VIII) of the Social Security Act | Title XIX | MEG - 1 |

19. **Medically Frail Individuals.** Arkansas has instituted a process to determine whether a beneficiary is medically frail. The process is described in the Alternative Benefit state plan. Beneficiaries excluded from enrolling in QHPs through the Arkansas Works as a result of a determination of medical frailty as that term is defined above will have the option of receiving direct coverage through the state of either the same ABP offered to the beneficiaries or an ABP that includes all benefits otherwise available under the approved Medicaid state plan (the standard Medicaid benefit package). Direct coverage will be provided through a fee- for- service (FFS) system.

20. **American Indian/Alaska Native Individuals.** Beneficiaries identified as American Indian or Alaskan Native (AI/AN) will not be required to enroll in QHPs in this demonstration, but can choose to opt into a QHP. New applicants will be subject to provisions of STC 21 and coverage will begin 30 days prior to the date an application is submitted for coverage. Beneficiaries who are AI/AN and who have not opted into a QHP will receive the ABP through a fee for service (FFS) system. An AI/AN beneficiary will be able to access covered benefits through Indian Health Service (IHS), Tribal or Urban Indian Organization (collectively, I/T/U) facilities funded through the IHS. Under the Indian Health Care Improvement Act (IHCIA), I/T/U facilities are entitled to payment notwithstanding network restrictions.

21. **Retroactive Eligibility.** The state will provide coverage effective 30 days prior to the date of submitting an application for coverage for beneficiaries in table 1.

## V. ARKANSAS WORKS PREMIUM ASSISTANCE ENROLLMENT

**22. Arkansas Works.** For Arkansas Works beneficiaries, except as noted in STCs 19 and 20, enrollment in a QHP is a condition of receiving benefits.

**23. Notices.** Arkansas Works beneficiaries will receive a notice or notices from Arkansas Medicaid or its designee advising them of the following:

a. QHP Plan Selection. The notice will include information regarding how Arkansas Works beneficiaries can select a QHP and information on the State's auto-assignment process in the event that the beneficiary does not select a plan.

b. State Premiums and Cost-Sharing. The notice will include information about the beneficiary's premium and cost-sharing obligations, if any, as well as the quarterly cap on premiums and cost-sharing.

c. Access to Services until QHP Enrollment is Effective. The notice will include the Medicaid client identification number (CIN) and information on how beneficiaries can use the CIN number to access services until their QHP enrollment is effective.

d. Wrapped Benefits. The notice will also include information on how beneficiaries can access wrapped benefits. The notice will include specific information regarding services that are covered directly through fee-for-service Medicaid and what phone numbers to call or websites to visit to access wrapped services.

e. Appeals. The notice will also include information regarding the grievance and appeals process.

f. Identification of Medically Frail. The notice will include information describing how Arkansas Works beneficiaries who believe they are medically frail can request a determination of whether they are exempt from the ABP. The notice will also include alternative benefit plan options.

g. Timely and adequate notice concerning adverse actions. The notice must give beneficiaries timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility or to reduce or discontinue services they may receive under Medicaid in accordance with 42 CFR 435.919.

**24. QHP Selection.** The QHPs in which Arkansas Works beneficiaries enroll are certified through the Arkansas Insurance Department's QHP certification process. The QHPs available for selection by the beneficiary are determined by the Medicaid agency.

**25. Auto-assignment.** In the event that an beneficiary is determined eligible for coverage through the Arkansas Works QHP premium assistance program, but does not select a plan, the State will auto-assign the beneficiary to one of the available QHPs in the

beneficiary's rating area. Beneficiaries who are auto-assigned will be notified of their assignment, and the effective date of QHP enrollment, and will be given a thirty-day period from the date of enrollment to request enrollment in another plan.

26. **Distribution of Members Auto-assigned.** Arkansas Works QHP auto-assignments will be distributed among QHP issuers in good standing with the Arkansas Insurance Department offering certified silver-level QHPs certified by the Arkansas Insurance Department.

27. **Changes to Auto-assignment Methodology.** The state will advise CMS prior to implementing a change to the auto-assignment methodology.

28. **Disenrollment.** Beneficiaries may be disenrolled from the demonstration if they are determined to be medically frail after they were previously determined eligible.

## VI. PREMIUM ASSISTANCE DELIVERY SYSTEM

29. **Memorandum of Understanding for QHP Premium Assistance.** The Arkansas Department of Human Services and the Arkansas Insurance Department have entered into a memorandum of understanding (MOU) with each QHP that enrolls beneficiaries. Areas to be addressed in the MOU include, but are not limited to:

    a. Enrollment of beneficiaries in populations covered by the demonstration;

    b. Payment of premiums and cost-sharing reductions, including the process for collecting and tracking beneficiary premiums;

    c. Reporting and data requirements necessary to monitor and evaluate the Arkansas Works including those referenced in STC 74, ensuring beneficiary access to EPSDT and other covered benefits through the QHP;

    d. Requirement for QHPs to provide, consistent with federal and state laws, claims and other data as requested to support state and federal evaluations, including any corresponding state arrangements needed to disclose and share data, as required by 42 CFR 431.420(f)(2), to CMS or CMS' evaluation contractors.

    e. Noticing requirements; and

    f. Audit rights.

30. **Qualified Health Plans.** The State will use premium assistance to support the purchase of coverage for Arkansas Works beneficiaries through Marketplace QHPs.

31. **Choice of QHPs.** Each Arkansas Works beneficiary required to enroll in a QHP will have the option to choose between at least two silver plans covering only Essential Health

Benefits that are offered in the individual market through the Marketplace. The State will pay the full cost of QHP premiums.

a. Arkansas Works beneficiaries will be able to choose from at least two silver plans covering only Essential Health Benefits that are in each rating area of the State.

b. Arkansas Works beneficiaries will be permitted to choose among all silver plans covering only Essential Health Benefits that are offered in their geographic area and that meet the purchasing guidelines established by the State in that year, and thus all Arkansas Works beneficiaries will have a choice of at least two QHPs.

c. The State will comply with Essential Community Provider network requirements, as part of the QHP certification process.

d. Arkansas Works beneficiaries will have access to the same networks as other beneficiaries enrolling in QHPs through the individual Marketplace.

**32. Coverage Prior to Enrollment in a QHP.** The State will provide coverage through fee-for-service Medicaid from the date a beneficiary is determined eligible until the beneficiary's enrollment in the QHP becomes effective.

a. For beneficiaries who enroll in a QHP (whether by selecting the QHP or through auto-assignment) between the first and fifteenth day of a month, QHP coverage will become effective as of the first day of the month following QHP enrollment.

b. For beneficiaries who enroll in a QHP (whether by selecting the QHP or through auto-assignment) between the sixteenth and last day of a month, QHP coverage will become effective as of the first day of the second month following QHP selection (or auto-assignment).

**33. Family Planning.** If family planning services are accessed at a facility that the QHP considers to be an out-of-network provider, the State's fee-for-service Medicaid program will cover those services.

**34. NEMT.** Non-emergency medical transport services will be provided through the State's fee-for-service Medicaid program. See STC 41 for further discussion of non-emergency medical transport services.

## VII. BENEFITS

**35. Arkansas Works Benefits.** Beneficiaries affected by this demonstration will receive benefits as set forth in section 1905(y)(2)(B) of the Act and codified at 42 CFR Section 433.204(a)(2). These benefits are described in the Medicaid state plan.

**36. Alternative Benefit Plan.** The benefits provided under an alternative benefit plan for the new adult group are reflected in the State ABP state plan.

37. **Medicaid Wrap Benefits.** The State will provide through its fee-for-service system wrap-around benefits that are required for the ABP but not covered by QHPs. These benefits include non-emergency transportation and Early Periodic Screening Diagnosis and Treatment (EPSDT) services for beneficiaries participating in the demonstration who are under age 21.

38. **Access to Wrap Around Benefits.** In addition to receiving an insurance card from the applicable QHP issuer, Arkansas Works beneficiaries will have a Medicaid CIN through which providers may bill Medicaid for wrap-around benefits. The notice containing the CIN will include information about which services Arkansas Works beneficiaries may receive through fee-for-service Medicaid and how to access those services. This information is also posted on Arkansas Department of Human Service's Medicaid website and will be provided through information at the Department of Human Service's call centers and through QHP issuers.

39. **Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).** The State must fulfill its responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

40. **Access to Federally Qualified Health Centers and Rural Health Centers.** Arkansas Works beneficiaries will have access to at least one QHP in each service area that contracts with at least one FQHC and RHC.

41. **Access to Non-Emergency Medical Transportation.** The state will establish prior authorization for NEMT in the ABP. Beneficiaries served by IHS or Tribal facilities and medically frail beneficiaries will be exempt from such requirements.

42. **Incentive Benefits.** To the extent an amendment is approved by CMS, Arkansas will offer an additional benefit not otherwise provided under the Alternative Benefit Plan for Arkansas Works beneficiaries who make timely premium payments (if above 100 percent FPL) and engage with a primary care provider (PCP). Arkansas Works beneficiaries with incomes at or below 100 percent FPL and others who are exempt from premiums will be eligible for an incentive benefit at the time the amendment is approved.

## VIII. PREMIUMS & COST SHARING

43. **Premiums & Cost Sharing.** Cost sharing for Arkansas Works beneficiaries must be in compliance with federal requirements that are set forth in statute, regulation and policies, including exemptions from cost-sharing set forth in 42 CFR Section 447.56(a).

44. **Premiums & Cost Sharing Parameters for the Arkansas Works Program.** With the approval of this demonstration:

a. Beneficiaries up to and including 100 percent of the FPL will have no cost sharing.

b. Beneficiaries above 100 percent of the FPL will have cost sharing consistent with Medicaid requirements.

c. Beneficiaries above 100 percent of the FPL will be required to pay monthly premiums of up to 2 percent of household income.

d. Premiums and cost-sharing will be subject to an aggregate cap of no more than 5 percent of family monthly or quarterly income.

e. Cost sharing limitations described in 42 CFR 447.56(a) will be applied to all program beneficiaries.

f. Copayment and coinsurance amounts will be consistent with federal requirements regarding Medicaid cost sharing and with the state's approved state plan; premium, copayment, and coinsurance amounts are listed in Attachment B.

**45. Payment Process for Payment of Cost Sharing Reduction to QHPs.** Agreements with QHP issuers may provide for advance monthly cost-sharing reduction (CSR) payments to cover the costs associated with the reduced cost sharing for Arkansas Works beneficiaries. Such payments will be subject to reconciliation at the conclusion of the benefit year based on actual expenditures by the QHP for cost sharing reduction. If a QHP issuer's actuary determines during the benefit year that the estimated advance CSR payments are significantly different than the CSR payments the QHP issuer will be entitled to during reconciliation, the QHP issuer may ask Arkansas' Department of Human Services to adjust the advance payments. Arkansas' reconciliation process will follow 45 CFR Section 156.430 to the extent applicable.

**46. Grace Period/Debt Collection.** Arkansas Works beneficiaries will have two months from the date of the payment invoice to make the required monthly premium contribution. Arkansas and/or its vendor may attempt to collect unpaid premiums and the related debt from beneficiaries, but may not report the debt to credit reporting agencies, place a lien on an individual's home, refer the case to debt collectors, file a lawsuit, or seek a court order to seize a portion of the individual's earnings for beneficiaries at any income level. The state and/or its vendor may not "sell" the debt for collection by a third party.

## IX. APPEALS

**47.** Beneficiary safeguards of appeal rights will be provided by the State, including fair hearing rights. No waiver will be granted related to appeals. The State must ensure compliance with all federal and State requirements related to beneficiary appeal rights. Pursuant to the Intergovernmental Cooperation Act of 1968, the State has submitted a

state plan amendment delegating certain responsibilities to the Arkansas Insurance Department.

## X. GENERAL REPORTING REQUIREMENTS

**48. Deferral for Failure to Submit Timely Demonstration Deliverables.** The state agrees that CMS may issue deferrals in the amount of $5,000,000 (federal share) per deliverable when items required by these STCs (e.g., required data elements, analyses, reports, design documents, presentations, and other items specified in these STCs (hereafter singly or collectively referred to as "deliverable(s)") are not submitted timely to CMS or are found to not be consistent with the requirements approved by CMS.

a. Thirty (30) days after the deliverable was due, CMS will issue a written notification to the state providing advance notification of a pending deferral for late or non-compliant submissions of required deliverables.

b. For each deliverable, the state may submit a written request for an extension in which to submit the required deliverable. Extension requests that extend beyond the fiscal quarter in which the deliverable was due must include a Corrective Action Plan (CAP).

   i. CMS may decline the extension request.

   ii. Should CMS agree in writing to the state's request, a corresponding extension of the deferral process described below can be provided.

   iii. If the state's request for an extension includes a CAP, CMS may agree to or further negotiate the CAP as an interim step before applying the deferral.

c. The deferral would be issued against the next quarterly expenditure report following the written deferral notification.

d. When the state submits the overdue deliverable(s) that are accepted by CMS, the deferral(s) will be released.

e. As the purpose of a section 1115 demonstration is to test new methods of operation or service delivery, a state's failure to submit all required reports, evaluations and other deliverables may preclude a state from renewing a demonstration or obtaining a new demonstration.

f. CMS will consider with the state an alternative set of operational steps for implementing the intended deferral to align the process with the state's existing deferral process, for example the structure of the state request for an extension, what quarter the deferral applies to, and how the deferral is released.

**49.** **Post Award Forum.** Pursuant to 42 CFR 431.420(c), within six months of the demonstration's implementation, and annually thereafter, the state shall afford the public with an opportunity to provide meaningful comment on the progress of the demonstration. At least 30 days prior to the date of the planned public forum, the state must publish the date, time and location of the forum in a prominent location on its website. Pursuant to 42 CFR 431.420(c),the state must include a summary of the comments in the Quarterly Report associated with the quarter in which the forum was held, as well as in its compiled Annual Report.

**50.** **Electronic Submission of Reports.** The state shall submit all required plans and reports using the process stipulated by CMS, if applicable.

**51.** **Compliance with Federal Systems Innovation.** As federal systems continue to evolve and incorporate 1115 demonstration reporting and analytics, the state will work with CMS to:

a. Revise the reporting templates and submission processes to accommodate timely compliance with the requirements of the new systems;

b. Ensure all 1115, T-MSIS, and other data elements that have been agreed to are provided; and

c. Submit the monitoring reports and evaluation reports to the appropriate system as directed by CMS.

## XI. GENERAL FINANCIAL REQUIREMENTS

This project is approved for Title XIX expenditures applicable to services rendered during the demonstration period. This section describes the general financial requirements for these expenditures.

**52.** **Quarterly Expenditure Reports.** The State must provide quarterly Title XIX expenditure reports using Form CMS-64, to separately report total Title XIX expenditures for services provided through this demonstration under section 1115 authority. CMS shall provide Title XIX FFP for allowable demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in section XII of the STCs.

**53.** **Reporting Expenditures under the Demonstration.** The following describes the reporting of expenditures subject to the budget neutrality agreement:

a. **Tracking Expenditures.** In order to track expenditures under this demonstration, the State will report demonstration expenditures through the Medicaid and State Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in section 2500 and Section 2115 of the SMM. All demonstration expenditures

subject to the budget neutrality limit must be reported each quarter on separate forms CMS-64.9 Waiver and/or 64.9P Waiver, identified by the demonstration project number assigned by CMS (including the project number extension, which indicates the DY in which services were rendered or for which capitation payments were made). For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements must be recorded on the appropriate prior period adjustment schedules (forms CMS-64.9 Waiver) for the summary line 10B, in lieu of lines 9 or l0C. For any other cost settlements (i.e., those not attributable to this demonstration), the adjustments should be reported on lines 9 or 10C, as instructed in the SMM. The term, “expenditures subject to the budget neutrality limit,” is defined below in STC 67.

b. **Cost Settlements.** For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements attributable to the demonstration must be recorded on the appropriate prior period adjustment schedules (forms CMS-64.9P Waiver) for the summary sheet sine 10B, in lieu of lines 9 or 10C. For any cost settlement not attributable to this demonstration, the adjustments should be reported as otherwise instructed in the SMM.

c. **Premium and Cost Sharing Contributions.** Premiums and other applicable cost sharing contributions from beneficiaries that are collected by the state from beneficiaries under the demonstration must be reported to CMS each quarter on Form CMS-64 summary sheet line 9.D, columns A and B. In order to assure that these collections are properly credited to the demonstration, premium and cost-sharing collections (both total computable and federal share) should also be reported separately by DY on the form CMS-64 narrative. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to demonstration populations will be offset against expenditures. These section 1115 premium collections will be included as a manual adjustment (decrease) to the demonstration’s actual expenditures on a quarterly basis.

d. **Pharmacy Rebates.** Pharmacy rebates are not considered here as this program is not eligible.

e. **Use of Waiver Forms for Medicaid.** For each DY, separate Forms CMS-64.9 Waiver and/or 64.9P Waiver shall be submitted reporting expenditures for individuals enrolled in the demonstration, subject to the budget neutrality limit (Section XII of these STCs). The State must complete separate waiver forms for the following eligibility groups/waiver names:

    i. MEG 1 - “New Adult Group”

f. The first Demonstration Year (DY1) will begin on January 1, 2014. Subsequent DYs will be defined as follows:

**Table 2Demonstration Populations**

| | | |
|---|---|---|
| Demonstration Year 1 (DY1) | January 1, 2014 | 12 months |
| Demonstration Year 2 (DY2) | January 1, 2015 | 12 months |
| Demonstration Year 3 (DY3) | January 1, 2016 | 12 months |
| Demonstration Year 4 (DY4) | January 1, 2017 | 12 months |
| Demonstration Year 5 (DY5) | January 1, 2018 | 12 months |
| Demonstration Year 6 (DY6) | January 1, 2019 | 12 months |
| Demonstration Year 7 (DY7) | January 1, 2020 | 12 months |
| Demonstration Year 8 (DY8) | January 1, 2021 | 12 months |

**54.** **Administrative Costs.** Administrative costs will not be included in the budget neutrality limit, but the State must separately track and report additional administrative costs that are directly attributable to the demonstration, using Forms CMS-64.10 Waiver and/or 64.10P Waiver, with waiver name Local Administration Costs ("ADM").

**55.** **Claiming Period.** All claims for expenditures subject to the budget neutrality limit (including any cost settlements resulting from annual reconciliation) must be made within 2 years after the calendar quarter in which the State made the expenditures. Furthermore, all claims for services during the demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the demonstration. During the latter 2-year period, the State must continue to identify separately net expenditures related to dates of service during the operation of the section 1115 demonstration on the Form CMS-64 and Form CMS-21 in order to properly account for these expenditures in determining budget neutrality.

**56.** **Reporting Member Months.** The following describes the reporting of member months for demonstration populations:

a. For the purpose of calculating the budget neutrality expenditure cap and for other purposes, the State must provide to CMS, as part of the quarterly report required under STC 82, the actual number of eligible member months for the demonstration populations defined in STC 18. The State must submit a statement accompanying the quarterly report, which certifies the accuracy of this information. To permit full recognition of "in-process" eligibility, reported counts of member months may be subject to revisions after the end of each quarter. Member month counts may be revised retrospectively as needed.

b. The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for three months contributes three eligible member months to the total. Two individuals who are eligible for two months each contribute two eligible member months to the total, for a total of four eligible member months.

57. **Standard Medicaid Funding Process.** The standard Medicaid funding process must be used during the demonstration. The State must estimate matchable demonstration expenditures (total computable and federal share) subject to the budget neutrality expenditure cap and separately report these expenditures by quarter for each federal fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and State and Local Administration Costs (ADM). CMS will make federal funds available based upon the State's estimate, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure report, showing Medicaid expenditures made in the quarter just ended. The CMS will reconcile expenditures reported on the Form CMS-64 quarterly with federal funding previously made available to the State, and include the reconciling adjustment in the finalization of the grant award to the State.

58. **Extent of FFP for the Demonstration.** Subject to CMS approval of the source(s) of the non-federal share of funding, CMS will provide FFP at the applicable federal matching rate for the demonstration as a whole as outlined below, subject to the limits described in STC 59:

a. Administrative costs, including those associated with the administration of the demonstration.

b. Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved State plan.

c. Medical Assistance expenditures made under section 1115 demonstration authority, including those made in conjunction with the demonstration, net of enrollment fees, cost sharing, pharmacy rebates, and all other types of third party liability or CMS payment adjustments.

59. **Sources of Non-Federal Share.** The State must certify that the matching non-federal share of funds for the demonstration is state/local monies. The State further certifies that such funds shall not be used as the match for any other federal grant or contract, except as permitted by law. All sources of non-federal funding must be compliant with section 1903(w) of the Act and applicable regulations. In addition, all sources of the non-federal share of funding are subject to CMS approval.

a. CMS may review the sources of the non-federal share of funding for the demonstration at any time. The State agrees that all funding sources deemed unacceptable by CMS shall be addressed within the time frames set by CMS.

b. Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-federal share of funding.

c. The State assures that all health care-related taxes comport with section 1903(w) of the Act and all other applicable federal statutory and regulatory provisions, as well as the approved Medicaid State plan.

**60. State Certification of Funding Conditions.** The State must certify that the following conditions for non-federal share of demonstration expenditures are met:

a. Units of government, including governmentally operated health care providers, may certify that State or local tax dollars have been expended as the non-federal share of funds under the demonstration.

b. To the extent the State utilizes certified public expenditures (CPEs) as the funding mechanism for Title XIX (or under section 1115 authority) payments, CMS must approve a cost reimbursement methodology. This methodology must include a detailed explanation of the process by which the State would identify those costs eligible under Title XIX (or under section 1115 authority) for purposes of certifying public expenditures.

c. To the extent the State utilizes CPEs as the funding mechanism to claim federal match for payments under the demonstration, governmental entities to which general revenue funds are appropriated must certify to the State the amount of such tax revenue (State or local) used to satisfy demonstration expenditures. The entities that incurred the cost must also provide cost documentation to support the State's claim for federal match.

d. The State may use intergovernmental transfers to the extent that such funds are derived from State or local tax revenues and are transferred by units of government within the State. Any transfers from governmentally operated health care providers must be made in an amount not to exceed the non-federal share of Title XIX payments.

e. Under all circumstances, health care providers must retain 100 percent of the reimbursement amounts claimed by the State as demonstration expenditures. Moreover, no pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (such as payments related to taxes - including health care provider-related taxes - fees, and business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments) are not considered returning and/or redirecting a Medicaid payment.

## XII. MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

61. **Limit on Title XIX Funding.** The State shall be subject to a limit on the amount of federal Title XIX funding that the State may receive on selected Medicaid expenditures during the period of approval of the demonstration. The limit is determined by using the per capita cost method described in STC 62, and budget neutrality expenditure limits are set on a yearly basis with a cumulative budget neutrality expenditure limit for the length of the entire demonstration. The data supplied by the State to CMS to set the annual caps is subject to review and audit, and if found to be inaccurate, will result in a modified budget neutrality expenditure limit. CMS' assessment of the State's compliance with these annual limits will be done using the Schedule C report from the CMS-64.

62. **Risk.** The State will be at risk for the per capita cost (as determined by the method described below) for demonstration populations as defined in STC 64, but not at risk for the number of beneficiaries in the demonstration population. By providing FFP without regard to enrollment in the demonstration populations, CMS will not place the State at risk for changing economic conditions that impact enrollment levels. However, by placing the State at risk for the per capita costs of current eligibles, CMS assures that the demonstration expenditures do not exceed the levels that would have been realized had there been no demonstration.

63. **Calculation of the Budget Neutrality Limit.** For the purpose of calculating the overall budget neutrality limit for the demonstration, separate annual budget limits will be calculated for each DY on a total computable basis, as described in STC 64 below. The annual limits will then be added together to obtain a budget neutrality limit for the entire demonstration period. The federal share of this limit will represent the maximum amount of FFP that the State may receive during the demonstration period for the types of demonstration expenditures described below. The federal share will be calculated by multiplying the total computable budget neutrality limit by the Composite Federal Share, which is defined in STC 65 below.

64. **Demonstration Populations Used to Calculate the Budget Neutrality Limit.** For each DY, separate annual budget limits of demonstration service expenditures will be calculated as the product of the trended monthly per person cost times the actual number of eligible/member months as reported to CMS by the State under the guidelines set forth in STC 73. The trend rates and per capita cost estimates for each Mandatory Enrollment Group (MEG) for each year of the demonstration are listed in the table below.

**Table 3 Per Capita Cost Estimate**

| MEG | TREND | DY 4 - PMPM | DY 5 - PMPM | DY 6 - PMPM | DY 7 - PMPM | DY 8 - PMPM |
|---|---|---|---|---|---|---|
| New Adult Group | 4.7% | \$570.50 | \$597.32 | \$625.39 | \$654.79 | \$685.56 |

a. If the State's experience of the take up rate for the new adult group and other factors that affect the costs of this population indicates that the PMPM limit

described above in paragraph (a) may underestimate the actual costs of medical assistance for the new adult group, the State may submit an adjustment to paragraph (a), along with detailed expenditure data to justify this, for CMS review without submitting an amendment pursuant to STC 7. Adjustments to the PMPM limit for a demonstration year must be submitted to CMS by no later than October 1 of the demonstration year for which the adjustment would take effect.

b. The budget neutrality cap is calculated by taking the PMPM cost projection for the above group in each DY, times the number of eligible member months for that group and DY, and adding the products together across DYs. The federal share of the budget neutrality cap is obtained by multiplying total computable budget neutrality cap by the federal share.

c. The State will not be allowed to obtain budget neutrality "savings" from this population.

65. **Composite Federal Share Ratio.** The Composite Federal Share is the ratio calculated by dividing the sum total of federal financial participation (FFP) received by the State on actual demonstration expenditures during the approval period, as reported through the MBES/CBES and summarized on Schedule C (with consideration of additional allowable demonstration offsets such as, but not limited to, premium collections) by total computable demonstration expenditures for the same period as reported on the same forms. Should the demonstration be terminated prior to the end of the extension approval period (see STC 9), the Composite Federal Share will be determined based on actual expenditures for the period in which the demonstration was active. For the purpose of interim monitoring of budget neutrality, a reasonable estimate of Composite Federal Share may be developed and used through the same process or through an alternative mutually agreed upon method.

66. **Future Adjustments to the Budget Neutrality Expenditure Limit.** CMS reserves the right to adjust the budget neutrality expenditure limit to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or policy interpretations implemented through letters, memoranda, or regulations with respect to the provision of services covered under the demonstration.

67. **Enforcement of Budget Neutrality.** CMS shall enforce budget neutrality over the life of the demonstration rather than on an annual basis. However, if the State's expenditures exceed the calculated cumulative budget neutrality expenditure cap by the percentage identified below for any of the demonstration years, the State must submit a corrective action plan to CMS for approval. The State will subsequently implement the approved corrective action plan.

**Table 4 Cap Thresholds**

| Year | Cumulative target definition | Percentage |
|---|---|---|
| DY 4 | Cumulative budget neutrality limit plus: | 0% |

| | | |
|---|---|---|
| DY 5 | Cumulative budget neutrality limit plus: | 0% |
| DY 6 | Cumulative budget neutrality limit plus: | 0% |
| DY 7 | Cumulative budget neutrality limit plus: | 0% |
| DY 8 | Cumulative budget neutrality limit plus: | 0% |

68. **Exceeding Budget Neutrality.** If at the end of the demonstration period the cumulative budget neutrality limit has been exceeded, the excess federal funds will be returned to CMS. If the demonstration is terminated prior to the end of the budget neutrality agreement, an evaluation of this provision will be based on the time elapsed through the termination date.

69. Impermissible DSH, Taxes or Donations. The CMS reserves the right to adjust the budget neutrality expenditure limit in order to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or with policy interpretations implemented through letters, memoranda, or regulations. CMS reserves the right to make adjustments to the budget neutrality expenditure limit if CMS determines that any health care-related tax that was in effect during the base year, or provider-related donation that occurred during the base year, is in violation of the provider donation and health care related tax provisions of Section 1903(w) of the Act. Adjustments to the budget neutrality agreement will reflect the phase-out of impermissible provider payments by law or regulation, where applicable.

## XIII. EVALUATION

70. **Evaluation Design and Implementation.** The State shall submit a draft evaluation design for Arkansas Works to CMS no later than 120 days after the award of the demonstration amendment. Such revisions to the evaluation design and the STCs shall not affect previously established timelines for report submission for the Health Care Independence Program. The state must submit a final evaluation design within 60 days after receipt of CMS' comments. Upon CMS approval of the evaluation design, the state must implement the evaluation design and submit their evaluation implementation progress in each of the quarterly and annual progress reports, including the rapid cycle assessments as outlined in the Monitoring Section of these STCs. The final evaluation design will be included as an attachment to the STCs. Per 42 CFR 431.424(c), the state will publish the approved evaluation design within 30 days of CMS approval.

71. **Evaluation Budget.** A budget for the evaluation shall be provided with the evaluation design. It will include the total estimated cost, as well as a breakdown of estimated staff, administrative and other costs for all aspects of the evaluation such as any survey and measurement development, quantitative and qualitative data collection and cleaning, analyses, and reports generation. A justification of the costs may be required by CMS if

the estimates provided do not appear to sufficiently cover the costs of the design or if CMS finds that the design is not sufficiently developed.

**72.** **Cost-effectiveness.** While not the only purpose of the evaluation, the core purpose of the evaluation is to support a determination as to whether the preponderance of the evidence about the costs and effectiveness of the Arkansas Works Demonstration using premium assistance when considered in its totality demonstrates cost effectiveness taking into account both initial and longer term costs and other impacts such as improvements in service delivery and health outcomes.

a. The evaluation will explore and explain through developed evidence the effectiveness of the demonstration for each hypothesis, including total costs in accordance with the evaluation design as approved by CMS.

b. Included in the evaluation will be examinations using a robust set of measures of provider access and clinical quality measures under the Arkansas Works demonstration compared to what would have happened for a comparable population in Medicaid fee-for-service.

c. The State will compare total costs under the Arkansas Works demonstration to costs of what would have happened under a traditional Medicaid expansion. This will include an evaluation of provider rates, healthcare utilization and associated costs, and administrative expenses over time.

d. The State will compare changes in access and quality to associated changes in costs within the Arkansas Works. To the extent possible, component contributions to changes in access and quality and their associated levels of investment in Arkansas will be determined and compared to improvement efforts undertaken in other delivery systems.

**73.** **Evaluation Requirements.** The demonstration evaluation will meet the prevailing standards of scientific and academic rigor, as appropriate and feasible for each aspect of the evaluation, including standards for the evaluation design, conduct, and interpretation and reporting of findings. The demonstration evaluation will use the best available data; use controls and adjustments for and reporting of the limitations of data and their effects on results; and discuss the generalizability of results.

The State shall acquire an independent entity to conduct the evaluation. The evaluation design shall discuss the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications the entity must possess, how the State will assure no conflict of interest, and a budget for evaluation activities.

**74.** **Evaluation Design.** The Evaluation Design shall include the following core components to be approved by CMS:

a. **Research questions and hypotheses:** This includes a statement of the specific research questions and testable hypotheses that address the goals of the demonstration. At a minimum, the research questions shall address the goals of improving access, reducing churning, improving quality of care thereby leading to enhanced health outcomes, and lowering costs. The research questions will have appropriate comparison groups and may be studied in a time series. The analyses of these research questions will provide the basis for a robust assessment of cost effectiveness.

The following are among the hypotheses to be considered in development of the evaluation design and will be included in the design as appropriate. Additional hypotheses relative to the new and revised components of the demonstration will also be included in the state's evaluation design.

i. Premium Assistance beneficiaries will have equal or better access to care, including primary care and specialty physician networks and services.
ii. Premium Assistance beneficiaries will have equal or better access to preventive care services.
iii. Premium Assistance beneficiaries will have lower non-emergent use of emergency room services.
iv. Premium Assistance beneficiaries will have fewer gaps in insurance coverage.
v. Premium Assistance beneficiaries will maintain continuous access to the same health plans, and will maintain continuous access to providers.
vi. Premium Assistance beneficiaries, including those who become eligible for Exchange Marketplace coverage, will have fewer gaps in plan enrollment, improved continuity of care, and resultant lower administrative costs.
vii. Premium Assistance beneficiaries will have lower rates of potentially preventable emergency department and hospital admissions.
viii. Premium assistance beneficiaries will report equal or better satisfaction in the care provided.
ix. Premium Assistance beneficiaries who are young adults eligible for EPSDT benefits will have at least as satisfactory and appropriate access to these benefits.
x. Premium Assistance beneficiaries will have appropriate access to non-emergency transportation.
xi. Premium Assistance will reduce overall premium costs in the Exchange Marketplace and will increase quality of care.
xii. The cost for covering Premium Assistance beneficiaries will be comparable to what the costs would have been for covering the same expansion group in Arkansas Medicaid fee-for-service in accordance with STC 72 on determining cost effectiveness and other requirements in the evaluation design as approved by CMS.

xiii. Incentive benefits offered to Arkansas Works beneficiaries will increase primary care utilization.

These hypotheses should be addressed in the demonstration reporting described in STC 82 and 83 with regard to progress towards the expected outcomes.

b. Data: This discussion shall include:

i. A description of the data, including a definition/description of the sources and the baseline values for metrics/measures;
ii. Method of data collection;
iii. Frequency and timing of data collection.

The following shall be considered and included as appropriate:

i. Medicaid encounters and claims data;
ii. Enrollment data; and
iii. Consumer and provider surveys

c. **Study Design**: The design will include a description of the quantitative and qualitative study design, including a rationale for the methodologies selected. The discussion will include a proposed baseline and approach to comparison; examples to be considered as appropriate include the definition of control and/or comparison groups or within-subjects design, use of propensity score matching and difference in differences design to adjust for differences in comparison populations over time. To the extent possible, the former will address how the effects of the demonstration will be isolated from those other changes occurring in the state at the same time through the use of comparison or control groups to identify the impact of significant aspects of the demonstration. The discussion will include approach to benchmarking, and should consider applicability of national and state standards. The application of sensitivity analyses as appropriate shall be considered

d. **Study Population**: This includes a clear description of the populations impacted by each hypothesis, as well as the comparison population, if applicable. The discussion may include the sampling methodology for the selected population, as well as support that a statistically reliable sample size is available.

e. **Access, Service Delivery Improvement, Health Outcome, Satisfaction and Cost Measures**: This includes identification, for each hypothesis, of quantitative and/or qualitative process and/or outcome measures that adequately assess the effectiveness of the demonstration. Nationally recognized measures may be used where appropriate. Measures will be clearly stated and described, with the numerator and dominator clearly defined. To the extent possible, the State may incorporate comparisons to national data and/or measure sets. A broad set of performance metrics may be selected from nationally recognized metrics, for

example from sets developed by the Center for Medicare and Medicaid Innovation, for meaningful use under HIT, and from the Medicaid Core Adult sets. Among considerations in selecting the metrics shall be opportunities identified by the State for improving quality of care and health outcomes, and controlling cost of care.

f. **Assurances Needed to Obtain Data**: The design report will discuss the State's arrangements to assure needed data to support the evaluation design are available.

g. **Data Analysis**: This includes a detailed discussion of the method of data evaluation, including appropriate statistical methods that will allow for the effects of the demonstration to be isolated from other initiatives occurring in the State. The level of analysis may be at the beneficiary, provider, and program level, as appropriate, and shall include population stratifications, for further depth. Sensitivity analyses may be used when appropriate. Qualitative analysis methods may also be described, if applicable.

h. **Timeline**: This includes a timeline for evaluation-related milestones, including those related to procurement of an outside contractor, and the deliverables outlined in this section. Pursuant to 42 CFR 431.424(c)(v), this timeline should also include the date by which the final summative evaluation report is due.

i. **Evaluator**: This includes a discussion of the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications that the selected entity must possess; how the state will assure no conflict of interest, and a budget for evaluation activities.

j. **State additions**: The state may provide to CMS any other information pertinent to the state's research on the policy operations of the demonstration operations. The state and CMS may discuss the scope of information necessary to clarify what is pertinent to the state's research.

**75. Interim Evaluation Report.** The state must submit a draft Interim Evaluation Report one year prior to this renewal period ending December 31, 2021. The Interim Evaluation Report shall include the same core components as identified in STC 74 for the Summative Evaluation Report and should be in accordance with the CMS approved evaluation design. The State shall submit the final Interim Evaluation Report within 30 days after receipt of CMS' comments. The state will submit an Interim Evaluation Report for the completed years of the demonstration, and for each subsequent renewal or extension of the demonstration, as outlined in 42 CFR 431.412(c)(2)(vi). When submitting an application for renewal, the Interim Evaluation Report should be posted to the state's website with the application for public comment. Also refer to Attachment C for additional information on the Interim Evaluation Report.

a. The Interim Evaluation Report will discuss evaluation progress and present findings to date as per the approved Evaluation Design.

b. For demonstration authority that expires prior to the overall demonstration's expiration date, the Interim Evaluation Report must include an evaluation of the authority as approved by CMS.

c. If the state is seeking to renew or extend the demonstration, the draft Interim Evaluation Report is due when the application for renewal is submitted. If the state made changes to the demonstration, the research questions, hypotheses and how the design was adapted should be included. If the state is not requesting a renewal for a demonstration, an Interim Evaluation report is due one (1) year prior to the end of the demonstration. For demonstration phase outs prior to the expiration of the approval period, the draft Interim Evaluation Report is due to CMS on the date that will be specified in the notice of termination or suspension.

d. The state will submit the final Interim Evaluation Report sixty (60) days after receiving CMS comments on the draft Interim Evaluation Report and post the document to the state's website.

e. The Interim Evaluation Report must comply with Attachment B of these STCs.

**76. Summative Evaluation Reports.**

a. The state shall provide the summative evaluation reports described below to capture the different demonstration periods.

i. The state shall provide a Summative Evaluation Report for the Arkansas Private Option demonstration period September 27, 2013 through December 31, 2016. This Summative Evaluation Report is due July 1, 2018, i.e., eighteen months following the date by which the demonstration would have ended except for this extension.

ii. The state shall submit a draft summative evaluation report for the Arkansas Works demonstration period starting January 1, 2017 through December 31, 2021. The draft summative evaluation report must be submitted within 18 months of the end of the approved period (December 31, 2021). The summative evaluation report must include the information in the approved evaluation design.

a. Unless otherwise agreed upon in writing by CMS, the state shall submit the final summative evaluation report within 60 days of receiving comments from CMS on the draft.

b. The final summative evaluation report must be posted to the state's Medicaid website within 30 days of approval by CMS.

b. The Summative Evaluation Report shall include the following core components:

i. **Executive Summary**. This includes a concise summary of the goals of the demonstration; the evaluation questions and hypotheses tested; and key findings including whether the evaluators find the demonstration to be budget neutral and cost effective, and policy implications.

ii. **Demonstration Description**. This includes a description of the demonstration programmatic goals and strategies, particularly how they relate to budget neutrality and cost effectiveness.

iii. **Study Design**. This includes a discussion of the evaluation design employed including research questions and hypotheses; type of study design; impacted populations and stakeholders; data sources; and data collection; analysis techniques, including controls or adjustments for differences in comparison groups, controls for other interventions in the State and any sensitivity analyses, and limitations of the study.

iv. **Discussion of Findings and Conclusions.** This includes a summary of the key findings and outcomes, particularly a discussion of cost effectiveness, as well as implementation successes, challenges, and lessons learned.

v. **Policy Implications**. This includes an interpretation of the conclusions; the impact of the demonstration within the health delivery system in the State; the implications for State and Federal health policy; and the potential for successful demonstration strategies to be replicated in other State Medicaid programs.

vi. **Interactions with Other State Initiatives**. This includes a discussion of this demonstration within an overall Medicaid context and long range planning, and includes interrelations of the demonstration with other aspects of the State's Medicaid program, and interactions with other Medicaid waivers, the SIM award and other federal awards affecting service delivery, health outcomes and the cost of care under Medicaid.

**77.** **State Presentations for CMS.** The State will present to and participate in a discussion with CMS on the final design plan, post approval, in conjunction with STC 74. The State will present on its interim evaluation in conjunction with STC 75. The State will present on its summative evaluation in conjunction with STC 76.

**78.** **Public Access.** The State shall post the final documents (e.g. Quarterly Reports, Annual Reports, Final Report, approved Evaluation Design, Interim Evaluation Report, and Summative Evaluation Report) on the State Medicaid website within 30 days of approval by CMS.

79. **Additional Publications and Presentations.** For a period of 24 months following CMS approval of the Summative Evaluation Report, CMS will be notified prior to the public release or presentation of these reports and related journal articles, by the State, contractor or any other third party. Prior to release of these reports, articles and other documents, CMS will be provided a copy including press materials. CMS will be given 30 days to review and comment on journal articles before they are released. CMS may choose to decline to comment or review some or all of these notifications and reviews.

80. **Cooperation with Federal Evaluators.** Should CMS undertake an evaluation of the demonstration or any component of the demonstration, the state shall cooperate timely and fully with CMS and its contractors. This includes, but is not limited to, submitting any required data to CMS or the contractor in a timely manner. Failure to cooperate with federal evaluators in a timely manner, including but not limited to entering into data use agreements covering data that the state is legally permitted to share, providing a technical point of contact, providing data dictionaries and record layouts of any data under control of the state that the state is legally permitted to share, and/or disclosing data may result in CMS requiring the state to cease drawing down federal funds until satisfactory cooperation, until the amount of federal funds not drawn down would exceed $5,000,000.

## XIV. MONITORING

81. **Monitoring Calls.** CMS will convene periodic conference calls with the state. The purpose of these calls is to discuss any significant actual or anticipated developments affecting the demonstration. CMS will provide updates on any amendments or concept papers under review, as well as federal policies and issues that may affect any aspect of the demonstration. The state and CMS will jointly develop the agenda for the calls. Areas to be addressed include, but are not limited to:

a. Transition and implementation activities;
b. Stakeholder concerns;
c. QHP operations and performance;
d. Enrollment;
e. Cost sharing;
f. Quality of care;
g. Beneficiary access,
h. Benefit package and wrap around benefits;
i. Audits;
j. Lawsuits;
k. Financial reporting and budget neutrality issues;
l. Progress on evaluation activities and contracts;
m. Related legislative developments in the state; and
n. Any demonstration changes or amendments the state is considering.

82. **Quarterly Reports.** The state must submit three Quarterly Reports and one compiled Annual Report each DY.

a. The state will submit the reports following the format established by CMS. All Quarterly Reports and associated data must be submitted through the designated electronic system(s). The Quarterly Reports are due no later than 60 days following the end of each demonstration quarter, and the compiled Annual Report is due no later than 90 days following the end of the DY.

b. The reports shall provide sufficient information for CMS to understand implementation progress of the demonstration, including the reports documenting key operational and other challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed.

c. Monitoring and performance metric reporting templates are subject to review and approval by CMS. Where possible, information will be provided in a structured manner that can support federal tracking and analysis.

d. The Quarterly Report must include all required elements and should not direct readers to links outside the report, except if listed in a Reference/Bibliography section. The reports shall provide sufficient information for CMS to understand implementation progress and operational issues associated with the demonstration and whether there has been progress toward the goals of the demonstration.

    i. **Operational Updates** - The reports shall provide sufficient information to document key operational and other challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed. The discussion should also include any lawsuits or legal actions; unusual or unanticipated trends; legislative updates; and descriptions of any public forums held.

    ii. **Performance Metrics** - Progress on any required monitoring and performance metrics must be included in writing in the Quarterly and Annual Reports. Information in the reports will follow the framework provided by CMS and be provided in a structured manner that supports federal tracking and analysis.

    iii. **Budget Neutrality and Financial Reporting Requirements** - The state must provide an updated budget neutrality workbook with every Quarterly and Annual Report that meets all the reporting requirements for monitoring budget neutrality set forth in the General Financial Requirements section of these STCs, including the submission of corrected budget neutrality data upon request. In addition, the state must report quarterly expenditures associated

with the populations affected by this demonstration on the Form CMS-64.

iv. **Evaluation Activities and Interim Findings**. The state shall include a summary of the progress of evaluation activities, including key milestones accomplished, as well as challenges encountered and how they were addressed. The state shall specify for CMS approval a set of performance and outcome metrics and network adequacy, including their specifications, reporting cycles, level of reporting (e.g., the state, health plan and provider level, and segmentation by population) to support rapid cycle assessment in trends for monitoring and evaluation of the demonstration.

e. The Annual Report must include all items included in the preceding three quarterly reports, which must be summarized to reflect the operation/activities throughout the whole DY. All items included in the quarterly report pursuant to STC 86 must be summarized to reflect the operation/activities throughout the DY. In addition, the annual report must, at should include the requirements outlined below.

i. Total annual expenditures for the demonstration population for each DY, with administrative costs reported separately;
ii. Total contributions, withdrawals, balances, and credits; and,
iii. Yearly unduplicated enrollment reports for demonstration beneficiaries for each DY (beneficiaries include all individuals enrolled in the demonstration) that include the member months, as required to evaluate compliance with the budget neutrality agreement.

**83.** **Final Report.** Within 120 days after the expiration of the demonstration, the state must submit a draft Close Out Report to CMS for comments.

a. The draft report must comply with the most current guidance from CMS.

b. The state will present to and participate in a discussion with CMS on the Close-Out report.

c. The state must take into consideration CMS' comments for incorporation into the final Close Out Report.

d. The final Close Out Report is due to CMS no later than thirty (30) days after receipt of CMS' comments.

e. A delay in submitting the draft or final version of the Close Out Report may subject the state to penalties described in STC 6.

ATTACHMENT A
Copayment Amounts[1]

| General Service Description | Cost Sharing for Beneficiaries with Incomes >100% FPL |
|---|---|
| Behavioral Health - Inpatient | $60 |
| Behavioral Health - Outpatient | $4 |
| Behavioral Health - Professional | $4 |
| Durable Medical Equipment | $4 |
| Emergency Room Services | - |
| FQHC | $8 |
| Inpatient | $60 |
| Lab and Radiology | - |
| Skilled Nursing Facility | $20 |
| Other | $4 |
| Other Medical Professionals | $4 |
| Outpatient Facility | - |
| Primary Care Physician | $8 |
| Specialty Physician | $10 |
| Pharmacy - Generics | $4 |
| Pharmacy - Preferred Brand Drugs | $4 |
| Pharmacy - Non-Preferred Brand Drugs, including specialty drugs | $8 |

No copayments for individuals at or below 100% FPL.

[1] Beneficiaries with incomes above 100% FPL will also be required to pay monthly premiums of up to 2 percent of household income.

ATTACHMENT B
Preparing the Interim and Summative Evaluation Reports